# Exhibit 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM 40-F**

(Check One)

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13(a) OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended:        December 31, 2019        Commission File Number:        001-39034

# BELLUS HEALTH INC.

(Exact name of Registrant as specified in its charter)

**Canada**

(Province or other jurisdiction of incorporation or organization)

**2834**

(Primary Standard Industrial Classification Code Number (if applicable))

**Not Applicable**

(I.R.S. Employer Identification Number (if applicable))

**275 Armand-Frappier Blvd.**
**Laval, Quebec H7V 4A7, Canada**
**Telephone: (450) 680-4525**

(Address and telephone number of Registrant's principal executive offices)

**C T Corporation System**
**1015 15th Street, NW, Suite 1000**
**Washington, District of Columbia 20005**
**Telephone: (202) 572-3111**

(Name, address (including zip code) and telephone number (including area code)
of agent for service in the United States)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares | BLU | The NASDAQ Stock Market LLC |

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**

(Title of Class)

For annual reports, indicate by check mark the information filed with this Form:

☒ Annual Information    ☒ Audited Annual Financial Statements
Form

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report: 55,378,660

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒        No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

Yes ☒        No ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 12b-2 of the Exchange Act.

Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐



## EXPLANATORY NOTE

BELLUS Health Inc. (the "**Registrant**") is a Canadian corporation eligible to file its Annual Report pursuant to Section 13(a) of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), on Form 40-F. The Registrant is a "foreign private issuer" as defined in Rule 3b-4 under the Exchange Act. Equity securities of the Registrant are accordingly exempt from Sections 14(a), 14(b), 14(c), 14(f) and 16 of the Exchange Act pursuant to Rule 3a12-3 thereunder.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this Annual Report on Form 40-F are forward-looking statements within the meaning of Section 21E of the Exchange Act and Section 27A of the United States Securities Act of 1933, as amended (the "**Securities Act**"). Additionally, the safe harbor provided in Section 21E of the Exchange Act and Section 27A of the Securities Act applies to any forward-looking information provided pursuant to "Off-Balance Sheet Arrangements" and "Disclosure of Contractual Obligations" in this Annual Report on Form 40-F. Please see "Forward-Looking Statements" beginning on page 1 of the Management Discussion and Analysis for the fiscal year ended December 31, 2019 of the Registrant, attached as Exhibit 99.3 to this Annual Report on Form 40-F, and "Forward-Looking Statements" beginning on page 1 of the Annual Information Form for the fiscal year ended December 31, 2019 of the Registrant, attached as Exhibit 99.1 to this Annual Report on Form 40-F.

## NOTE TO UNITED STATES READERS – DIFFERENCES IN UNITED STATES AND CANADIAN REPORTING PRACTICES

The Registrant is permitted, under a multijurisdictional disclosure system adopted by the United States, to prepare this Annual Report on Form 40-F in accordance with Canadian disclosure requirements, which are different from those of the United States.

The Registrant prepares its consolidated financial statements, which are filed with this Annual Report on Form 40-F, in accordance with International Financial Reporting Standards, as issued by the International Accounting Standards Board ("**IFRS**"). IFRS differ in some significant respects from United States generally accepted accounting principles ("**U.S. GAAP**"), and thus the Registrant's financial statements may not be comparable to the financial statements of United States companies. These differences between IFRS and U.S. GAAP might be material to the financial information presented in this Annual Report on Form 40-F. In addition, differences may arise in subsequent periods related to changes in IFRS or U.S. GAAP or due to new transactions that the Registrant enters into. The Registrant is not required to prepare a reconciliation of its consolidated financial statements and related footnote disclosures between IFRS and U.S. GAAP and has not quantified such differences. The prior audit period is subject to Canadian auditing and auditor independence standards.

Unless otherwise indicated, all dollar amounts in this Annual Report on Form 40-F are in Canadian dollars. The exchange rate of Canadian dollars into United States dollars, on December 31, 2019, based upon the Bank of Canada published daily exchange rate, was U.S.$1.00 = CDN$1.2988.

Purchasing, holding, or disposing of securities of the Registrant may have tax consequences under the laws of the United States and Canada that are not described in this Annual Report on Form 40-F.

## PRINCIPAL DOCUMENTS

***Annual Information Form***

The Registrant's Annual Information Form for the fiscal year ended December 31, 2019 is filed as Exhibit 99.1 and incorporated by reference in this Annual Report on Form 40-F.

***Audited Annual Financial Statements***

The audited consolidated financial statements of the Registrant for the fiscal year ended December 31, 2019 and 2018, including the Report of Independent Registered Public Accounting Firm with respect thereto, are filed as Exhibit 99.2 and incorporated by reference in this Annual Report on Form 40-F.

***Management Discussion and Analysis***

The Registrant's Management Discussion and Analysis for the fiscal year ended December 31, 2019 is filed as Exhibit 99.3 and incorporated by reference in this Annual Report on Form 40-F.

## CONTROLS AND PROCEDURES

***Certifications***

The required certifications are included in Exhibits 99.4, 99.5, 99.6 and 99.7 of this Annual Report on Form 40-F.

***Disclosure Controls and Procedures***

At the end of the period covered by this report, an evaluation of the effectiveness of the design and operation of the Registrant's "disclosure controls and procedures" (as such term is defined in Rules 13a-15(e) under the Exchange Act) was carried out by the Registrant's principal executive officer and principal financial officer. Based upon that evaluation, the Registrant's principal executive officer and principal financial officer have concluded that, as of the end of the period covered by this report, the design and operation of the Registrant's disclosure controls and procedures are effective to ensure that (i) information required to be disclosed in reports that the Registrant files or submits to regulatory authorities is recorded, processed, summarized and reported within the time periods specified by regulation, and (ii) is accumulated and communicated to management, including the Registrant's principal executive officer (the "**CEO**") and principal financial officer (the "**CFO**"), to allow timely decisions regarding required disclosure.

It should be noted that while the Registrant's CEO and CFO believe that the Registrant's disclosure controls and procedures provide a reasonable level of assurance that they are effective, they do not expect that the Registrant's disclosure controls and procedures will prevent all errors and fraud. A control system, no matter how well conceived or operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.

***Management Report on Internal Control Over Financial Reporting***

This Annual Report on Form 40-F does not include a report of management's assessment regarding internal control over financial reporting due to a transition period established by rules of the United States Securities and Exchange Commission (the "**Commission**") for newly public companies.

***Attestation Report of Independent Auditor***

In accordance with the United States Jumpstart Our Business Startup Act (the "**JOBS Act**") enacted on April 5, 2012, the Registrant qualifies as an "emerging growth company" (an "**EGC**"), which entitles the Registrant to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not EGCs. Specifically, the JOBS Act defers the requirement to have the Registrant's independent auditor assess the Registrant's internal controls over financial reporting under Section 404(b) of the United States Sarbanes-Oxley Act of 2002. As such, the Registrant is exempted from the requirement to include an auditor attestation report in this Form 40-F for so long as the Registrant remains an EGC, which may be for as long as five years following its initial registration in the United States.

*Changes in Internal Control over Financial Reporting*

During the year ended December 31, 2019, there were no changes in the Registrant's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, the Registrant's internal control over financial reporting.

## NOTICES PURSUANT TO REGULATION BTR

There were no notices required by Rule 104 of Regulation BTR that the Registrant sent during the year ended December 31, 2019 concerning any equity security subject to a blackout period under Rule 101 of Regulation BTR.

## AUDIT COMMITTEE AND AUDIT COMMITTEE FINANCIAL EXPERT

*Audit Committee*

The Board of Directors has a separately-designated standing Audit Committee established in accordance with Section 3(a)(58)(A) of the Exchange Act for the purpose of overseeing the accounting and financial reporting processes of the Registrant and audits of the Registrant's annual financial statements. As of the date of this Annual Report on Form 40-F, the members of the Audit Committee are Pierre Larochelle (as Chairperson), Franklin M. Berger and Joseph Rus.

The Board of Directors of the Registrant has determined that all members of the Audit Committee are "independent," as such term is defined under the rules of The NASDAQ Stock Market LLC ("**NASDAQ**"). Further, the Registrant has determined that all members of the Audit Committee are financially literate, meaning that they must be able to read and understand fundamental financial statements.

*Audit Committee Financial Expert*

The Board of Directors of the Registrant has determined that Franklin M. Berger is an "audit committee financial expert," as defined in General Instruction B(8)(b) of Form 40-F. The U.S. Securities and Exchange Commission has indicated that the designation of Franklin M. Berger as an audit committee financial expert does not make him an "expert" for any purpose, impose any duties, obligations or liability on him that are greater than those imposed on members of the audit committee and board of directors who do not carry this designation or affect the duties, obligations or liability of any other member of the audit committee.

## CODE OF ETHICS

The Registrant has adopted a written code of ethics for its directors, officers and employees entitled "BELLUS Health Inc. Code of Ethics" (the "**Code**") that complies with Section 406 of the Sarbanes-Oxley Act of 2002 and with NASDAQ Listing Rule 5610. The Code includes, among other things, written standards for the Registrant's principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions, which are required by the Commission for a code of ethics applicable to such officers. A copy of the Code is posted on the Registrant's website at www.bellushealth.com under the Investors & Media tab and under the Corporate Governance tab under the Documents & Charters tab (titled "Code of Ethics").

No substantive amendments to the Code were adopted during the year ended December 31, 2019. No "waiver" or "implicit waiver," as such terms are defined in Note 6 to General Instruction B(9) of Form 40-F, was granted relating to any provision of the Code during the year ended December 31, 2019.

## PRINCIPAL ACCOUNTANT FEES AND SERVICES

KPMG LLP has served as the Registrant's auditing firm since 1995. Aggregate fees billed to the Registrant for professional services rendered by KPMG LLP and its affiliates during the fiscal years ended December 31, 2019 and December 31, 2018 are detailed below (stated in Canadian dollars):

| | Fiscal 2019 | | Fiscal 2018 | |
|---|---|---|---|---|
| Audit Fees | $ | 264,500 | $ | 142,500 |
| Audit-Related Fees | $ | 20,150 | $ | 12,000 |
| Tax Fees | $ | 8,500 | $ | 8,500 |
| All Other Fees | $ | Nil | $ | Nil |
| **Total Fees** | $ | 293,150 | $ | 163,000 |

The nature of each category of fees is as follows:

### Audit Fees

Audit fees were paid for professional services rendered by the auditors for the annual audit of the Registrant's consolidated financial statements, quarterly reviews of the Registrant's interim financial statements, services provided in connection with statutory and regulatory filings, and work in connection with registration statements filed in the United States and prospectuses filed in Canada.

### Audit-Related Fees

Audit-related fees consist of the aggregate fees billed for assurance and related services that are reasonably related to the performance of the audit or review of the Registrant's financial statements and are not reported under the Audit Fees item above. This category is comprised of fees billed for the provision of French translation services.

### Tax Fees

Tax fees include fees billed for tax compliance.

### All Other Fees

All Other Fees include the aggregate fees billed for products and services provided by the auditors, other than the services reported above.

### Pre-Approval Policies and Procedures

All audit and non-audit services performed by the Registrant's auditor must be pre-approved by the Audit Committee of the Registrant. For the fiscal year ended December 31, 2019, all audit and non-audit services performed by the Registrant's auditor were pre-approved by the Audit Committee of the Registrant, pursuant to Rule 2-01(c)(7)(i) of Regulation S-X.

## OFF-BALANCE SHEET ARRANGEMENTS

As of December 31, 2019, the Registrant does not have any "off-balance sheet arrangements" (as that term is defined in paragraph 11(ii) of General Instruction B to Form 40-F) that have or are reasonably likely to have a current or future effect on its financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

**DISCLOSURE OF CONTRACTUAL OBLIGATIONS**

The following table lists, as of December 31, 2019, information with respect to the Registrant's known contractual obligations:

**Payments Due by Period (All amounts in thousands of Canadian dollars)**

| Contractual Obligations | Less than 1 year | 1-3 years | 3-5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Long-Term Debt Obligations | Nil | Nil | Nil | Nil | Nil |
| Lease Liabilities | 230 | 29 | Nil | Nil | 259 |
| Purchase Obligations | 11,216 | 116 | Nil | Nil | 11,332 |
| Other Long-Term Liabilities Reflected on the Company's Balance Sheet | Nil | Nil | Nil | Nil | Nil |
| Total | 21,390 | 145 | Nil | Nil | 21,535 |

**INTERACTIVE DATA FILE**

The Registrant is submitting as Exhibit 101 to this Annual Report on Form 40-F its Interactive Data File.

**MINE SAFETY DISCLOSURE**

Not applicable.

**CORPORATE GOVERNANCE**

The Registrant is a "foreign private issuer" as defined in Rule 3b-4 under the Exchange Act and its common shares are listed on NASDAQ. NASDAQ Marketplace Rule 5615(a)(3) permits a foreign private issuer to follow its home country practices in lieu of certain requirements in the NASDAQ Listing Rules. A foreign private issuer that follows home country practices in lieu of certain corporate governance provisions of the NASDAQ Listing Rules must disclose each NASDAQ corporate governance requirement that it does not follow and include a brief statement of the home country practice the issuer follows in lieu of the NASDAQ corporate governance requirement(s), either on its website or in its annual filings with the Commission. A description of the significant ways in which the Registrant's corporate governance practices differ from those followed by domestic companies pursuant to the applicable NASDAQ Listing Rules is disclosed on the Registrant's website at www.bellushealth.com under the Investors & Media tab and under the Corporate Governance tab under the Documents & Charters tab (titled "Nasdaq Statements of Governance Differences").

**UNDERTAKING**

The Registrant undertakes to make available, in person or by telephone, representatives to respond to inquiries made by the Commission staff, and to furnish promptly, when requested to do so by the Commission staff, information relating to: the securities registered pursuant to Form 40-F; the securities in relation to which the obligation to file an Annual Report on Form 40-F arises; or transactions in said securities.

**CONSENT TO SERVICE OF PROCESS**

The Registrant filed an Appointment of Agent for Service of Process and Undertaking on Form F-X with the Commission on September 3, 2019 with respect to the class of securities in relation to which the obligation to file this Annual Report on Form 40-F arises.

Any change to the name or address of the Registrant's agent for service of process shall be communicated promptly to the Commission by an amendment to the Form F-X referencing the file number of the Registrant.

**EXHIBIT INDEX**

| Exhibit No. | Title of Exhibit |
|---|---|
| 99.1 | Annual Information Form of the Registrant for the year ended December 31, 2019 |
| 99.2 | Audited Consolidated Financial Statements of the Registrant for the year ended December 31, 2019 and 2018, together with the Auditors' Reports thereon |
| 99.3 | Management Discussion and Analysis of the Registrant for the year ended December 31, 2019 |
| 99.4 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the United States Securities Exchange Act of 1934 |
| 99.5 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the United States Securities Exchange Act of 1934 |
| 99.6 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the United States Sarbanes Oxley Act of 2002 |
| 99.7 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the United States Sarbanes Oxley Act of 2002 |
| 99.8 | Consent of Independent Registered Public Accounting Firm – KPMG LLP |
| 101 | XBRL Document |

**SIGNATURES**

Pursuant to the requirements of the Exchange Act, the Registrant certifies that it meets all of the requirements for filing on Form 40-F and has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BELLUS Health Inc.**

By:   /s/ Roberto Bellini

Name: Roberto Bellini

Title: President and Chief Executive Officer

Date: February 27, 2020

**Exhibit 99.1**



**BELLUS HEALTH INC.**
**ANNUAL INFORMATION FORM**
**Fiscal year ended December 31, 2019**

**February 26, 2020**

**TABLE OF CONTENTS**

| | |
|---|---|
| **CORPORATE STRUCTURE** | **3** |
| Name, Address and Incorporation | 3 |
| Intercorporate Relationships | 3 |
| **BUSINESS** | **3** |
| Overview | 3 |
| 2019 Highlights and Recent 2020 Developments | 4 |
| September 2019 Equity Offering, Nasdaq Listing and Share Consolidation | 4 |
| Our Strategy | 5 |
| Our Pipeline | 6 |
| Appointment of a Chief Medical Officer | 18 |
| Intellectual Property | 18 |
| License Agreement | 19 |
| Human Resources | 20 |
| Facilities | 20 |
| **RISK FACTORS** | **20** |
| **DIVIDENDS** | **39** |
| **DESCRIPTION OF CAPITAL STRUCTURE** | **39** |
| **MARKET FOR SECURITIES** | **40** |
| **PRIOR SALES** | **40** |
| **DIRECTORS AND OFFICERS** | **41** |
| **LEGAL PROCEEDINGS AND REGULATORY ACTIONS** | **43** |
| **INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS** | **43** |
| **AUDIT COMMITTEE AND PRINCIPAL ACCOUNTANTS FEES AND SERVICES** | **43** |
| **TRANSFER AGENT AND REGISTRAR** | **44** |
| **INTEREST OF EXPERTS** | **45** |
| **ADDITIONAL INFORMATION** | **45** |
| **SCHEDULE A AUDIT COMMITTEE CHARTER** | **46** |

*As used in this annual information form, unless the context otherwise requires, the terms "we", "us", "our", "BELLUS Health" or the "Company" mean or refer to BELLUS Health Inc. and its subsidiaries and its Affiliates (as such term is defined in this annual information form). All currency figures reported in this document are in CDN dollars, unless otherwise specified.*

**FORWARD-LOOKING STATEMENTS**

Certain statements contained in this annual information form may constitute "forward-looking information" within the meaning of applicable securities laws in Canada and "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, as amended (collectively, "forward-looking statements"), which involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These forward-looking statements include information about possible or assumed future results of our business, financial condition, results of operations, liquidity, objectives and strategies to achieve those objectives, as well as statements with respect to our beliefs, targets, expectations, anticipations, estimates or intentions. In some cases, you can identify forward-looking statements by terminology such as "believe", "may", "estimate", "continue", "anticipate", "intend", "should", "plan", "expect", "predict", "potential", "could", "assume", "project", "guidance" or the negative of these terms or other similar expressions, although not all forward-looking statements include such words. The statements we make regarding the following matters are forward-looking by their nature and are based on certain of the assumptions noted below:

- our aim to develop and commercialize BLU-5937 for the treatment of hypersensitization disorders, including chronic cough and chronic pruritus;
- our aim to complete additional preclinical studies on BLU-5937;
- our aim to pursue the Phase 2 clinical trial on BLU-5937 for the treatment of patients with refractory chronic cough in 2019 with topline data in mid-2020, and initiate later stage clinical studies thereafter;
- our aim to initiate a Phase 2 clinical trial on BLU-5937 for the treatment of patients with chronic pruritus associated with atopic dermatitis, in Q2 2020, with topline data expected in mid-2021;
- our aim to further explore the potential of BLU-5937 for the treatment of other afferent hypersensitization-related conditions;
- our expectations relating to the timing and cost of significant preclinical study and clinical trial milestones;
- our expectations with respect to the timing and cost of the research and development activities of BLU-5937;
- the function, potential benefits, effectiveness and safety of our product candidates, including BLU-5937;
- our expectations with respect to pre-commercialization activities related to the commercial launch of BLU-5937;
- our estimates and assessment of the potential markets for our product candidates;
- our expectations regarding pricing and acceptance of our product candidates by the market;
- the benefits and risks of our product candidates as compared to others;
- our aim to obtain regulatory approvals to market our product candidates;
- our expectations with respect to the cost of preclinical studies and clinical trials and commercialization of our product candidates, including BLU-5937;
- our current and future capital requirements and anticipated sources of financing or revenue;
- our expectations regarding the protection of our intellectual property;
- our business strategy;
- potential milestone payments and royalties pursuant to license agreements and other partnerships; and
- our development and partnership plans and objectives.

The preceding list is not intended to be an exhaustive list of all of our forward-looking statements.

Conclusions, forecasts and projections set out in forward-looking information are based on our current objectives and strategies and on expectations and estimates and other factors and assumptions that we believe to be reasonable at the time applied but may prove to be incorrect. These include, but are not limited to:

1

- the function, potential benefits, effectiveness and safety of BLU-5937;
- the benefits and risks of our product candidates as compared to others;
- progress, timing and costs related to the development, completion and potential commercialization of our product candidate;
- estimates and projections regarding our industry;
- market acceptance of our product candidate;
- future success of current research and development activities;
- achievement of development and commercial milestones, including forecasted preclinical study and clinical trial milestones;
- our reliance on third parties to conduct preclinical studies and clinical trials for BLU-5937;
- that the timeline and costs for our preclinical and clinical programs are not incorrectly estimated or affected by unforeseen circumstances;
- absence of material deterioration in general business and economic conditions;
- the receipt of regulatory and governmental approvals for research and development projects and timing thereof;
- the availability of tax credits and financing for research and development projects, and the availability of financing on favorable terms;
- the accuracy of our estimates regarding future financing and capital requirements and expenditures;
- the achievement of our forecasted cash burn rate;
- the sufficiency and validity of our intellectual property rights;
- our ability to secure, maintain and protect our intellectual property rights, and to operate without infringing on the proprietary rights of others or having third parties circumvent the rights owned or licensed by us;
- our ability to source and maintain licenses from third-party owners on acceptable terms and conditions;
- absence of significant changes in Canadian dollar-U.S. dollar and other foreign exchange rates or significant variability in interest rates;
- the absence of material changes in market competition;
- our ability to attract and retain skilled staff;
- our ability to maintain ongoing relations with employees and business partners, suppliers and other third parties;
- the accuracy of the market research, third-party industry data and forecasts relied upon by us; and
- the absence of adverse changes in relevant laws or regulations.

There are important factors that could cause our actual results, levels of activity, performance or achievements to differ materially from the results, levels of activity, performance or achievements expressed or implied by the forward-looking statements. See "Risk Factors" in this annual information form. Should one or more of the risks, uncertainties or other factors outlined in this annual information form materialize, our objectives, strategies or intentions change, or any of the factors or assumptions underlying the forward-looking information prove incorrect, our actual results and our plans and targets could vary significantly from what we currently foresee. Accordingly, we warn investors to exercise caution when considering statements containing forward-looking information and that it would be unreasonable to rely on such statements as creating legal rights regarding our future results or plans or targets. All of the forward-looking information in this annual information form is qualified by the cautionary statements herein.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this annual information form, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that future results, levels of activity, performance and events and circumstances reflected in the forward-looking statements will be achieved or will occur. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason after the date of this annual information form, to conform these statements to actual results or to changes in our expectations.

*Unless otherwise noted, all information in this annual information form is presented as at December 31, 2019.*

## CORPORATE STRUCTURE

### NAME, ADDRESS AND INCORPORATION

The company was incorporated on April 12, 2012 under the *Canada Business Corporations Act* and is the successor of BELLUS Health Inc., a company incorporated on June 17, 1993 (known as Neurochem Inc. prior to April 15, 2008).

Our outstanding common shares are listed on the Toronto Stock Exchange ("**TSX**") and on the Nasdaq Capital Market ("**NASDAQ**") under the symbol "**BLU**".

Our head office is located at 275 Armand-Frappier Boulevard, Laval, Quebec H7V 4A7, Canada.

### INTERCORPORATE RELATIONSHIPS

As at February 26, 2020, we have two wholly-owned subsidiaries, BELLUS Health Cough Inc., also incorporated under the *Canada Business Corporations Act*, and BELLUS Health Corp., incorporated under the laws of the State of Delaware.

## BUSINESS

### OVERVIEW

We are a clinical stage biopharmaceutical company focused on the development of novel therapeutics for the treatment of chronic cough and other hypersensitization disorders. Our product candidate, BLU-5937, is a twice daily oral small molecule specifically designed to be a highly selective antagonist of the P2X3 receptor, a clinically validated target linked to hypersensitivity. We are developing BLU-5937 for the treatment of chronic cough and chronic pruritus, or chronic itch. These hypersensitization-related disorders, which share a common pathophysiology that is mediated through the P2X3 receptor, represent areas of significant unmet medical need and potentially large market opportunities. We believe BLU-5937's characteristics shown in our preclinical studies and Phase 1 trial position it as a differentiated treatment option in the P2X3 antagonists class.

In July 2019, we enrolled our first patient in our ongoing Phase 2 clinical trial for BLU-5937 for the treatment of refractory chronic cough. The end of patient enrollment is expected by the end of March 2020, with topline data expected in mid-2020. We also expect to initiate a Phase 2 clinical trial of BLU-5937 for the treatment of chronic pruritus associated with atopic dermatitis, also known as eczema, in Q2 2020, with topline data expected in mid-2021. We have exclusive worldwide development and commercialization rights to BLU-5937 in all indications.

We believe that BLU-5937 has best-in-class selectivity for the homotrimeric P2X3 receptor, or "P2X3". Given this selectivity, we believe that BLU-5937 has the potential to significantly alleviate refractory chronic cough and chronic pruritus symptoms while limiting or potentially eliminating the taste loss and taste alteration observed with the most advanced P2X3 receptor antagonist in development, Merck & Co.'s gefapixant, which has low selectivity for P2X3. While we are initially focused on development in chronic cough and chronic pruritus, we are also evaluating the potential role of P2X3 inhibition in the treatment of other afferent hypersensitization-related disorders

**2019 Highlights and Recent 2020 Developments**

- **Ongoing Phase 2 RELIEF trial of BLU-5937 for the treatment of refractory chronic cough, with top-line results anticipated in mid-2020.**
  In July 2019, we enrolled the first patient in the Phase 2 RELIEF trial of BLU-5937 for the treatment of refractory chronic cough. We expect to complete patient enrollment by the end of March with topline results anticipated in mid-2020.
- **Completed a clinical Phase 1 drug-drug interaction ("DDI") trial of BLU-5937 in 28 healthy adult subjects demonstrating no clinically significant interaction with CYP3A4, OATP1B1 and BCRP.**
  In December 2019, we completed a DDI trial which indicated that the administration of BLU-5937 should not affect the elimination of other drugs that are substrates of these enzymes/transporters. BLU-5937 was found to be safe and generally well tolerated in the trial (200 mg BID dose administered for 10 days). Two subjects out of 28 (7%) reported a mild taste alteration, which occurred only on the first day of dosing.
- **Closed a US$79.4 million equity offering and began trading on the NASDAQ.**
  In September 2019, we completed an offering of our common shares resulting in gross proceeds to BELLUS Health of US$79.4 million. Concurrently with the pricing of our equity offering, our common shares began trading on the NASDAQ on September 5, 2019.
- **Appointed Catherine Bonuccelli, MD as Chief Medical Officer.**
  In August 2019, we hired Dr. Bonuccelli, who brings over 20 years of pharmaceutical experience at GlaxoSmithKline ("GSK") and Astra Zeneca with significant expertise in clinical development of respiratory products.
- **Obtained Clearance of U.S. IND for the BLU-5937 Phase 2 trial in chronic pruritus; Phase 2 trial to commence Q2 2020.**
  On February 20, 2020, the U.S. Food and Drug Administration ("FDA") accepted our Investigational New Drug ("IND") application for BLU-5937 for the treatment of chronic pruritus associated with AD, also known as eczema. The clinical Phase 2 trial is expected to be initiated in Q2 2020. In July 2019, we announced that we were expanding our BLU-5937 P2X3 antagonist platform to include chronic pruritus and in September 2019, presented preclinical data on BLU-5937 in pruritus at the European Society for Dermatological Research Conference.
- **Held a Key Opinion Leader ("KOL") meeting to discuss the state of chronic cough treatment.**
  In July 2019, we held a KOL, which was led by Dr. Jacky Smith, Professor at the University of Manchester, United Kingdom, to discuss chronic cough and BLU-5937. A replay of the event is available on the Events & Presentations page of our website.
- **Ended the year with cash, cash equivalents and short-term investments totalling $116.9 million (US$90.0 million).**

**September 2019 Equity Offering, Nasdaq Listing and Share Consolidation**

In September 2019, we raised total gross proceeds of $104.6 million (US$79.4 million) by issuing a total of 11,179,451 common shares in the United States and in Canada (the "**2019 Offering**"). Concurrently with the pricing of our equity offering, our common shares began trading on the NASDAQ on September 5, 2019. Our common shares are now dual-listed on the NASDAQ and TSX.

4

On September 9, 2019, we closed an equity offering, issuing 9,859,155 common shares from treasury at a price of $9.35 (US$7.10) per share for gross proceeds of $92.2 million (US$70.0 million). On September 17, 2019, the underwriters of the equity offering partially exercised their option to purchase additional common shares (over-allotment option), resulting in the issuance of an additional 1,320,296 common shares from treasury at a price of $9.40 (US$7.10) per share, for additional gross proceeds of $12.4 million (US$9.4 million). We intend to use the net proceeds of the 2019 Offering, together with the cash, cash equivalents and short-term investments on hand at the time of closing, primarily to fund research and development activities, general and administrative expenses, working capital needs and other general corporate purposes.

Prior to the financing, we completed a share consolidation on the basis of one new common share for every 3.6 outstanding shares, effective on August 19, 2019, in order to increase our share price to allow listing on the NASDAQ. With the share consolidation, our number of outstanding common shares was reduced from approximately 159.1 million outstanding common shares to approximately 44.2 million outstanding common shares at August 19, 2019.

OUR STRATEGY

We are focused on the development and commercialization of BLU-5937 as a potential differentiated treatment option for chronic cough patients, as well as for the treatment of chronic pruritus associated with atopic dermatitis and other hypersensitization-related disorders. The key elements of our strategy are:

• *Advance the development of BLU-5937 in the treatment of chronic cough, our lead indication.* We are focused on efficiently developing BLU-5937 to treat patients with chronic cough. We are conducting a Phase 2 clinical trial to evaluate the efficacy, safety, and tolerability of BLU-5937 in refractory chronic cough patients at four doses: 25 mg, 50 mg, 100 mg and 200 mg BID. We enrolled the first patient in the RELIEF trial at the end of July 2019. The end of patient enrollment is expected by the end of March 2020, and we expect topline data in mid-2020. If our Phase 2 clinical trial is successful, we expect to initiate either a Phase 2b or a Phase 2/3 trial to further pursue the development of BLU-5937 for the treatment of chronic cough.

• *Advance the development of BLU-5937 in the treatment of chronic pruritus.* We expect to initiate a Phase 2 clinical trial in Q2 2020 to evaluate the efficacy, safety and tolerability of BLU-5937 in chronic pruritus associated with atopic dermatitis, a hypersensitization-related disorder, with topline data expected in mid-2021.

• *Maximize the value of BLU-5937 by maintaining flexibility to develop and commercialize our product independently or through collaborations.* We have exclusive worldwide development and commercialization rights for BLU-5937 in all indications. We may choose to pursue the development and commercialization of BLU-5937 independently or through collaborations with third parties.

• *Leverage our proprietary P2X3 antagonist technology platform to pursue other hypersensitization-related conditions.* We are evaluating the potential role of P2X3 inhibition in the treatment of other afferent hypersensitization-related disorders.

OUR PIPELINE

The following table sets forth the status of our BLU-5937 pipeline.

| PROGRAM | DEVELOPMENT | | | | STATUS | |
|---|---|---|---|---|---|---|
| Indication | Preclinical | Phase 1 | Phase 2 | Phase 3 | Worldwide Rights | Next Anticipated Milestone |
| **BLU-5937** | | | | | | |
| Refractory Chronic Cough | | | | | Bellus HEALTH | Mid-2020: Topline data |
| Chronic Pruritus Associated with Atopic Dermatitis | | | | | Bellus HEALTH | Q2 2020: Phase 2 initiation |

We are currently conducting a Phase 2 clinical trial of BLU-5937 patients with refractory chronic cough, which we refer to as the RELIEF (A Randomized, Double-blind, Placebo-Controlled, Crossover, Dose Escalation Study of BLU-5937 in Subjects with Refractory Chronic Cough) trial. The trial was initiated in July 2019 and we expect to report topline data in mid-2020.

Chronic cough, our lead indication for BLU-5937, is a cough lasting more than eight weeks, and may have a significant adverse impact on patients' quality of life. It is estimated that more than 26 million adults in the United States suffer from chronic cough, with more than 2.6 million of those people having refractory chronic cough lasting more than one year. Many patients report that their condition has a marked effect on their quality of life including sleep disruption, tiredness, incontinence, and disrupting social interactions. Currently, there is no therapy approved specifically for the treatment of refractory chronic cough. Available treatment options are limited and may have inadequate benefit and/or significant safety and tolerability issues, including significant taste alteration or loss. We believe that BLU-5937, if approved, may be adopted by physicians as an oral cough therapy either as an adjunct to treatments targeting the underlying cause of the chronic cough or as a monotherapy in patients for whom cough is the primary etiology.

In November 2018, we reported positive results from our Phase 1 clinical trial in 90 healthy volunteers, in which we observed that BLU-5937 had a favorable tolerability and safety profile at all doses tested. At doses of 50 mg to 100 mg, there was only one subject out of 24 (<5%) who reported taste alteration, which was transient, sporadic and only occurred on the first day of dosing. None of the 24 subjects (0%) reported any taste loss. We believe that doses of 50 mg to 100 mg administered twice-daily (BID) would result in the desired level of therapeutic activity. In contrast, gefapixant was reported to cause taste alteration and/or taste loss in up to 80% of patients at the therapeutically relevant dose of 50 mg BID in a Phase 2 clinical trial. We are currently conducting a Phase 2 clinical trial of BLU-5937 in patients with refractory chronic cough. This randomized, double-blind, placebo-controlled, dose-escalation, two-period crossover trial is designed to assess the efficacy, safety, and tolerability of BLU-5937 at four doses; 25, 50, 100 and 200 mg, administered orally, BID. Doses are escalated at four-day intervals. We expect that approximately 65 patients with refractory chronic cough will be enrolled at 16 clinical sites in the United Kingdom and the United States. We enrolled our first patient in July 2019, are actively recruiting patients and expect to report topline data in mid-2020.

Chronic pruritus, commonly known as chronic itch, our second indication for BLU-5937, is characterized as an ongoing, uncomfortable, irritating sensation that makes a person want to scratch, persists for more than six weeks and may have a significant adverse impact on patients' quality of life. Atopic dermatitis, also known as eczema, is a non-contagious itchy skin disorder characterized by the presence of dry and scaly patches on the skin of the scalp, forehead, arms, torso and face, particularly the cheeks. The itch associated with atopic dermatitis can be so intense that repeated scratching can lead to skin lesions, bleeding and infection. It is estimated that 16.9 million adults in the United States are affected by atopic dermatitis, with pruritus being the primary complaint among such patients. Of the total population of adults affected by atopic dermatitis in the United States, it is estimated that three million of those are diagnosed with the disease, and of those diagnosed, it is estimated that 2.25 million patients are actively being treated by a physician. Accordingly, we believe that there is a significant market opportunity for a therapy for chronic pruritus associated with atopic dermatitis. Despite currently available treatments, an estimated 40-50% of atopic dermatitis patients report having inadequate relief of their pruritus and are in need of new, efficacious pruritus therapies.

<u>Trial Design</u>

The clinical Phase 1 trial was a randomized, double-blind, placebo-controlled trial of orally administered BLU-5937 in 90 healthy adult subjects. The primary objectives of this trial were to assess the safety, tolerability (including taste perception) and pharmacokinetic profile of BLU-5937 in healthy subjects. The trial was divided in two parts:

**Part 1**. A single ascending dose (SAD) trial was conducted in 60 healthy subjects. Subjects were randomized into six cohorts of 10 subjects (8 BLU-5937: 2 placebo). The trial evaluated single oral doses of BLU-5937 from 50 to 1200 mg.

**Part 2**. A multiple ascending dose (MAD) trial was conducted in 30 healthy subjects. Subjects were randomized into three cohorts of 10 subjects (8 BLU-5937: 2 placebo). The trial evaluated multiple oral doses of BLU-5937 of 100, 200 and 400 mg administered twice-a-day (BID) for seven consecutive days.

<u>BLU-5937 Regulatory Pathway in Chronic Cough</u>

If the results of the RELIEF trial are positive, we expect to meet with the FDA and European regulatory authorities to discuss the registration pathway for BLU-5937 in chronic cough patients and the design of the next trial, including the target population, dose, duration and primary efficacy endpoint. We expect to initiate either a Phase 2b or a Phase 2/3 trial to further pursue the development of BLU-5937 for the treatment of chronic cough. We will then need to conduct an additional Phase 3 clinical trial to support the submission of a new drug application ("**NDA**") to the FDA and a marketing authorization application ("**MAA**") to the European Medicines Agency ("**EMA**") for BLU-5937 in chronic cough. If the results of these studies are positive, we would plan to seek approval for BLU-5937 for refractory chronic cough which, if successful, would lead to the marketing and sale of BLU-5937. See "Risk Factors".

<u>BLU-5937 Drug-Drug Interaction Trial</u>

We are pursuing BLU-5937 enabling activities to prepare our program for later stage clinical development. We completed in December 2019 a clinical Phase 1 drug-drug interaction (DDI) trial in 28 healthy adult subjects to study potential interactions of BLU-5937 (200 mg BID for 10 days) with CYP3A4, OATP1B1 and BCRP. This trial revealed that BLU-5937 is not a CYP3A4 inducer. BLU-5937 was shown to be a weak inhibitor of OATP1B1 and a very weak inhibitor of BCRP, which is not considered clinically meaningful at the predicted therapeutic doses studied in the Phase 2 RELIEF trial. These results indicate that the administration of BLU-5937 should not affect the elimination of other drugs that are substrates of these enzymes/transporters. Furthermore, the weak inhibition of OATP1B1 is consistent with the hypothesis that BLU-5937 is affecting bilirubin disposition at predicted supra-therapeutic doses. BLU-5937 was found to be safe and generally well tolerated in the trial. Only two subjects out of 28 (7%) reported a mild taste alteration, only on the first day of dosing.

<hr>

13

NEOMED will be entitled to receive a tiered, low single-digit royalty on net sales-based revenues. In lieu of milestone payments, a certain portion of all other revenues we receive from BLU-5937 (excluding revenues derived from commercial sales) will be shared with NEOMED in accordance with a pre-established schedule whereby the shared revenue portion decreases as the program progresses in development.

Our royalty obligation with respect to the licensed product in each country commences upon the first commercial sale of the product in that country and extends until the later of (i) the expiration, of the last valid claim of any licensed patent or application covering the licensed product in the country, or (ii) the expiration of the market exclusivity granted by a regulatory authority in that country allowing the exclusive commercialization of the product. Upon the expiration of the royalty term for a product in a country, we are obligated to pay a reduced royalty rate only if we are still generating revenues in a given country.

Both we and NEOMED have the right to terminate the agreement if the other party materially breaches the agreement and fails to cure the breach within specified cure periods. Either party also has the right to terminate in the event the other party undergoes specified bankruptcy, insolvency or liquidation events, and we have the right to terminate the agreement for our convenience at any time on 180 days' notice to NEOMED. We have diligence and reporting obligations under the agreement that require us to keep NEOMED informed of our research and development efforts and to use commercially reasonable efforts to commercialize at least one licensed product. See "Risk Factors" in this annual information form.

HUMAN RESOURCES

As at February 26, 2020, we employed 17 people.

FACILITIES

We leases office space in facilities located in the *Parc Scientifique de la Haute Technologie* in Laval, Quebec, Canada, pursuant to a lease originally entered into in March 2011. In March 2018, the lease was extended to January 31, 2020. In November 2019, we leased additional office space in the same facilities.

## RISK FACTORS

*Investing in our common shares involves a significant amount of risk. You should carefully consider the risks described below. If any of these risks actually occurs, our business, financial condition, results of operations or prospects could be materially adversely affected. These are not the only risks and uncertainties that we face. Additional risks and uncertainties not presently known to us, or that we currently consider immaterial, may also materially and adversely affect us. In such an event, the trading price of our common shares could decline and you may lose part or all of your investment in our securities. Any reference in this section to the Company's "products" or "product candidates" includes a reference to BELLUS Health's product candidate and future products or product candidates that may be developed.*

**Risks related to our business**

*We may not be able to maintain our operations and research and development without additional funding, and we may not have access to sufficient capital.*

To date, we have financed our operations primarily through public offerings of common shares, private placements, the issuance of convertible notes and research tax credits. We have incurred significant operating losses and negative cash flows from operations since inception. As at December 31, 2019, we had available cash, cash equivalents and short-term investments totaling $116.9 million (US$90.0 million). Based on management's estimate and current level of operations, we believe that our current liquidity position is sufficient to finance our operations into the foreseeable future. We will need to raise additional capital to fund our operations and to develop BLU-5937. Our future capital requirements will be substantial and may increase beyond current expectations depending on many factors, such as the duration, scope, rate of progress, results and costs of any preclinical studies and clinical trials for our current or any future product candidates; unexpected delays or developments in seeking regulatory approvals and the outcome thereof; the time and cost in preparing, filing, prosecuting, maintaining, and enforcing patent claims; other unexpected developments encountered in implementing our business development and commercialization strategies; the outcome of any litigation; and arrangements with collaborators. Further, changing circumstances may cause us to consume capital significantly faster than we currently anticipate. We have based the foregoing estimates on assumptions that may prove to be wrong, and we could utilize our available financial resources sooner than we currently expect.

20

We may seek to raise additional funds through public or private equity or debt financing, collaborations agreements with other companies and/or from other sources. We have no committed source of additional capital and additional funding may not be available on terms that are acceptable to us, or at all. If adequate funding is not available on reasonable terms, we may need to obtain funds on terms less favorable than we would otherwise accept. To the extent that additional capital is raised through the sale of equity or convertible debt securities, the issuance of those securities could result in dilution to our shareholders. Moreover, the incurrence of debt financing could result in a substantial portion of our future operating cash flow, if any, being dedicated to the payment of principal and interest on such indebtedness and could impose restrictions on operations. This could render us more vulnerable to competitive pressures and economic downturns. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we may have to significantly delay, scale back or discontinue the development or commercialization of BLU-5937 or other future product candidates or other research and development initiatives. We could be required to seek collaborators for our product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available or relinquish or license on unfavorable terms our rights to our product candidates in markets where we otherwise would seek to pursue development or commercialization ourselves.

No assurance can be given that any such additional funding will be available or that, if available, it can be obtained on terms favorable to us. The failure to obtain additional financing on favorable terms, or at all, could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We have a history of losses and have not generated any product sales revenue to date. We may never achieve or maintain profitability.***

Our product candidate, BLU-5937, is still only in development, and as a result, we have not generated any revenues from product sales to date. We have incurred substantial expenses in our efforts to develop BLU-5937, and consequently, have generated operating losses each year since our inception. For the years ended December 31, 2018 and 2019, we incurred net losses of $9.1 million and $34.5 million, respectively. As of December 31, 2019, we had an accumulated deficit of $522.5 million. Our losses have adversely affected, and will continue to adversely impact, working capital, total assets, and shareholders' equity. We do not expect to generate any revenues from product sales in the immediate future. We may never successfully commercialize any products. Even if we succeed in developing commercial products, we expect to incur additional operating losses for at least the next several years. If we do not ultimately commercialize products and achieve or maintain profitability, an investment in our shares could result in a significant or total loss.

***Our prospects currently depend heavily on the success and market acceptance of BLU-5937, which is still in clinical development.***

We currently have no products for sale and may never be able to successfully develop products for sale. We currently believe that our growth and future prospects are mainly dependent on the successful development, regulatory approval and commercialization of our product candidate BLU-5937, which may never occur. We are focusing our efforts and resources into the development of BLU-5937. Our business thus depends on the successful preclinical and clinical development, regulatory approval and commercialization of BLU-5937, for which we must conduct additional preclinical studies and clinical trials, undergo further development activities and seek and receive regulatory approval prior to commercial launch. Further development of BLU-5937 will require substantial investment, access to sufficient commercial manufacturing capacity and significant marketing efforts before we can generate any revenue from product sales, if approved.

We anticipate that our ability to generate revenues will depend on the commercial success of BLU-5937, which will depend upon its market acceptance by purchasers in the pharmaceutical market and the future market demand and medical need for products and research utilizing BLU-5937. Most prescription drug candidates never reach the clinical development stage and even those that do reach clinical development have only a small chance of successfully completing clinical development and gaining regulatory approval. If we are unable to successfully commercialize BLU-5937, we may never generate revenues. There is also the risk that the actual market size or opportunity for BLU-5937 is not certain. If BLU-5937 reaches commercialization and there is low market demand for BLU-5937 or the market for BLU-5937 develops less rapidly than we anticipate, we may not have the ability to shift our resources to the development of alternative products. Failure to gain market acceptance of BLU-5937 or an incorrect estimate in the nature and size of our market could have a material adverse effect on us.

21

***We rely on third parties to conduct preclinical studies and clinical trials for BLU-5937, and if they do not properly and successfully perform their obligations to us, we may not be able to obtain regulatory approvals for BLU-5937.***

We have designed the clinical trials for BLU-5937. However, we rely on contract research organizations and other third parties to assist in managing, monitoring and otherwise carrying out these trials. We compete with many other companies for the resources of these third parties. The third parties on whom we rely generally may terminate their engagements at any time, and having to enter into alternative arrangements would delay development and commercialization of our product candidate. The U.S. Food and Drug Administration, or the "**FDA**", and comparable foreign regulatory authorities require compliance with regulations and standards for designing, conducting, monitoring, recording, analyzing, and reporting the results of clinical trials to assure that the data and results are credible and accurate and that the rights, integrity and confidentiality of trial participants are protected. Although we rely on third parties to conduct our clinical trials, they are not our employees, and we are responsible for ensuring that each of these clinical trials is conducted in accordance with our general investigational plan, protocol and other requirements. Our reliance on these third parties for research and development activities will reduce our control over these activities but will not relieve us of our responsibilities.

If these third parties do not successfully carry out their duties under their agreements, if the quality or accuracy of the data they obtain is compromised due to their failure to adhere to clinical trial protocols or to regulatory requirements, or if they otherwise fail to comply with clinical trial protocols or meet expected deadlines, the clinical trials of BLU-5937 may not meet regulatory requirements. If clinical trials do not meet regulatory requirements or if these third parties need to be replaced, preclinical development activities or clinical trials may be extended, delayed, suspended or terminated. If any of these events occur, we may not be able to obtain regulatory approval of BLU-5937 on a timely basis or at all.

***We rely completely on one third-party contract manufacturer to manufacture the active pharmaceutical ingredient, or "API", for BLU-5937 and another third-party contract manufacturer to manufacture the final drug product, and we intend to rely on third parties to produce non-clinical, clinical and commercial supplies of BLU-5937 and any other future product candidates.***

We do not currently have, nor do we plan to acquire, the infrastructure or capability to internally manufacture our clinical drug supply of BLU-5937, or any other product candidates we may develop in the future, for use in the conduct of our research and development activities, preclinical studies and clinical trials, and we lack the internal resources and the capability to manufacture any product candidates on a clinical or commercial scale. We currently have the API for BLU-5937 manufactured by one third-party contract manufacturer and final drug product supplied by another contract manufacturer, and do not currently have backup manufacturing capacity.

We plan to continue to rely on contract manufacturers for the foreseeable future to produce quantities of products and substances necessary for research and development, preclinical studies, human clinical trials and product commercialization, and to perform their obligations in a timely manner and in accordance with applicable government regulations. While we intend to contract for the commercial manufacture of our product candidates, we may not be able to identify and qualify contractors or obtain favorable contracting terms.

Our third-party contract manufacturer for the API for BLU-5937 is located in China. The COVID-19 (coronavirus) outbreak could potentially disrupt the operations of such third-party contract manufacturer if any of its employees are suspected or have been infected by the virus, and identified as a possible source of spreading the infection. Our contract manufacturer may also be required to disinfect its production plant and therefore suffer a temporary suspension of business operations.

22

If our current or future third-party manufacturers do not perform as agreed, experience business disruptions as previously described, or breach or terminate their agreements with us, significant additional time and costs would be required to effect a transition to a new contract manufacturer. If we are unable to retain our current contractors, or are unable to secure arrangements with new contractors to provide manufacturing services in a timely manner and on acceptable terms as needed, it will delay or prevent the development, promotion, marketing, or sale of BLU-5937, if approved, or any other future product candidates we may develop, and have a negative effect on our operations and financial condition. Moreover, if a replacement to our current or future contract manufacturers is required, the ability to establish second-sourcing or find a replacement manufacturer may be difficult due to the lead times generally required to manufacture drug products and the need for regulatory compliance inspections and approvals of any replacement manufacturer, all of which factors could result in production delays and additional costs.

Manufacturing of API and final drug products is complex and requires significant expertise. Difficulties could be encountered in production, particularly in scaling up and validating production. There can be no assurance that contract manufacturers will be successful at scaling up and producing BLU-5937 with the required quality and in the quantities and timelines that will be needed for clinical and/or commercial purposes. So far, we have only produced small quantities of BLU-5937 at kilogram scale for use in preclinical studies and clinical trials.

Our reliance on these contract manufacturers also exposes us to the possibility that they, or third parties with access to their facilities, will have access to and may appropriate our trade secrets or other proprietary information.

We rely on third-party contract manufacturers that are located outside of Canada. As a result, our operations are subject to customary risks related to the import of goods, including fluctuations in the value of currencies, changes in import duties, exchange controls, trade restrictions, work stoppages and general political and economic conditions in foreign countries. The countries from which we import pharmaceutical ingredients may, from time to time, impose new duties, tariffs or other restrictions or adjust presently prevailing duties or tariffs, which could adversely impact our ability to purchase such pharmaceutical ingredients or significantly increase the cost of doing so. The occurrence of any of these risks could delay or prevent the development, promotion, marketing, or sale of BLU-5937, if approved, or of any other future product candidates we may develop, and have a negative effect on our operations and financial condition.

***The clinical effectiveness of BLU-5937 is not yet supported by clinical data.***

The preclinical toxicology studies and the Phase 1 topline data announced in November 2018 showed that BLU- 5937 has a favorable safety and tolerability profile. However, the clinical safety of BLU-5937 has to be demonstrated through further clinical studies. The clinical effectiveness of BLU-5937 is not yet supported by clinical data and the medical community has not yet developed a large body of peer reviewed literature that supports the safety and efficacy of BLU-5937. If future studies call into question the safety or efficacy of BLU-5937 or any other product candidates we may develop in the future, our business, financial condition, results of operations or prospects could be adversely affected.

Even if BLU-5937 or any other product candidates we may develop in the future successfully complete the clinical trials and receive the regulatory approval necessary to market the product candidates to the public, there is also the risk of unknown side effects, which may not appear until the product candidates are on the market and may result in delay or denial of regulatory approval or withdrawal of previous approvals, product recalls or other adverse events, which could materially adversely affect us.

***Our clinical trials may not yield results that will enable us to obtain regulatory approval for our current or future product candidates.***

We will only receive regulatory approval for a product candidate if we can demonstrate in carefully designed and conducted clinical trials that the product candidate is safe and effective. We do not know whether our current or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or if they will result in marketable products.

Clinical trials are lengthy, complex, costly, and uncertain processes. It takes several years to complete testing, and failure can occur at any stage of testing. The early stage of our product candidate involves risks related to safety, efficacy, drug metabolism, pharmacokinetic profile, tolerability, manufacturing, formulation and distribution, among others. Results attained in preclinical testing and early clinical studies or trials may not be indicative of results that are obtained in later studies. We have suffered, and may suffer further, significant setbacks in advanced clinical trials, even after promising results in earlier studies. For instance, in June 2016, we announced that KIACTA (eprodisate) did not meet the primary efficacy endpoint in a Phase 3 clinical trial. Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue the development of a product candidate. Furthermore, actual results may vary once the final and quality-controlled verification of data and analyses has been completed. If we fail to adequately demonstrate the safety and efficacy of BLU-5937, we will not be able to obtain the required regulatory approvals to commercialize that product candidate.

Clinical trials are subject to continuing oversight by governmental regulatory authorities and institutional review boards, and must meet the requirements of these authorities; must meet requirements for informed consent; and must meet requirements for good clinical practices.

We may not be able to comply with these requirements. We rely on third parties, including contract research organizations and outside consultants, to assist in managing and monitoring clinical trials. Our reliance on these third parties may result in delays in completing, or in failing to complete, these trials if one or more third parties fail to perform with the speed and level of competence expected. If clinical trials for a product candidate are unsuccessful, we will be unable to commercialize such product candidate. If one or more of the clinical trials is delayed, we will be unable to meet our anticipated development or commercialization timelines. Either circumstance could have a material adverse effect on our business, financial condition, results of operations and prospects.

***If we encounter difficulties enrolling patients in clinical trials, the trials could be delayed or otherwise adversely affected.***

Clinical trials for product candidates require us or third parties we contract with to identify and enroll a large number of patients with the disorder under investigation. We or the third parties we contract with may not be able to enroll a sufficient number of patients to complete clinical trials in a timely manner. Patient enrollment is a function of many factors, including the following: design of the protocol, size of the patient population, eligibility criteria for the trial in question, perceived risks and benefits of the drug under study, availability of competing therapies, efforts to facilitate timely enrollment in clinical trials, patient referral practices of physicians, and availability of clinical trial sites. If we or the third parties we contract with have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay or terminate ongoing clinical trials.

***The outcome of preclinical studies and earlier-stage clinical trials may not be predictive of the success of later-stage clinical trials.***

The outcome of preclinical testing and earlier-stage clinical trials may not be predictive of the success of later-stage clinical trials. BLU-5937 and any other product candidates we may develop may fail to show the desired safety and efficacy in clinical development despite positive results in preclinical studies or having successfully advanced through initial clinical trials. Numerous companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in later-stage clinical trials even after achieving promising results in preclinical testing and earlier-stage clinical trials, and we cannot be certain that we will not face similar setbacks. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval of their products. Furthermore, the failure of any product candidate to demonstrate safety and efficacy in any clinical trial could negatively impact the perception of any other product candidates then under development and/or cause applicable regulatory authorities to require additional testing before approving any other product candidates.

24

***Interim topline and preliminary results from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures, which could result in material changes in the final data.***

From time to time, we may publish interim topline or preliminary results from our clinical trials. Interim results from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Preliminary or topline results also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, interim and preliminary data should be viewed with caution until the final data are available. Differences between preliminary or interim data and final data could significantly harm our business prospects and may cause the trading price of our common shares to fluctuate significantly.

***Even if we or any future partners obtain regulatory approvals for our product candidates, we will be subject to ongoing government regulation.***

Even if regulatory authorities approve BLU-5937 or any future product candidate we may develop, the manufacturing, marketing, and sale of such products will be subject to strict and ongoing regulation. Compliance with such regulation may be costly and consume substantial financial and management resources. For example, an approval for a product may be conditioned on conducting costly post-marketing follow-up studies. In addition, if, based on these studies, a regulatory authority does not believe that the drug demonstrates a benefit to patients, such authority could limit the indications for which the product may be sold or revoke the product's regulatory approval.

We and our contract manufacturers are required to comply with applicable current Good Manufacturing Practice regulations for the manufacture of product candidates. These regulations include requirements relating to quality assurance, as well as the corresponding maintenance of records and documentation. Manufacturing facilities must be approved before they can be used in the commercial manufacturing of products and are subject to subsequent periodic inspection by regulatory authorities. In addition, material changes in the methods of manufacturing or changes in the suppliers of raw materials are subject to further regulatory review and approval.

If we or any future marketing collaborators or contract manufacturers fail to comply with applicable regulatory requirements, we may be subject to sanctions, including fines, drug recalls or seizures, injunctions, total or partial suspension of production, civil penalties, withdrawals of previously granted regulatory approvals, and criminal prosecution. Any of these penalties could delay or prevent the promotion, marketing, or sale of our products.

In addition, we are currently or will in the future be subject to healthcare regulation and enforcement by the federal government and the states in which we will conduct our business once our product candidates are approved by the FDA and commercialized in the United States. In addition to the FDA's restrictions on marketing of pharmaceutical products, the healthcare laws and regulations that may affect our ability to operate include: the federal fraud and abuse laws, including the federal anti-kickback and false claims laws; federal data privacy and security laws; and federal transparency laws related to payments and/or other transfers of value made to physicians and other healthcare professionals and teaching hospitals. Many states have similar laws and regulations that may differ from each other and federal law in significant ways, thus complicating compliance efforts. These laws may adversely affect our sales, marketing and other activities with respect to any product candidate for which we receive approval to market in the United States by imposing administrative and compliance burdens on us.

Because of the breadth of these laws and the narrowness of available statutory exceptions and regulatory safe harbors, it is possible that some of our business activities, particularly any sales and marketing activities after a product candidate has been approved for marketing in the United States, could be subject to legal challenge and enforcement actions. If our operations are found to be in violation of any of the federal and state laws described above or any other governmental regulations that apply to us, we may be subject to significant civil, criminal, and administrative penalties, including, without limitation, damages, fines, imprisonment, exclusion from participation in government healthcare programs, additional reporting obligations and oversight if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***We may not achieve our projected development goals in the announced and expected time frames.***

From time to time, we set goals for and make public statements regarding the expectations for and timing of the accomplishment of objectives material to our success, such as the commencement and completion of clinical trials, expected results, anticipated regulatory submission and approval dates, and timing of product launch. The actual timing of these events can vary dramatically due to factors such as delays or failures in clinical trials, the uncertainties inherent in the regulatory approval process, and delays in achieving manufacturing or marketing arrangements sufficient to commercialize products. There can be no assurance that our clinical trials will be completed, that we will make regulatory submissions or receive regulatory approvals as planned, or that we will be able to adhere to our current schedule for the launch of BLU-5937 or any other future product candidates we may develop. If we fail to achieve one or more of these milestones as planned, the price of our common shares would likely be adversely affected.

***If we or our partners fail to obtain acceptable prices, coverage or adequate reimbursement for our products, our ability to generate revenues will be diminished.***

Patients in the United States and elsewhere generally rely on third-party payors to reimburse part or all of the costs associated with their prescription drugs. Accordingly, our ability to successfully commercialize our products would depend significantly on the ability to obtain acceptable prices and the availability of coverage and adequate reimbursement from third-party payors, such as government and private insurance plans. Coverage and reimbursement policies for drug products can differ significantly among payors as there is no uniform policy of coverage and reimbursement for drug products among U.S. third-party payors. There may be significant delays in obtaining coverage and reimbursement as the process of determining coverage and reimbursement is often time-consuming and costly which will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that coverage or adequate reimbursement will be obtained. While we have not commenced discussions with any such parties, these third-party payors frequently require companies to provide predetermined discounts from list prices, and they are increasingly challenging the prices charged for pharmaceuticals and other medical products. Our products may not be considered cost-effective, and reimbursement to the patient may not be available or sufficient to allow us to sell our products on a competitive basis. Even if we obtain coverage for a given product candidate, the associated reimbursement rate may not be adequate to cover our costs, including research, development, intellectual property, manufacture, sale and distribution expenses, or may require co-payments that patients find unacceptably high.

In addition, the continuing efforts of third-party payors to contain or reduce the costs of healthcare through various means may limit our commercial opportunity and reduce any associated revenue and profits. We expect proposals to implement similar government controls to continue. In addition, increasing emphasis on managed care will continue to put pressure on the pricing of pharmaceutical and biopharmaceutical products. Cost-control initiatives could decrease the price that we or any current or potential collaborators could receive for any of the products and could adversely affect profitability. In addition, in Canada and in many other countries, where significant healthcare reforms are currently under discussion, pricing and/or profitability of some or all prescription pharmaceuticals and biopharmaceuticals are subject to government control. In the United States, there have been and continue to be a number of healthcare-related legislative initiatives that have significantly affected the pharmaceutical industry. For example, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, the Affordable Care Act, was passed in March 2010, and substantially changed the way healthcare is financed by both governmental and private insurers, and continues to significantly impact the pharmaceutical industry. There also has been heightened governmental scrutiny in the United States of pharmaceutical pricing practices in light of the rising cost of prescription drugs and biologics. Such scrutiny has resulted in several recent congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for products. If we fail to obtain acceptable prices, coverages or an adequate level of reimbursement for our products, the sales of the products would be adversely affected or there may be no commercially viable market for our products.

***Competition in the biopharmaceutical industry is intense, and development by other companies could render our product candidate or any future product candidates or technologies non-competitive.***

The biopharmaceutical industry is intensely competitive and is subject to rapid and significant change. We face potential competition from many sources, including major pharmaceutical, specialty pharmaceutical and biotechnology companies. We consider our primary competitors to be those companies that are developing products specifically to treat chronic cough and those companies that develop products that, when approved, could be used off-label to treat cough. We are aware of other companies targeting chronic cough as the primary outcome measure in clinical studies of products. There are multiple companies developing products at varying stages of development specifically intended to treat chronic cough including Merck & Co., Bayer AG, Shionogi Inc. and NeRRe Therapeutics Ltd, some of which have substantially greater product development capabilities and financial, scientific, marketing, and human resources than us. Of these companies, Merck, Bayer and Shionogi are developing P2X3 antagonists for chronic cough that could compete directly with BLU-5937. Moreover, there are multiple companies developing therapeutic treatments for atopic dermatitis specifically, or various other forms of pruritus which could also have a therapeutic effect on atopic dermatitis itch including Sanofi S.A., Bayer AG, Pfizer Inc., Novartis International AG, LEO Pharma Inc., Menlo Therapeutics Inc., Vanda Pharmaceuticals Inc., Trevi Therapeutics Inc., Galderma S.A., Sienna Biopharmaceuticals, Inc., Tioga Pharmaceuticals, Inc. and Cara Therapeutics Inc.

***We are heavily dependent on licensed intellectual property. If we were to lose our rights to licensed intellectual property, we would not be able to continue developing or commercializing BLU-5937. If we breach any of the agreements under which we license the use, development and commercialization rights to BLU-5937 or any other future product candidate or technology from third parties or if certain insolvency events were to occur, we could lose license rights that are critical to our business.***

We have an exclusive worldwide license to develop and commercialize BLU-5937 pursuant to a license agreement with the NEOMED Institute, now adMare Bionnovations ("**NEOMED**"), that is critical to our business, which is subject to termination for breach of our terms and, therefore, our rights may only be available to us for as long as our development and commercialization activities are sufficient to meet the terms of the license. In addition, we may need to enter into additional license agreements in the future. Our existing license agreements impose, and any future license agreements may impose on us, various developments, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. If we fail to comply with our obligations under these agreements, or we are subject to a bankruptcy, the licensor may have the right to terminate the license, in which event we would not be able to market products covered by the license, which would have a material adverse effect on our business, financial condition, results of operations and prospects. Moreover, our current or future licenses may provide for a reversion to the licensor of our rights in regulatory filings or other intellectual property or data that we regard as our own in the event the license terminates under certain circumstances, such as due to breach.

Licensing of intellectual property is of critical importance to our business and involves complex legal, business and scientific issues. Disputes may arise between us and our licensors regarding intellectual property subject to a license agreement, including with respect to:

• the scope of rights granted under the license agreement and other interpretation-related issues;

• the rights of our licensors under the license agreements; and

• our diligence obligations with respect to the use of the licensed technology in relation to our development and commercialization of BLU-5937 and any future product candidates, and what activities satisfy those diligence obligations.

Any disputes with our licensors over intellectual property that we have licensed from them may prevent or impair our ability to maintain our current licensing arrangements on acceptable terms. Termination or expiry of our license agreements could result in the loss of significant rights and could materially harm our ability to further develop and commercialize BLU-5937 or other future product candidates.

We depend on our licensors to protect a significant portion of our proprietary rights that derive from license agreements, including our exclusive worldwide license with NEOMED to develop and commercialize BLU-5937. BLU-5937 is covered by a patent that is not owned by us but is instead licensed to us by NEOMED. Moreover, our licensors under current licenses retain and our licensors under future licenses may retain certain rights and obligations.

Our business could suffer, for example, if the licensed patents or other rights are found to be invalid or unenforceable, or if we are unable to enter into necessary licenses on acceptable terms.

27

In addition, the agreements under which we currently license intellectual property or technology from third parties are complex, and certain provisions in such agreements may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could narrow what we believe to be the scope of our rights to the relevant intellectual property or technology, or increase what we believe to be our financial or other obligations under the relevant agreement, either of which could have a material adverse effect on our business, financial condition, results of operations, and prospects. Moreover, if disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on commercially acceptable terms, we may be unable to successfully develop and commercialize the affected product candidates, which could have a material adverse effect on our business, financial conditions, results of operations, and prospects.

***We may not obtain adequate protection for our products through our intellectual property.***

Our success depends, in large part, on our ability to protect our competitive position through patents, trade secrets, trademarks, and other intellectual property rights. Our success, competitive position and future revenues with respect to these product candidates will depend, in part, on our ability to protect our intellectual property. We will be able to protect our proprietary rights from unauthorized use by third parties only to the extent that our proprietary rights are covered by valid and enforceable patents or are effectively maintained as trade secrets. We attempt to protect our proprietary position by maintaining trade secrets and by filing U.S. and foreign patent applications related to our in-licensed technology, inventions and improvements that are important to the development of our business. Our failure to do so may adversely affect our business and competitive position.

The patent positions of pharmaceutical and biopharmaceutical firms, including ours, are uncertain and involve complex questions of law and fact for which important legal issues remain unresolved. The patents issued or to be issued to us may not provide us with any competitive advantage. We may not be able to protect our intellectual property rights throughout the world. Our patents may be challenged by third parties in patent litigation. In addition, it is possible that third parties with drugs that are very similar to ours will circumvent our patents by means of alternate designs or processes. We may have to rely on method of use protection for our compounds in development and any resulting drugs, which may not confer the same level of protection as protection of our compounds per se. We may be required to disclaim part of the term of certain patents. There may be prior art of which we are not aware that may affect the validity or enforceability of a patent claim. There also may be prior art of which we are aware, but which we do not believe affects the validity or enforceability of a claim, which may, nonetheless ultimately be found to affect the validity or enforceability of a claim. No assurance can be given that our patents would, if challenged, be held by a court to be valid or enforceable or that a competitor's technology or drug would be found by a court to infringe our patents.

Patent terms may be inadequate to protect our competitive position on our product candidates for an adequate amount of time. Patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. Various extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering our product candidates are obtained, once the patent life has expired, we may be open to competition from competitive products, including generics or biosimilars. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

Patent applications relating to or affecting our business may have been filed by a number of pharmaceutical and biopharmaceutical companies and academic institutions. A number of the technologies in these applications or patents may conflict with our technologies, patents, or patent applications, and such conflict could reduce the scope of patent protection that we could otherwise obtain. We could become involved in interference proceedings in the United States in connection with one or more of our patents or patent applications to determine priority of invention. Our granted patents could also be challenged and revoked in opposition proceedings in certain countries outside of the United States. In addition to patents, we rely on trade secrets and proprietary know-how to protect our intellectual property. We generally require employees, consultants, outside scientific collaborators, and sponsored researchers and other advisors to enter into confidentiality agreements. These agreements provide that all confidential information developed or made known to the individual during the course of the individual's relationship with us is to be kept confidential and not disclosed to third parties except in specific circumstances. In the case of employees, the agreements provide that all of the technology that is conceived by the individual during the course of employment is our exclusive property. These agreements may not provide meaningful protection or adequate remedies in the event of unauthorized use or disclosure of proprietary information. In addition, it is possible that third parties could independently develop proprietary information and techniques substantially similar to ours or otherwise gain access to our trade secrets.

28

We may obtain the right to use certain technology under license agreements with third parties. Our failure to comply with the requirements of material license agreements could result in the termination of such agreements, which could cause us to terminate the related development program and cause a complete loss of investment in that program. As a result of the foregoing factors, we may not be able to rely on our intellectual property to protect our products in the marketplace.

***If we are unable to protect the confidentiality of our trade secrets, the value of our technology could be materially adversely affected and our business would be harmed.***

We seek to protect our confidential proprietary information, in part, by confidentiality agreements and invention assignment agreements with our employees, consultants, scientific advisors, contractors and collaborators. These agreements are designed to protect our proprietary information. However, we cannot be certain that such agreements have been entered into with all relevant parties, and we cannot be certain that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. For example, any of these parties may breach the agreements and disclose our proprietary information, including our trade secrets, and we may not be able to obtain adequate remedies for such breaches. We also seek to preserve the integrity and confidentiality of our confidential proprietary information by maintaining physical security of our premises and physical and electronic security of our information technology systems, but it is possible that these security measures could be breached. If any of our confidential proprietary information were to be lawfully obtained or independently developed by a competitor, we would have no right to prevent such competitor from using that technology or information to compete with us, which could harm our competitive position.

***We may infringe the intellectual property rights of others.***

Our commercial success depends significantly on our ability to operate without infringing on the patents and other intellectual property rights of third parties. There could be issued patents of which we are not aware that our products infringe or patents that we believe we do not infringe, but that we may ultimately be found to infringe. Moreover, patent applications are, in some cases, maintained in secrecy until patents are issued. The publication of discoveries in the scientific or patent literature frequently occurs substantially later than the date on which the underlying discoveries were made and patent applications were filed. Because patents can take many years to issue, there may be currently pending applications of which we are unaware that may later result in issued patents that our products infringe. For example, pending applications may exist that provide support or can be amended to provide support for a claim that results in an issued patent that our drug infringes.

The biopharmaceutical industry has produced a proliferation of patents, and it is not always clear to industry participants which patents cover various types of products. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. We believe that BLU-5937 does not infringe any valid claim of these patents, although there can be no assurances of this. In the event of an infringement or violation of another party's patent, we may not be able to enter into licensing arrangements or make other arrangements at a reasonable cost. Any inability to secure licenses or alternative technology could result in delays in the introduction of drugs or lead to prohibition of the manufacture or sale of drugs by us.

***Third parties may initiate legal proceedings alleging that we are infringing their intellectual property rights, the outcome of which would be uncertain and could harm our business.***

Third parties may assert patent or other intellectual property infringement claims against us or our other licensors arising from the manufacture, use, or sale of our current or future product candidates. An unfavorable outcome could result in loss of patent rights and require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, pay royalties, redesign our infringing products or obtain one or more licenses from third parties, which may be impossible or require substantial time and monetary expenditure.

29

***We may become involved in lawsuits or other proceedings to protect or enforce our patents or other intellectual property, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or other intellectual property. If we were to initiate legal proceedings against a third party to enforce a patent covering our product candidates, the defendant could counterclaim that the patent covering our product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, including lack of novelty, obviousness, written description or non-enablement. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld relevant information from the United States Patent and Trademark Office, or "**USPTO**", or made a misleading statement, during prosecution. The outcome following legal assertions of invalidity and unenforceability is unpredictable. The validity of our current or future patents or patent applications or those of our licensors may also be challenged in interference or derivation proceedings, opposition, post grant review, inter partes review, or other similar enforcement and revocation proceedings, provoked by third parties or brought by us. Our patents could be found invalid, unenforceable, or their scope significantly reduced.

Interference or derivation proceedings provoked by third parties or brought by us or declared by the USPTO may be necessary to determine the priority of inventions with respect to our patents or patent applications. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms or at all, or if a non-exclusive license is offered and our competitors gain access to the same technology. Our defense of litigation or other proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. In addition, the uncertainties associated with litigation could have a material adverse effect on our ability to raise the funds necessary to continue our clinical trials, continue our research programs, license necessary technology from third parties, or enter into development partnerships that would help us bring our product candidates to market.

***Patent litigation is costly and time consuming and may subject us to liabilities.***

Our involvement in any patent litigation, interference, post-grant proceedings such as inter partes review or opposition, or other administrative proceedings will likely cause us to incur substantial expenses, and the efforts of technical and management personnel will be significantly diverted. In addition, an adverse determination in litigation could subject us to significant liabilities. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions, or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common shares.

***We may be subject to claims challenging the inventorship of our patents and other intellectual property.***

We or our licensors may be subject to claims that former employees, collaborators or other third parties have an interest in our owned or in-licensed patents, trade secrets, or other intellectual property as an inventor or co-inventor. For example, we or our licensors may have inventorship disputes arise from conflicting obligations of employees, consultants or others who are involved in developing our product candidates. Litigation may be necessary to defend against these and other claims challenging inventorship or our or our licensors' ownership of our owned or in-licensed patents, trade secrets or other intellectual property. If we or our licensors fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, intellectual property that is important to our product candidates. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations and prospects.

30

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties or that our employees have wrongfully used or disclosed alleged trade secrets of their former employers.***

As is common in the biotechnology and pharmaceutical industry, we employ individuals who were previously employed at universities or other biotechnology or pharmaceutical companies, including our competitors or potential competitors. Although we try to ensure that our employees, consultants and independent contractors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of any of our employees' former employers or other third parties. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel, which could adversely impact our business. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.***

Periodic maintenance fees, renewal fees, annuity fees and various other governmental fees on patents and/or applications will be due to be paid to the USPTO and various governmental patent agencies outside of the United States in several stages over the lifetime of the patents and/or applications. We have systems in place to remind us to pay these fees, and we employ an outside firm and rely on our outside counsel to pay these fees due to non-U.S. patent agencies. The USPTO and various non-U.S. governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. We employ reputable law firms and other professionals to help us comply, and in many cases, an inadvertent lapse can be cured by payment of a late fee or by other means in accordance with the applicable rules. However, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. In such an event, our competitors might be able to enter the market and this circumstance would have a material adverse effect on our business.

***The market price of our common shares experiences a high level of volatility due to factors such as the volatility in the market for biotechnology stocks generally and the short-term effect of a number of possible events.***

We are a public growth company in the biotechnology sector. As frequently occurs among these companies, the market price for our common shares may experience a high level of volatility. During the 12-month period ended on December 31, 2019, giving effect to the one-for-3.6 consolidation of our common shares effective on August 19, 2019, our common shares traded between $3.49 and $11.20 per share on the TSX. Since their initial NASDAQ listing on September 5, 2019, up to December 31, 2019, our common shares traded between US$5.55 and US$7.88 per share on NASDAQ.

Numerous factors, including many over which we have no control, may have a significant impact on the market price of our common shares, including, among other things, the following: (1) clinical and regulatory developments regarding our product candidate and those of our competitors; (2) arrangements or strategic partnerships by our competitors; (3) other announcements by us or our competitors regarding technological, drug development, sales, or other matters; (4) patent or other intellectual property achievements or adverse developments; (5) arrivals or departures of key personnel; (6) changes in financial estimates and recommendations by securities analysts; (7) government regulatory action affecting our product candidate and our competitors' products in the United States, Canada, and foreign countries; (8) actual or anticipated fluctuations in revenues or expenses; (9) general market conditions and fluctuations for the emerging growth and biopharmaceutical market sectors; (10) failure to enter into favorable third-party manufacturing agreements; (11) events related to threatened, new, or existing litigation; (12) economic conditions in the United States, Canada, or abroad; (13) purchases or sales of blocks of our securities; and (14) difficulties in our ability to obtain additional financing.

31

**Exhibit 99.3**

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

This Management's Discussion and Analysis ("MD&A") provides a review of BELLUS Health Inc.'s operations and financial performance for the years ended December 31, 2019 and 2018. In this MD&A, unless the context otherwise requires, the terms "BELLUS Health", "we", "us", and "our" refer to BELLUS Health Inc. This document should be read in conjunction with the our audited consolidated financial statements for the year ended December 31, 2019, which have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"). Additional information relating to us, including our Annual Report and Annual Information Form, as well as other public filings, is available on SEDAR at www.sedar.com and on EDGAR at www.sec.gov/edgar.

The consolidated financial statements and MD&A have been reviewed by our Audit Committee and approved by our Board of Directors. This MD&A was prepared by management with information available as at February 26, 2020.

Information in relation to common shares, stock options, broker warrants and per share amounts included in the audited consolidated financial statements and MD&A for the year ended December 31, 2019 reflect the 3.6 for 1 share consolidation effective on August 19, 2019.

All currency figures reported in the consolidated financial statements and in this document are in Canadian dollars, unless otherwise specified. The Canadian dollar was the Company's functional and presentation currency for all years presented.

**FORWARD-LOOKING STATEMENTS**

Certain statements contained in this MD&A may constitute "forward-looking information" within the meaning of applicable securities laws in Canada and "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, as amended (collectively, "forward-looking statements"), which involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company, or industry results, to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. These forward-looking statements include information about possible or assumed future results of our business, financial condition, results of operations, liquidity, objectives and strategies to achieve those objectives, as well as statements with respect to our beliefs, targets, expectations, anticipations, estimates or intentions. In some cases, you can identify forward-looking statements by terminology such as "believe", "may", "estimate", "continue", "anticipate", "intend", "should", "plan", "expect", "predict", "potential", "could", "assume", "project", "guidance" or the negative of these terms or other similar expressions, although not all forward-looking statements include such words. The statements we make regarding the following matters are forward-looking by their nature and are based on certain of the assumptions noted below:

- our aim to develop and commercialize BLU-5937 for the treatment of hypersensitization disorders, including chronic cough and chronic pruritus;
- our aim to complete additional preclinical studies on BLU-5937;
- our aim to pursue the Phase 2 clinical trial on BLU-5937 for the treatment of patients with refractory chronic cough in 2019 with topline data in mid-2020, and initiate later stage clinical studies thereafter;
- our aim to initiate a Phase 2 clinical trial on BLU-5937 for the treatment of patients with chronic pruritus associated with atopic dermatitis, in Q2 2020, with topline data expected in mid-2021;

1

- our aim to further explore the potential of BLU-5937 for the treatment of other afferent hypersensitization-related conditions;
- our expectations relating to the timing and cost of significant preclinical study and clinical trial milestones;
- our expectations with respect to the timing and cost of the research and development activities of BLU-5937;
- the function, potential benefits, effectiveness and safety of our product candidates, including BLU-5937;
- our expectations with respect to pre-commercialization activities related to the commercial launch of BLU-5937;
- our estimates and assessment of the potential markets for our product candidates;
- our expectations regarding pricing and acceptance of our product candidates by the market;
- the benefits and risks of our product candidates as compared to others;
- our aim to obtain regulatory approvals to market our product candidates;
- our expectations with respect to the cost of preclinical studies and clinical trials and commercialization of our product candidates, including BLU-5937;
- our current and future capital requirements and anticipated sources of financing or revenue;
- our expectations regarding the protection of our intellectual property;
- our business strategy;
- potential milestone payments and royalties pursuant to license agreements and other partnerships; and
- our development and partnership plans and objectives.

The preceding list is not intended to be an exhaustive list of all of our forward-looking statements.

Conclusions, forecasts and projections set out in forward-looking information are based on our current objectives and strategies and on expectations and estimates and other factors and assumptions that we believe to be reasonable at the time applied but may prove to be incorrect. These include, but are not limited to:

- the function, potential benefits, effectiveness and safety of BLU-5937;
- the benefits and risks of our product candidates as compared to others;
- progress, timing and costs related to the development, completion and potential commercialization of our product candidate;
- estimates and projections regarding our industry;
- market acceptance of our product candidate;
- future success of current research and development activities;
- achievement of development and commercial milestones, including forecasted preclinical study and clinical trial milestones;
- our reliance on third parties to conduct preclinical studies and clinical trials for BLU-5937;
- that the timeline and costs for our preclinical and clinical programs are not incorrectly estimated or affected by unforeseen circumstances;
- absence of material deterioration in general business and economic conditions;
- the receipt of regulatory and governmental approvals for research and development projects and timing thereof;
- the availability of tax credits and financing for research and development projects, and the availability of financing on favorable terms;
- the accuracy of our estimates regarding future financing and capital requirements and expenditures;
- the achievement of our forecasted cash burn rate;

- the sufficiency and validity of our intellectual property rights;
- our ability to secure, maintain and protect our intellectual property rights, and to operate without infringing on the proprietary rights of others or having third parties circumvent the rights owned or licensed by us;
- our ability to source and maintain licenses from third-party owners on acceptable terms and conditions;
- absence of significant changes in Canadian dollar-U.S. dollar and other foreign exchange rates or significant variability in interest rates;
- the absence of material changes in market competition;
- our ability to attract and retain skilled staff;
- our ability to maintain ongoing relations with employees and business partners, suppliers and other third parties;
- the accuracy of the market research, third-party industry data and forecasts relied upon by us; and
- the absence of adverse changes in relevant laws or regulations.

There are important factors that could cause our actual results, levels of activity, performance or achievements to differ materially from the results, levels of activity, performance or achievements expressed or implied by the forward-looking statements. See "Risk Factors" in this MD&A. Should one or more of the risks, uncertainties or other factors outlined in this MD&A materialize, our objectives, strategies or intentions change, or any of the factors or assumptions underlying the forward-looking information prove incorrect, our actual results and our plans and targets could vary significantly from what we currently foresee. Accordingly, we warn investors to exercise caution when considering statements containing forward-looking information and that it would be unreasonable to rely on such statements as creating legal rights regarding our future results or plans or targets. All of the forward-looking information in this MD&A is qualified by the cautionary statements herein.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this MD&A, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that future results, levels of activity, performance and events and circumstances reflected in the forward-looking statements will be achieved or will occur. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason after the date of this MD&A, to conform these statements to actual results or to changes in our expectations.

3

**CORPORATE PROFILE**

We are a clinical stage biopharmaceutical company focused on the development of novel therapeutics for the treatment of chronic cough and other hypersensitization disorders. Our product candidate, BLU-5937, is a twice daily oral small molecule specifically designed to be a highly selective antagonist of the P2X3 receptor, a clinically validated target linked to hypersensitivity. We are developing BLU-5937 for the treatment of chronic cough and chronic pruritus, or chronic itch. These hypersensitization-related disorders, which share a common pathophysiology that is mediated through the P2X3 receptor, represent areas of significant unmet medical need and potentially large market opportunities. We believe BLU-5937's characteristics shown in our preclinical studies and Phase 1 trial position it as a differentiated treatment option in the P2X3 antagonists class.

Our shares trade on the Nasdaq Global Market ("Nasdaq") and on the Toronto Stock Exchange ("TSX") both under the symbol "BLU".

**BUSINESS OVERVIEW**

**2020 Corporate Plan**

Our priorities for 2020 will be focused on achieving the following:

- Completing recruitment for the Company's Phase 2 RELIEF trial for BLU-5937 in refractory chronic cough, anticipated by the end of March 2020.
- Releasing top-line data for our Phase 2 RELIEF trial for BLU-5937 in refractory chronic cough patients, anticipated in mid-2020.
- Initiating a Phase 2 trial of BLU-5937 in patients with chronic pruritus associated with atopic dermatitis ("AD") in Q2 2020, with top-line results anticipated in mid-2021.
- Pursuing activities that will further enable late-stage clinical development of BLU-5937.
- Presenting detailed BLU-5937 Phase 2 RELIEF trial data at a medical conference.

**2019 Highlights and Recent 2020 Developments**

- **Ongoing Phase 2 RELIEF trial of BLU-5937 for the treatment of refractory chronic cough, with top-line results anticipated in mid-2020.**
  In July 2019, we enrolled the first patient in the Phase 2 RELIEF trial of BLU-5937 for the treatment of refractory chronic cough. We expect to complete patient enrollment by the end of March with topline results anticipated in mid-2020.
- **Completed a clinical Phase 1 drug-drug interaction ("DDI") trial of BLU-5937 in 28 healthy adult subjects demonstrating no clinically significant interaction with CYP3A4, OATP1B1 and BCRP.**
  In December 2019, we completed a DDI trial, which indicated that the administration of BLU-5937 should not affect the elimination of other drugs that are substrates of these enzymes/transporters. BLU-5937 was found to be safe and generally well tolerated in the trial (200 mg BID dose administered for 10 days). Two subjects out of 28 (7%) reported a mild taste alteration, which occurred only on the first day of dosing.

4

Change in functional and presentation currency in 2020:

As a result of the advancement of our development programs, we anticipate higher research and development costs in future periods which will be denominated mainly in US dollars. In addition, these will be financed from proceeds received from our new financing in US dollars in September 2019. As a result of these changes, we have determined that the US dollar will better reflect the primary economic environment in which we will operate in the future, as a result of these changes, a significant portion of our expenses and net assets are and will continue to be denominated in US dollars. Therefore, effective January 1, 2020, we adopted the US dollar as our functional and presentation currency. On January 1, 2020, the change in functional currency will result in the assets, liabilities and equity transactions as of January 1, 2020 being translated in US dollars using the exchange rate in effect on that date and the change in functional currency will then be applied prospectively. The change in presentation currency will be applied retrospectively resulting in the comparative financial information being recasted into US dollars.

**RISK FACTORS**

*Investing in our common shares involves a significant amount of risk. You should carefully consider the risks described below. If any of these risks actually occurs, our business, financial condition, results of operations or prospects could be materially adversely affected. These are not the only risks and uncertainties that we face. Additional risks and uncertainties not presently known to us, or that we currently consider immaterial, may also materially and adversely affect us. In such an event, the trading price of our common shares could decline and you may lose part or all of your investment in our securities. Any reference in this section to the Company's "products" or "product candidates" includes a reference to BELLUS Health's product candidate and future products or product candidates that may be developed.*

**Risks related to our business**

***We may not be able to maintain our operations and research and development without additional funding, and we may not have access to sufficient capital.***

To date, we have financed our operations primarily through public offerings of common shares, private placements, the issuance of convertible notes and research tax credits. We have incurred significant operating losses and negative cash flows from operations since inception. As at December 31, 2019, we had available cash, cash equivalents and short-term investments totaling $116.9 million (US$90.0 million). Based on management's estimate and current level of operations, we believe that our current liquidity position is sufficient to finance our operations into the foreseeable future. We will need to raise additional capital to fund our operations and to develop BLU-5937. Our future capital requirements will be substantial and may increase beyond current expectations depending on many factors, such as the duration, scope, rate of progress, results and costs of any preclinical studies and clinical trials for our current or any future product candidates; unexpected delays or developments in seeking regulatory approvals and the outcome thereof; the time and cost in preparing, filing, prosecuting, maintaining, and enforcing patent claims; other unexpected developments encountered in implementing our business development and commercialization strategies; the outcome of any litigation; and arrangements with collaborators. Further, changing circumstances may cause us to consume capital significantly faster than we currently anticipate. We have based the foregoing estimates on assumptions that may prove to be wrong, and we could utilize our available financial resources sooner than we currently expect.

20

We may seek to raise additional funds through public or private equity or debt financing, collaborations agreements with other companies and/or from other sources. We have no committed source of additional capital and additional funding may not be available on terms that are acceptable to us, or at all. If adequate funding is not available on reasonable terms, we may need to obtain funds on terms less favorable than we would otherwise accept. To the extent that additional capital is raised through the sale of equity or convertible debt securities, the issuance of those securities could result in dilution to our shareholders. Moreover, the incurrence of debt financing could result in a substantial portion of our future operating cash flow, if any, being dedicated to the payment of principal and interest on such indebtedness and could impose restrictions on operations. This could render us more vulnerable to competitive pressures and economic downturns. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we may have to significantly delay, scale back or discontinue the development or commercialization of BLU-5937 or other future product candidates or other research and development initiatives. We could be required to seek collaborators for our product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available or relinquish or license on unfavorable terms our rights to our product candidates in markets where we otherwise would seek to pursue development or commercialization ourselves.

No assurance can be given that any such additional funding will be available or that, if available, it can be obtained on terms favorable to us. The failure to obtain additional financing on favorable terms, or at all, could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We have a history of losses and have not generated any product sales revenue to date. We may never achieve or maintain profitability.***

Our product candidate, BLU-5937, is still only in development, and as a result, we have not generated any revenues from product sales to date. We have incurred substantial expenses in our efforts to develop BLU-5937, and consequently, have generated operating losses each year since our inception. For the years ended December 31, 2018 and 2019, we incurred net losses of $9.1 million and $34.5 million, respectively. As of December 31, 2019, we had an accumulated deficit of $522.5 million. Our losses have adversely affected, and will continue to adversely impact, working capital, total assets, and shareholders' equity. We do not expect to generate any revenues from product sales in the immediate future. We may never successfully commercialize any products. Even if we succeed in developing commercial products, we expect to incur additional operating losses for at least the next several years. If we do not ultimately commercialize products and achieve or maintain profitability, an investment in our shares could result in a significant or total loss.

***Our prospects currently depend heavily on the success and market acceptance of BLU-5937, which is still in clinical development.***

We currently have no products for sale and may never be able to successfully develop products for sale. We currently believe that our growth and future prospects are mainly dependent on the successful development, regulatory approval and commercialization of our product candidate BLU-5937, which may never occur. We are focusing our efforts and resources into the development of BLU-5937. Our business thus depends on the successful preclinical and clinical development, regulatory approval and commercialization of BLU-5937, for which we must conduct additional preclinical studies and clinical trials, undergo further development activities and seek and receive regulatory approval prior to commercial launch. Further development of BLU-5937 will require substantial investment, access to sufficient commercial manufacturing capacity and significant marketing efforts before we can generate any revenue from product sales, if approved.

21

We anticipate that our ability to generate revenues will depend on the commercial success of BLU-5937, which will depend upon its market acceptance by purchasers in the pharmaceutical market and the future market demand and medical need for products and research utilizing BLU-5937. Most prescription drug candidates never reach the clinical development stage and even those that do reach clinical development have only a small chance of successfully completing clinical development and gaining regulatory approval. If we are unable to successfully commercialize BLU-5937, we may never generate revenues. There is also the risk that the actual market size or opportunity for BLU-5937 is not certain. If BLU-5937 reaches commercialization and there is low market demand for BLU-5937 or the market for BLU-5937 develops less rapidly than we anticipate, we may not have the ability to shift our resources to the development of alternative products. Failure to gain market acceptance of BLU-5937 or an incorrect estimate in the nature and size of our market could have a material adverse effect on us.

***We rely on third parties to conduct preclinical studies and clinical trials for BLU-5937, and if they do not properly and successfully perform their obligations to us, we may not be able to obtain regulatory approvals for BLU-5937.***

We have designed the clinical trials for BLU-5937. However, we rely on contract research organizations and other third parties to assist in managing, monitoring and otherwise carrying out these trials. We compete with many other companies for the resources of these third parties. The third parties on whom we rely generally may terminate their engagements at any time, and having to enter into alternative arrangements would delay development and commercialization of our product candidate. The U.S. Food and Drug Administration, or the "**FDA**", and comparable foreign regulatory authorities require compliance with regulations and standards for designing, conducting, monitoring, recording, analyzing, and reporting the results of clinical trials to assure that the data and results are credible and accurate and that the rights, integrity and confidentiality of trial participants are protected. Although we rely on third parties to conduct our clinical trials, they are not our employees, and we are responsible for ensuring that each of these clinical trials is conducted in accordance with our general investigational plan, protocol and other requirements. Our reliance on these third parties for research and development activities will reduce our control over these activities but will not relieve us of our responsibilities.

If these third parties do not successfully carry out their duties under their agreements, if the quality or accuracy of the data they obtain is compromised due to their failure to adhere to clinical trial protocols or to regulatory requirements, or if they otherwise fail to comply with clinical trial protocols or meet expected deadlines, the clinical trials of BLU-5937 may not meet regulatory requirements. If clinical trials do not meet regulatory requirements or if these third parties need to be replaced, preclinical development activities or clinical trials may be extended, delayed, suspended or terminated. If any of these events occur, we may not be able to obtain regulatory approval of BLU-5937 on a timely basis or at all.

***We rely completely on one third-party contract manufacturer to manufacture the active pharmaceutical ingredient, or "API", for BLU-5937 and another third-party contract manufacturer to manufacture the final drug product, and we intend to rely on third parties to produce non-clinical, clinical and commercial supplies of BLU-5937 and any other future product candidates.***

We do not currently have, nor do we plan to acquire, the infrastructure or capability to internally manufacture our clinical drug supply of BLU-5937, or any other product candidates we may develop in the future, for use in the conduct of our research and development activities, preclinical studies and clinical trials, and we lack the internal resources and the capability to manufacture any product candidates on a clinical or commercial scale. We currently have the API for BLU-5937 manufactured by one third-party contract manufacturer and final drug product supplied by another contract manufacturer, and do not currently have backup manufacturing capacity.

22

We plan to continue to rely on contract manufacturers for the foreseeable future to produce quantities of products and substances necessary for research and development, preclinical studies, human clinical trials and product commercialization, and to perform their obligations in a timely manner and in accordance with applicable government regulations. While we intend to contract for the commercial manufacture of our product candidates, we may not be able to identify and qualify contractors or obtain favorable contracting terms.

Our third-party contract manufacturer for the API for BLU-5937 is located in China. The COVID-19 (coronavirus) outbreak could potentially disrupt the operations of such third-party contract manufacturer if any of its employees are suspected or have been infected by the virus, and identified as a possible source of spreading the infection. Our contract manufacturer may also be required to disinfect its production plant and therefore suffer a temporary suspension of business operations.

If our current or future third-party manufacturers do not perform as agreed, experience business disruptions as previously described, or breach or terminate their agreements with us, significant additional time and costs would be required to effect a transition to a new contract manufacturer. If we are unable to retain our current contractors, or are unable to secure arrangements with new contractors to provide manufacturing services in a timely manner and on acceptable terms as needed, it will delay or prevent the development, promotion, marketing, or sale of BLU-5937, if approved, or any other future product candidates we may develop, and have a negative effect on our operations and financial condition. Moreover, if a replacement to our current or future contract manufacturers is required, the ability to establish second-sourcing or find a replacement manufacturer may be difficult due to the lead times generally required to manufacture drug products and the need for regulatory compliance inspections and approvals of any replacement manufacturer, all of which factors could result in production delays and additional costs.

Manufacturing of API and final drug products is complex and requires significant expertise. Difficulties could be encountered in production, particularly in scaling up and validating production. There can be no assurance that contract manufacturers will be successful at scaling up and producing BLU-5937 with the required quality and in the quantities and timelines that will be needed for clinical and/or commercial purposes. So far, we have only produced small quantities of BLU-5937 at kilogram scale for use in preclinical studies and clinical trials.

Our reliance on these contract manufacturers also exposes us to the possibility that they, or third parties with access to their facilities, will have access to and may appropriate our trade secrets or other proprietary information.

We rely on third-party contract manufacturers that are located outside of Canada. As a result, our operations are subject to customary risks related to the import of goods, including fluctuations in the value of currencies, changes in import duties, exchange controls, trade restrictions, work stoppages and general political and economic conditions in foreign countries. The countries from which we import pharmaceutical ingredients may, from time to time, impose new duties, tariff's or other restrictions or adjust presently prevailing duties or tariffs, which could adversely impact our ability to purchase such pharmaceutical ingredients or significantly increase the cost of doing so. The occurrence of any of these risks could delay or prevent the development, promotion, marketing, or sale of BLU-5937, if approved, or of any other future product candidates we may develop, and have a negative effect on our operations and financial condition.

23

***The clinical effectiveness of BLU-5937 is not yet supported by clinical data.***

The preclinical toxicology studies and the Phase 1 topline data announced in November 2018 showed that BLU- 5937 has a favorable safety and tolerability profile. However, the clinical safety of BLU-5937 has to be demonstrated through further clinical studies. The clinical effectiveness of BLU-5937 is not yet supported by clinical data and the medical community has not yet developed a large body of peer reviewed literature that supports the safety and efficacy of BLU-5937. If future studies call into question the safety or efficacy of BLU-5937 or any other product candidates we may develop in the future, our business, financial condition, results of operations or prospects could be adversely affected.

Even if BLU-5937 or any other product candidates we may develop in the future successfully complete the clinical trials and receive the regulatory approval necessary to market the product candidates to the public, there is also the risk of unknown side effects, which may not appear until the product candidates are on the market and may result in delay or denial of regulatory approval or withdrawal of previous approvals, product recalls or other adverse events, which could materially adversely affect us.

***Our clinical trials may not yield results that will enable us to obtain regulatory approval for our current or future product candidates.***

We will only receive regulatory approval for a product candidate if we can demonstrate in carefully designed and conducted clinical trials that the product candidate is safe and effective. We do not know whether our current or any future clinical trials will demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals or if they will result in marketable products.

Clinical trials are lengthy, complex, costly, and uncertain processes. It takes several years to complete testing, and failure can occur at any stage of testing. The early stage of our product candidate involves risks related to safety, efficacy, drug metabolism, pharmacokinetic profile, tolerability, manufacturing, formulation and distribution, among others. Results attained in preclinical testing and early clinical studies or trials may not be indicative of results that are obtained in later studies. We have suffered, and may suffer further, significant setbacks in advanced clinical trials, even after promising results in earlier studies. For instance, in June 2016, we announced that KIACTA (eprodisate) did not meet the primary efficacy endpoint in a Phase 3 clinical trial. Based on results at any stage of clinical trials, we may decide to repeat or redesign a trial or discontinue the development of a product candidate. Furthermore, actual results may vary once the final and quality-controlled verification of data and analyses has been completed. If we fail to adequately demonstrate the safety and efficacy of BLU-5937, we will not be able to obtain the required regulatory approvals to commercialize that product candidate.

Clinical trials are subject to continuing oversight by governmental regulatory authorities and institutional review boards, and must meet the requirements of these authorities; must meet requirements for informed consent; and must meet requirements for good clinical practices.

We may not be able to comply with these requirements. We rely on third parties, including contract research organizations and outside consultants, to assist in managing and monitoring clinical trials. Our reliance on these third parties may result in delays in completing, or in failing to complete, these trials if one or more third parties fail to perform with the speed and level of competence expected. If clinical trials for a product candidate are unsuccessful, we will be unable to commercialize such product candidate. If one or more of the clinical trials is delayed, we will be unable to meet our anticipated development or commercialization timelines. Either circumstance could have a material adverse effect on our business, financial condition, results of operations and prospects.

24

***If we encounter difficulties enrolling patients in clinical trials, the trials could be delayed or otherwise adversely affected.***

Clinical trials for product candidates require us or third parties we contract with to identify and enroll a large number of patients with the disorder under investigation. We or the third parties we contract with may not be able to enroll a sufficient number of patients to complete clinical trials in a timely manner. Patient enrollment is a function of many factors, including the following: design of the protocol, size of the patient population, eligibility criteria for the trial in question, perceived risks and benefits of the drug under study, availability of competing therapies, efforts to facilitate timely enrollment in clinical trials, patient referral practices of physicians, and availability of clinical trial sites. If we or the third parties we contract with have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay or terminate ongoing clinical trials.

***The outcome of preclinical studies and earlier-stage clinical trials may not be predictive of the success of later-stage clinical trials.***

The outcome of preclinical testing and earlier-stage clinical trials may not be predictive of the success of later-stage clinical trials. BLU-5937 and any other product candidates we may develop may fail to show the desired safety and efficacy in clinical development despite positive results in preclinical studies or having successfully advanced through initial clinical trials. Numerous companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in later-stage clinical trials even after achieving promising results in preclinical testing and earlier-stage clinical trials, and we cannot be certain that we will not face similar setbacks. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval of their products. Furthermore, the failure of any product candidate to demonstrate safety and efficacy in any clinical trial could negatively impact the perception of any other product candidates then under development and/or cause applicable regulatory authorities to require additional testing before approving any other product candidates.

***Interim topline and preliminary results from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures, which could result in material changes in the final data.***

From time to time, we may publish interim topline or preliminary results from our clinical trials. Interim results from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Preliminary or topline results also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, interim and preliminary data should be viewed with caution until the final data are available. Differences between preliminary or interim data and final data could significantly harm our business prospects and may cause the trading price of our common shares to fluctuate significantly.

***Even if we or any future partners obtain regulatory approvals for our product candidates, we will be subject to ongoing government regulation.***

Even if regulatory authorities approve BLU-5937 or any future product candidate we may develop, the manufacturing, marketing, and sale of such products will be subject to strict and ongoing regulation. Compliance with such regulation may be costly and consume substantial financial and management resources. For example, an approval for a product may be conditioned on conducting costly post-marketing follow-up studies. In addition, if, based on these studies, a regulatory authority does not believe that the drug demonstrates a benefit to patients, such authority could limit the indications for which the product may be sold or revoke the product's regulatory approval.

We and our contract manufacturers are required to comply with applicable current Good Manufacturing Practice regulations for the manufacture of product candidates. These regulations include requirements relating to quality assurance, as well as the corresponding maintenance of records and documentation. Manufacturing facilities must be approved before they can be used in the commercial manufacturing of products and are subject to subsequent periodic inspection by regulatory authorities. In addition, material changes in the methods of manufacturing or changes in the suppliers of raw materials are subject to further regulatory review and approval.

If we or any future marketing collaborators or contract manufacturers fail to comply with applicable regulatory requirements, we may be subject to sanctions, including fines, drug recalls or seizures, injunctions, total or partial suspension of production, civil penalties, withdrawals of previously granted regulatory approvals, and criminal prosecution. Any of these penalties could delay or prevent the promotion, marketing, or sale of our products.

In addition, we are currently or will in the future be subject to healthcare regulation and enforcement by the federal government and the states in which we will conduct our business once our product candidates are approved by the FDA and commercialized in the United States. In addition to the FDA's restrictions on marketing of pharmaceutical products, the healthcare laws and regulations that may affect our ability to operate include: the federal fraud and abuse laws, including the federal anti-kickback and false claims laws; federal data privacy and security laws; and federal transparency laws related to payments and/or other transfers of value made to physicians and other healthcare professionals and teaching hospitals. Many states have similar laws and regulations that may differ from each other and federal law in significant ways, thus complicating compliance efforts. These laws may adversely affect our sales, marketing and other activities with respect to any product candidate for which we receive approval to market in the United States by imposing administrative and compliance burdens on us.

Because of the breadth of these laws and the narrowness of available statutory exceptions and regulatory safe harbors, it is possible that some of our business activities, particularly any sales and marketing activities after a product candidate has been approved for marketing in the United States, could be subject to legal challenge and enforcement actions. If our operations are found to be in violation of any of the federal and state laws described above or any other governmental regulations that apply to us, we may be subject to significant civil, criminal, and administrative penalties, including, without limitation, damages, fines, imprisonment, exclusion from participation in government healthcare programs, additional reporting obligations and oversight if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***We may not achieve our projected development goals in the announced and expected time frames.***

From time to time, we set goals for and make public statements regarding the expectations for and timing of the accomplishment of objectives material to our success, such as the commencement and completion of clinical trials, expected results, anticipated regulatory submission and approval dates, and timing of product launch. The actual timing of these events can vary dramatically due to factors such as delays or failures in clinical trials, the uncertainties inherent in the regulatory approval process, and delays in achieving manufacturing or marketing arrangements sufficient to commercialize products. There can be no assurance that our clinical trials will be completed, that we will make regulatory submissions or receive regulatory approvals as planned, or that we will be able to adhere to our current schedule for the launch of BLU-5937 or any other future product candidates we may develop. If we fail to achieve one or more of these milestones as planned, the price of our common shares would likely be adversely affected.

26

***If we or our partners fail to obtain acceptable prices, coverage or adequate reimbursement for our products, our ability to generate revenues will be diminished.***

Patients in the United States and elsewhere generally rely on third-party payors to reimburse part or all of the costs associated with their prescription drugs. Accordingly, our ability to successfully commercialize our products would depend significantly on the ability to obtain acceptable prices and the availability of coverage and adequate reimbursement from third-party payors, such as government and private insurance plans. Coverage and reimbursement policies for drug products can differ significantly among payors as there is no uniform policy of coverage and reimbursement for drug products among U.S. third-party payors. There may be significant delays in obtaining coverage and reimbursement as the process of determining coverage and reimbursement is often time-consuming and costly which will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that coverage or adequate reimbursement will be obtained. While we have not commenced discussions with any such parties, these third-party payors frequently require companies to provide predetermined discounts from list prices, and they are increasingly challenging the prices charged for pharmaceuticals and other medical products. Our products may not be considered cost-effective, and reimbursement to the patient may not be available or sufficient to allow us to sell our products on a competitive basis. Even if we obtain coverage for a given product candidate, the associated reimbursement rate may not be adequate to cover our costs, including research, development, intellectual property, manufacture, sale and distribution expenses, or may require co-payments that patients find unacceptably high.

In addition, the continuing efforts of third-party payors to contain or reduce the costs of healthcare through various means may limit our commercial opportunity and reduce any associated revenue and profits. We expect proposals to implement similar government controls to continue. In addition, increasing emphasis on managed care will continue to put pressure on the pricing of pharmaceutical and biopharmaceutical products. Cost-control initiatives could decrease the price that we or any current or potential collaborators could receive for any of the products and could adversely affect profitability. In addition, in Canada and in many other countries, where significant healthcare reforms are currently under discussion, pricing and/or profitability of some or all prescription pharmaceuticals and biopharmaceuticals are subject to government control. In the United States, there have been and continue to be a number of healthcare-related legislative initiatives that have significantly affected the pharmaceutical industry. For example, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, the Affordable Care Act, was passed in March 2010, and substantially changed the way healthcare is financed by both governmental and private insurers, and continues to significantly impact the pharmaceutical industry. There also has been heightened governmental scrutiny in the United States of pharmaceutical pricing practices in light of the rising cost of prescription drugs and biologics. Such scrutiny has resulted in several recent congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for products. If we fail to obtain acceptable prices, coverages or an adequate level of reimbursement for our products, the sales of the products would be adversely affected or there may be no commercially viable market for our products.

27

***Competition in the biopharmaceutical industry is intense, and development by other companies could render our product candidate or any future product candidates or technologies non-competitive.***

The biopharmaceutical industry is intensely competitive and is subject to rapid and significant change. We face potential competition from many sources, including major pharmaceutical, specialty pharmaceutical and biotechnology companies. We consider our primary competitors to be those companies that are developing products specifically to treat chronic cough and those companies that develop products that, when approved, could be used off-label to treat cough. We are aware of other companies targeting chronic cough as the primary outcome measure in clinical studies of products. There are multiple companies developing products at varying stages of development specifically intended to treat chronic cough including Merck & Co., Bayer AG, Shionogi Inc. and NeRRe Therapeutics Ltd, some of which have substantially greater product development capabilities and financial, scientific, marketing, and human resources than us. Of these companies, Merck, Bayer and Shionogi are developing P2X3 antagonists for chronic cough that could compete directly with BLU-5937. Moreover, there are multiple companies developing therapeutic treatments for atopic dermatitis specifically, or various other forms of pruritus which could also have a therapeutic effect on atopic dermatitis itch including Sanofi S.A., Bayer AG, Pfizer Inc., Novartis International AG, LEO Pharma Inc., Menlo Therapeutics Inc., Vanda Pharmaceuticals Inc., Trevi Therapeutics Inc., Galderma S.A., Sienna Biopharmaceuticals, Inc., Tioga Pharmaceuticals, Inc. and Cara Therapeutics Inc.

***We are heavily dependent on licensed intellectual property. If we were to lose our rights to licensed intellectual property, we would not be able to continue developing or commercializing BLU-5937. If we breach any of the agreements under which we license the use, development and commercialization rights to BLU-5937 or any other future product candidate or technology from third parties or if certain insolvency events were to occur, we could lose license rights that are critical to our business.***

We have an exclusive worldwide license to develop and commercialize BLU-5937 pursuant to a license agreement with the NEOMED Institute, now adMare Bionnovations ("NEOMED"), that is critical to our business, which is subject to termination for breach of our terms and, therefore, our rights may only be available to us for as long as our development and commercialization activities are sufficient to meet the terms of the license. In addition, we may need to enter into additional license agreements in the future. Our existing license agreements impose, and any future license agreements may impose on us, various developments, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. If we fail to comply with our obligations under these agreements, or we are subject to a bankruptcy, the licensor may have the right to terminate the license, in which event we would not be able to market products covered by the license, which would have a material adverse effect on our business, financial condition, results of operations and prospects. Moreover, our current or future licenses may provide for a reversion to the licensor of our rights in regulatory filings or other intellectual property or data that we regard as our own in the event the license terminates under certain circumstances, such as due to breach.

28

Licensing of intellectual property is of critical importance to our business and involves complex legal, business and scientific issues. Disputes may arise between us and our licensors regarding intellectual property subject to a license agreement, including with respect to:

- the scope of rights granted under the license agreement and other interpretation-related issues;
- the rights of our licensors under the license agreements; and
- our diligence obligations with respect to the use of the licensed technology in relation to our development and commercialization of BLU-5937 and any future product candidates, and what activities satisfy those diligence obligations.

Any disputes with our licensors over intellectual property that we have licensed from them may prevent or impair our ability to maintain our current licensing arrangements on acceptable terms. Termination or expiry of our license agreements could result in the loss of significant rights and could materially harm our ability to further develop and commercialize BLU-5937 or other future product candidates.

We depend on our licensors to protect a significant portion of our proprietary rights that derive from license agreements, including our exclusive worldwide license with NEOMED to develop and commercialize BLU-5937. BLU-5937 is covered by a patent that is not owned by us but is instead licensed to us by NEOMED. Moreover, our licensors under current licenses retain and our licensors under future licenses may retain certain rights and obligations.

Our business could suffer, for example, if the licensed patents or other rights are found to be invalid or unenforceable, or if we are unable to enter into necessary licenses on acceptable terms.

In addition, the agreements under which we currently license intellectual property or technology from third parties are complex, and certain provisions in such agreements may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could narrow what we believe to be the scope of our rights to the relevant intellectual property or technology, or increase what we believe to be our financial or other obligations under the relevant agreement, either of which could have a material adverse effect on our business, financial condition, results of operations, and prospects. Moreover, if disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on commercially acceptable terms, we may be unable to successfully develop and commercialize the affected product candidates, which could have a material adverse effect on our business, financial conditions, results of operations, and prospects.

***We may not obtain adequate protection for our products through our intellectual property.***

Our success depends, in large part, on our ability to protect our competitive position through patents, trade secrets, trademarks, and other intellectual property rights. Our success, competitive position and future revenues with respect to these product candidates will depend, in part, on our ability to protect our intellectual property. We will be able to protect our proprietary rights from unauthorized use by third parties only to the extent that our proprietary rights are covered by valid and enforceable patents or are effectively maintained as trade secrets. We attempt to protect our proprietary position by maintaining trade secrets and by filing U.S. and foreign patent applications related to our in-licensed technology, inventions and improvements that are important to the development of our business. Our failure to do so may adversely affect our business and competitive position.

The patent positions of pharmaceutical and biopharmaceutical firms, including ours, are uncertain and involve complex questions of law and fact for which important legal issues remain unresolved. The patents issued or to be issued to us may not provide us with any competitive advantage. We may not be able to protect our intellectual property rights throughout the world. Our patents may be challenged by third parties in patent litigation. In addition, it is possible that third parties with drugs that are very similar to ours will circumvent our patents by means of alternate designs or processes. We may have to rely on method of use protection for our compounds in development and any resulting drugs, which may not confer the same level of protection as protection of our compounds per se. We may be required to disclaim part of the term of certain patents. There may be prior art of which we are not aware that may affect the validity or enforceability of a patent claim. There also may be prior art of which we are aware, but which we do not believe affects the validity or enforceability of a claim, which may, nonetheless ultimately be found to affect the validity or enforceability of a claim. No assurance can be given that our patents would, if challenged, be held by a court to be valid or enforceable or that a competitor's technology or drug would be found by a court to infringe our patents.

Patent terms may be inadequate to protect our competitive position on our product candidates for an adequate amount of time. Patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. Various extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering our product candidates are obtained, once the patent life has expired, we may be open to competition from competitive products, including generics or biosimilars. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

Patent applications relating to or affecting our business may have been filed by a number of pharmaceutical and biopharmaceutical companies and academic institutions. A number of the technologies in these applications or patents may conflict with our technologies, patents, or patent applications, and such conflict could reduce the scope of patent protection that we could otherwise obtain. We could become involved in interference proceedings in the United States in connection with one or more of our patents or patent applications to determine priority of invention. Our granted patents could also be challenged and revoked in opposition proceedings in certain countries outside of the United States. In addition to patents, we rely on trade secrets and proprietary know-how to protect our intellectual property. We generally require employees, consultants, outside scientific collaborators, and sponsored researchers and other advisors to enter into confidentiality agreements. These agreements provide that all confidential information developed or made known to the individual during the course of the individual's relationship with us is to be kept confidential and not disclosed to third parties except in specific circumstances. In the case of employees, the agreements provide that all of the technology that is conceived by the individual during the course of employment is our exclusive property. These agreements may not provide meaningful protection or adequate remedies in the event of unauthorized use or disclosure of proprietary information. In addition, it is possible that third parties could independently develop proprietary information and techniques substantially similar to ours or otherwise gain access to our trade secrets.

We may obtain the right to use certain technology under license agreements with third parties. Our failure to comply with the requirements of material license agreements could result in the termination of such agreements, which could cause us to terminate the related development program and cause a complete loss of investment in that program. As a result of the foregoing factors, we may not be able to rely on our intellectual property to protect our products in the marketplace.

***If we are unable to protect the confidentiality of our trade secrets, the value of our technology could be materially adversely affected and our business would be harmed.***

We seek to protect our confidential proprietary information, in part, by confidentiality agreements and invention assignment agreements with our employees, consultants, scientific advisors, contractors and collaborators. These agreements are designed to protect our proprietary information. However, we cannot be certain that such agreements have been entered into with all relevant parties, and we cannot be certain that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. For example, any of these parties may breach the agreements and disclose our proprietary information, including our trade secrets, and we may not be able to obtain adequate remedies for such breaches. We also seek to preserve the integrity and confidentiality of our confidential proprietary information by maintaining physical security of our premises and physical and electronic security of our information technology systems, but it is possible that these security measures could be breached. If any of our confidential proprietary information were to be lawfully obtained or independently developed by a competitor, we would have no right to prevent such competitor from using that technology or information to compete with us, which could harm our competitive position.

***We may infringe the intellectual property rights of others.***

Our commercial success depends significantly on our ability to operate without infringing on the patents and other intellectual property rights of third parties. There could be issued patents of which we are not aware that our products infringe or patents that we believe we do not infringe, but that we may ultimately be found to infringe. Moreover, patent applications are, in some cases, maintained in secrecy until patents are issued. The publication of discoveries in the scientific or patent literature frequently occurs substantially later than the date on which the underlying discoveries were made and patent applications were filed. Because patents can take many years to issue, there may be currently pending applications of which we are unaware that may later result in issued patents that our products infringe. For example, pending applications may exist that provide support or can be amended to provide support for a claim that results in an issued patent that our drug infringes.

The biopharmaceutical industry has produced a proliferation of patents, and it is not always clear to industry participants which patents cover various types of products. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. We believe that BLU-5937 does not infringe any valid claim of these patents, although there can be no assurances of this. In the event of an infringement or violation of another party's patent, we may not be able to enter into licensing arrangements or make other arrangements at a reasonable cost. Any inability to secure licenses or alternative technology could result in delays in the introduction of drugs or lead to prohibition of the manufacture or sale of drugs by us.

31

***Third parties may initiate legal proceedings alleging that we are infringing their intellectual property rights, the outcome of which would be uncertain and could harm our business.***

Third parties may assert patent or other intellectual property infringement claims against us or our other licensors arising from the manufacture, use, or sale of our current or future product candidates. An unfavorable outcome could result in loss of patent rights and require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, pay royalties, redesign our infringing products or obtain one or more licenses from third parties, which may be impossible or require substantial time and monetary expenditure.

***We may become involved in lawsuits or other proceedings to protect or enforce our patents or other intellectual property, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or other intellectual property. If we were to initiate legal proceedings against a third party to enforce a patent covering our product candidates, the defendant could counterclaim that the patent covering our product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, including lack of novelty, obviousness, written description or non-enablement. Grounds for an unenforceability assertion could be an allegation that someone connected with prosecution of the patent withheld relevant information from the United States Patent and Trademark Office, or "**USPTO**", or made a misleading statement, during prosecution. The outcome following legal assertions of invalidity and unenforceability is unpredictable. The validity of our current or future patents or patent applications or those of our licensors may also be challenged in interference or derivation proceedings, opposition, post grant review, inter partes review, or other similar enforcement and revocation proceedings, provoked by third parties or brought by us. Our patents could be found invalid, unenforceable, or their scope significantly reduced.

Interference or derivation proceedings provoked by third parties or brought by us or declared by the USPTO may be necessary to determine the priority of inventions with respect to our patents or patent applications. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms or at all, or if a non-exclusive license is offered and our competitors gain access to the same technology. Our defense of litigation or other proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. In addition, the uncertainties associated with litigation could have a material adverse effect on our ability to raise the funds necessary to continue our clinical trials, continue our research programs, license necessary technology from third parties, or enter into development partnerships that would help us bring our product candidates to market.

***Patent litigation is costly and time consuming and may subject us to liabilities.***

Our involvement in any patent litigation, interference, post-grant proceedings such as inter partes review or opposition, or other administrative proceedings will likely cause us to incur substantial expenses, and the efforts of technical and management personnel will be significantly diverted. In addition, an adverse determination in litigation could subject us to significant liabilities. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions, or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common shares.

***We may be subject to claims challenging the inventorship of our patents and other intellectual property.***

We or our licensors may be subject to claims that former employees, collaborators or other third parties have an interest in our owned or in-licensed patents, trade secrets, or other intellectual property as an inventor or co-inventor. For example, we or our licensors may have inventorship disputes arise from conflicting obligations of employees, consultants or others who are involved in developing our product candidates. Litigation may be necessary to defend against these and other claims challenging inventorship or our or our licensors' ownership of our owned or in-licensed patents, trade secrets or other intellectual property. If we or our licensors fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, intellectual property that is important to our product candidates. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties or that our employees have wrongfully used or disclosed alleged trade secrets of their former employers.***

As is common in the biotechnology and pharmaceutical industry, we employ individuals who were previously employed at universities or other biotechnology or pharmaceutical companies, including our competitors or potential competitors. Although we try to ensure that our employees, consultants and independent contractors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of any of our employees' former employers or other third parties. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel, which could adversely impact our business. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.***

Periodic maintenance fees, renewal fees, annuity fees and various other governmental fees on patents and/or applications will be due to be paid to the USPTO and various governmental patent agencies outside of the United States in several stages over the lifetime of the patents and/or applications. We have systems in place to remind us to pay these fees, and we employ an outside firm and rely on our outside counsel to pay these fees due to non-U.S. patent agencies. The USPTO and various non-U.S. governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. We employ reputable law firms and other professionals to help us comply, and in many cases, an inadvertent lapse can be cured by payment of a late fee or by other means in accordance with the applicable rules. However, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. In such an event, our competitors might be able to enter the market and this circumstance would have a material adverse effect on our business.

***The market price of our common shares experiences a high level of volatility due to factors such as the volatility in the market for biotechnology stocks generally and the short-term effect of a number of possible events.***

We are a public growth company in the biotechnology sector. As frequently occurs among these companies, the market price for our common shares may experience a high level of volatility. During the 12-month period ended on December 31, 2019, giving effect to the one-for-3.6 consolidation of our common shares effective on August 19, 2019, our common shares traded between $3.49 and $11.20 per share on the TSX. Since their initial NASDAQ listing on September 5, 2019, up to December 31, 2019, our common shares traded between US$5.55 and US$7.88 per share on NASDAQ.

Numerous factors, including many over which we have no control, may have a significant impact on the market price of our common shares, including, among other things, the following: (1) clinical and regulatory developments regarding our product candidate and those of our competitors; (2) arrangements or strategic partnerships by our competitors; (3) other announcements by us or our competitors regarding technological, drug development, sales, or other matters; (4) patent or other intellectual property achievements or adverse developments; (5) arrivals or departures of key personnel; (6) changes in financial estimates and recommendations by securities analysts; (7) government regulatory action affecting our product candidate and our competitors' products in the United States, Canada, and foreign countries; (8) actual or anticipated fluctuations in revenues or expenses; (9) general market conditions and fluctuations for the emerging growth and biopharmaceutical market sectors; (10) failure to enter into favorable third-party manufacturing agreements; (11) events related to threatened, new, or existing litigation; (12) economic conditions in the United States, Canada, or abroad; (13) purchases or sales of blocks of our securities; and (14) difficulties in our ability to obtain additional financing.