# Exhibit 23

**S&P Global**
Market Intelligence

# BELLUS Health Inc. TSX:BLU

# Shareholder/Analyst Call

## Thursday, May 14, 2020 7:30 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ...................................................................... | 3 |
| Presentation | ...................................................................... | 4 |
| Question and Answer | ...................................................................... | 13 |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Francesco Bellini**
*Chairman of the Board*

**Roberto Francesco Bellini**
*President, CEO & Director*

**SHAREHOLDERS**

**Denis Garceau**
*BELLUS Health Inc.*

**François Desjardins**
*BELLUS Health Inc.*

**ATTENDEES**

**Unknown Attendee**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Francesco Bellini**
*Chairman of the Board*

Ladies and gentlemen, we are going to open up the Annual and Special Shareholder Meeting of BELLUS Health. My name is Francesco Bellini, and I am happy to welcome our shareholders and guests and particularly, to member of our online audience joining us via our webcast today, helping to mitigate the risk for our shareholder, management, employee and other stakeholder associated with the global COVID-19 health emergency.

In the call, here is also present, Roberto Bellini, the President and Chief Executive Officer; and Sébastien Roy, Corporate Secretary of our company. Our rules provide that the Chairman of the Board of Directors preside at the Shareholders' Meeting. Therefore, I will act as the Chair of the meeting, and Mr. Roy will act as the secretary of the meeting.

I hereby designated Ms. Pina Pacifico and Ms. Gale Demick of the Computershare Investor Service as a scrutineer to report on the number of shareholders present or representative by proxy holder and the number of shares they represent. I ask now the scrutineer to read their report.

**Unknown Attendee**

Mr. Chairman, we, the undersigned scrutineers from Computershare Investor Services, hereby report that there are shareholders and/or proxy holders present at this meeting, representing in person or by proxy, over 80.08% of the total outstanding shares of BELLUS Health Inc. Thank you.

**Francesco Bellini**
*Chairman of the Board*

Thank you. I request that a copy of the scrutineers' report to be included in the minutes of the meeting. Since the scrutineer have declared a quorum, I declare the meeting open.

The secretary of the corporation confirmed to sending over the notice of this meeting to the shareholders. And I will ask that the secretary of the meeting to read the text of the notice of the meeting. Unless a motion is needed to dispense from doing so, I direct that the notice of the meeting be annexed to the minutes of the meeting. Denis?

**Denis Garceau**
*BELLUS Health Inc.*

Denis Garceau, shareholder of BELLUS Health Inc. Mr. Chairman, I move that the secretary be dispensed from reading the notice of the meeting at this meeting.

**François Desjardins**
*BELLUS Health Inc.*

My name is François Desjardins, shareholder of BELLUS Health. Mr. Chairman, I second the motion.

**Francesco Bellini**
*Chairman of the Board*

The motion has been made and seconded. Considering the amount of a proxy as the backup shareholder, I declare the motion adopted.

The audited financial statement of the corporation for the year ended December 31, 2019, and how it also report thereon have been sent to all shareholders with the notice of the meeting. I now table the audit financial statement for the year ended December 31, 2019, and the auditors report hereon, and I will ask the secretary to file them with the records of the meeting.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The next item in the agenda is the election of directors into ensuing years to hold office until the close of our next Annual Meeting of Shareholders or till their successors are duly elected or appointed. Former Director Chau Q. Khuong informed the company that he did not wish to stand for re-election.

I now open the floor to nomination for the election of the 7 directors.

**François Desjardins**
*BELLUS Health Inc.*

Mr. Chairman, I nominate the following 7 people as directors of the corporation to hold office until the close of the next Annual Meeting of Shareholders or until their successors are duly elected or appointed. They are: Dr. Francesco Bellini, Mr. Roberto Bellini, Dr. Youssef Bennani, Mr. Franklin Berger, Dr. Clarissa Desjardins, Mr. Pierre Larochelle and Mr. Joseph Rus.

**Denis Garceau**
*BELLUS Health Inc.*

Denis Garceau, shareholder, Mr. Chairman, I second the nomination.

**Francesco Bellini**
*Chairman of the Board*

Thank you. Each of this nominee has accepted his nomination and is eligible to act as a director of the corporation pursuant to the Canada Business Corporations Act. May I now have a motion declaring that the 7 nominees be duly elected as director of the corporation?

**François Desjardins**
*BELLUS Health Inc.*

Mr. Chairman, I move that each of the 7 nominees to be elected as director of the corporation.

**Denis Garceau**
*BELLUS Health Inc.*

Mr. Chairman, I second the motion.

**Francesco Bellini**
*Chairman of the Board*

The motion that each of the 7 nominees be duly elected as directors of the corporation has been made and seconded. We have received the proxy in favor of the election of each of the nominee well in excess of a majority of the votes cast by common shareholders at this meeting. Therefore, I declare the motion adopted.

Under the Board of Director majority voting policy, in an uncontested election of the director, any nominee that receive a greater number of votes withheld, that the votes for election will tender his or her resignation to the Chairman following the meeting. Considering that the proxy were received from holders of a sufficient number of shares, that each of the nominee for director received more votes than the possible number of votes withheld, none of the shareholder will be required to tender a resignation under a majority voting policy.

The next item in the agenda is the appointment of KPMG LLP, Chartered Accountants, as auditors of the corporation for the ensuing year at such remuneration as may be fixed by the Audit Committee of the corporation. And, therefore, I call for a motion in this regard.

**Denis Garceau**
*BELLUS Health Inc.*

Mr. Chairman, I move that KPMG LLP Chartered Accountants be appointed as auditor of the corporation for the ensuing year at such remuneration as may be fixed by the Audit Committee of the corporation.

**François Desjardins**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*BELLUS Health Inc.*

Mr. Chairman, I second the motion.

**Francesco Bellini**
*Chairman of the Board*

The motion has been made and seconded. More than 95% of the total number of votes cast by proxy have voted in favor of the appointment of KPMG LLP, Chartered Accountants, as auditor of the corporation. I declare the motion adopted.

The next item in the agenda is the ratification and confirmation of the resolution approving the unallocated option under the amended and the restated stock option plan of the corporation, as set forth in the Schedule A of the management proxy circular. I directed that a copy of the resolution be annexed to the minutes of this meeting. The resolution must be passed by a majority of the common shareholders of -- at this meeting. I will now call for a motion in this regard.

**François Desjardins**
*BELLUS Health Inc.*

Mr. Chairman, I move that the resolution approving the unallocated options under the amended and restated stock option plan as set forth in scheduling of the management proxy circular be ratified and confirmed by the shareholders of the corporation.

**Denis Garceau**
*BELLUS Health Inc.*

Mr. Chairman, I second the motion.

**Francesco Bellini**
*Chairman of the Board*

The motion has been made and seconded. Considering that the proxies received by policyholder well in excess of the required majority of the votes cast by the shareholders at the meeting, I declare the motion adopted.

Ladies and gentlemen, the formal items on the agenda have been covered. If there are no other matter to submit to the meeting, will someone move to terminate the meeting and move to the management of the presentation?

**Denis Garceau**
*BELLUS Health Inc.*

Mr. Chairman, I move to terminate the meeting.

**François Desjardins**
*BELLUS Health Inc.*

Mr. Chairman, I second the motion.

**Francesco Bellini**
*Chairman of the Board*

I declare the motion adopted and the meeting terminated.

Now I'd like to introduce Roberto Bellini, CEO of the corporation. He will provide you with an update of the company ongoing activities. Shareholders can submit the question via the question-and-answer text box to move the presentation. Roberto B.?

**Roberto Francesco Bellini**
*President, CEO & Director*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, I got it. Thank you, Dr. B. And obviously, this is a new format for us from -- for an AGM. And we're pretty -- I'm pretty excited about it. And I'm happy to give you a presentation today. It's obviously been a really important period for us over the last 12 months in terms of the project, and I'm happy to give some perspective on that and also, I think not only in looking backwards, but also looking forward. Obviously, this is a huge year for us. And I'm going to touch on that as well in the presentation.

Just like Dr. B mentioned, I think it would be -- I encourage you to submit questions in the Q&A widget on the webcast. We do have most of the -- I'll do the presentation, but we do have most of the management team with us on the line. And if there are some specific questions that you'd like to ask Cathy, Denis, François, we'd be happy to answer those at the end of the presentation. And do send them in as they kind of -- as you think about them, it will just help us kind of like manage those questions, and I might even try to like incorporate some of those answers as I'm going through the presentation.

So before getting started, this is our forward-looking statement slide. And I do encourage you to do your due diligence and to -- and in particular, to read the Risk section of our regulatory filings before making any kind of investment decision.

So just before we kind of like get into more of the regular corporate presentation, I think it's important to kind of look back a bit on the last 12 months at the company. We've obviously made a huge effort here into taking the 5937 into the clinic, both at the -- in terms of the chronic cough program that's currently in Phase II, but we also have an IND that's cleared for a second indication in chronic pruritus as well. The company has made incredible strides in terms of strengthening the balance sheet and being able to execute on the program, including completing a public listing on the NASDAQ and raising just under $80 million. And then more recently, just a month ago, we did reacquire the IP rights to the program. So it's currently a completely unencumbered program. We own 100% of the rights, the BLU-5937, and all the related IP.

We continue to also build out the team. So the core part of the senior management team has worked together for a long time. This is our second project together. And then more recently, in August of last year, Cathy Bonuccelli joined us. Cathy spent the last 25 years at GSK and Astra doing late-stage drug development in the respiratory space specifically, which obviously is the right kind of expertise that we want in our current project.

So on Slide 6, just a broad overview before we go through a number of these items in more detail. We think 5937 is a high potential program. This is addressing a large patient population, a large patient population with high significant unmet medical need, in chronic coughers in particular. And I'll go through all of this in a lot more details in the slides. This is an area that is an indication that where there's a significant interest by big pharma, the lead asset in refractory chronic cough is MK-7264 being developed by Merck. That's currently wrapping up 2 large Phase III studies. We think the data behind that program is great from an efficacy perspective. There is also a widely known tolerability issue with that program with about 80% of patients having some form of taste effect, taste alteration or partial or complete taste loss. So that does provide an opportunity for second-generation products to improve on that profile. And that's definitely what we think we have with 5937, it being highly selective, a highly selective P2X3 antagonist. We've demonstrated that in our Phase I trial already having -- in that trial having showed a significant reduction in the taste of vaccine in those subjects, and I'll go through that in more detail in the presentation.

Currently, the Phase II is underway, and we do expect top line data from that trial to be released in June or July of this year. So very, very, very shortly.

Beyond chronic cough, this is -- P2X3 is involved in a number of different hypersensitization disorders. We've selected chronic pruritus associated to atopic derm as our second indication. But there are a number of other companies working in this field. They're also looking at several other indications as well. And I'll touch on those later on in the presentation as well.

We believe the company to be relatively well financed, having completed last year with $90 million of cash. As I mentioned previously, the program is now 100% owned by BELLUS. The IP is robust. It's at its core composition of matter, which goes out to 2034, not including extensions.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**BELLUS HEALTH INC. SHAREHOLDER/ANALYST CALL | MAY 14, 2020**

On Slide 7, we think that we've put together a great team to execute on this project. I've talked a little bit about the management team, about Cathy Bonuccelli recently joining us. We think we have a deeply experienced Board of Directors supporting us at the clinical advisory board level. I think it's important to note the inclusion of Dr. Jacky Smith, Dr. Smith runs the largest cough clinic in the world out of the University of Manchester in the U.K. She's been involved in almost all of the chronic cough trials, including the ones from Merck. She's currently the principal investigator in our Phase II trial as well.

Slide 8 here. It's a little bit of a divider slide. Just to let you know that we're going to focus a lot of the discussion on refractory chronic cough. We'll touch on chronic pruritus as well during the presentation. So let's talk a little bit about chronic cough and refractory chronic cough. Chronic cough is defined as a cough that lasts longer than 8 weeks. When you use that definition, there's about 10% of the adult population in developed countries that have chronic cough. So those include countries like the U.S., EU, Japan, so the major pharma markets. So in the U.S., that's 26 million patients with chronic cough. Standard of care for those patients is to identify the cause of the cough and then to treat that underlying trigger. So the big causes are usually asthma, allergy, acid reflux. And if you adequately address those triggers, the cough can and will go away. For many patients, though, that doesn't suffice. So these patients continue to cough. We call those patients refractory chronic cough patients. So notwithstanding that physicians have identified some kind of underlying condition and treated it, they continue to cough or physicians can't identify an underlying condition and they continue to cough. So those -- that is this refractory chronic cough bucket of patients. Here, the literature is more varied in terms of what the percentage of those patients is. Literature suggests anywhere from 10% to 50% of patients in our market research today, we've identified long-standing refractory chronic cough patients. So these are patients that are coughing for over 1 year, so more strict definition, and that's about 10%. So about 1% in total of the adult population in most developed countries in the U.S., that's 2.6 million patients. So a very significant number of patients that are suffering from long-standing refractory chronic cough. And these patients suffer a lot. They cough a lot, 20, 30, 40 times, even hundreds of times per hour. They don't sleep well at night. They have physical pain from coughing. They get tired from coughing. But I think even more importantly is the psychosocial component to the condition. It's really the anxiety and even depression that can come with this stigma of coughing continuously. And I think in a kind of COVID environment that we're living in now, I think that's even more understandable and appreciable. Like if any of us go to the grocery store right now and someone starts coughing, I think we automatically think about disease. And so you can really appreciate how difficult it is for these patients from that perspective, whether it's in the past, previously we're going to like restaurants, going to the theater and coughing and bothering people around them, or in the current environment, probably even worse.

So how do we address that condition? At this point, we have very strong evidence to support the role of the P2X3 receptor in chronic cough. This is an ATP-gated ion channel. So it's a sensor receptor that's found throughout the body. And depending on its location in the body, it's sending different kind of sensory signals to the brain. In the upper airway, it's sensing irritation. And once triggered, it's sending the urge-to-cough signal to the brain, that then triggers the cough reflex. So it definitely makes a lot of sense to develop small molecule inhibitors of this receptor to treat the chronic cough patient population. And I think at this point, we know that, that works.

So on Slide 12, I'm showing you the data from MK-7264. This is a trial that was done over a 12-week period. But very consistently across numerous Phase II trials. Merck has shown very substantial reductions in cough frequency. So in this study, it was 57% from baseline. Placebo-adjusted was 37%. In previous Phase II trials definitely see a consistent kind of like 50% to 60% reduction in these patients. So very important and clinically meaningful effect for these patients. This is considered a breakthrough therapy for refractory chronic cough patients, and that's whether you speak to patients. Investigators results were published in The Lancet. So very good.

I think that there is -- so there's no real issue on the efficacy side. I think the only liability in this drug is really a tolerability issue, and that's linked to 81% of patients having some form of taste alteration or taste loss. That can often take the form, in the case of taste alteration, it's a metallic taste in the mouth or a gummy taste or a rubber taste in the mouth. And taste loss is just that when it's partial food, when you're eating food, it -- food can taste flat or you think it lacks salt or a complete taste loss where you don't taste your food at all.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

It's important to note that this program was not developed internally at Merck. It was acquired when Merck acquired Afferent Pharmaceuticals in mid-2016. That was just after Afferent has completed a Phase II trial. And it was paid for in total -- the total consideration was $1.25 billion, with $500 million upfront. That program has obviously progressed since then. And it is -- it has -- it is wrapping up 2 Phase III trials currently. But the primary efficacy end point and the top line -- qualitative top line data has been released by Merck, and they have said that the trial is successful at the top dose in terms of efficacy, and then that the safety and tolerability profile is in line with previous trials.

So why does that taste effect happen? To explain that, I think you need to appreciate that there are 2 forms of the P2X3 receptor. So these are trimeric receptors that are formed of 3 subunits. What we -- the homotrimeric forms, so the one that's formed of 3 identical subunits of P2X3, that one is commonly referred to as the P2X3 receptor. And then there's a second subtype called P2X2/3. This is the heterotrimeric form where there are 2 subunits of P2X3 and 1 subunit of P2X2. Both of these receptors play the same role, have the same function. It's really just a question of where they're located in the body. In the upper airway, you have almost exclusive expression of P2X3 and the formation of a homo trimer, so the homo trimer being principally responsible for driving that cough reflex. And in the taste buds, you have both of the receptor. So P2X3 and P2X2/3.

The Merck product doesn't differentiate much between those 2 receptors. So at the effective dose where they're showing that 57% drop in cough frequency, 37% placebo adjusted. They're also inhibiting the P2X2/3 receptor, which is hence causing the taste alteration and taste loss that you also see at that same dose.

So that's really what's creating the opportunity. The opportunity here is to develop a P2X3 antagonist that is more selective for P2X3 than P2X2/3, so that can drive that antitussive effect while minimizing the taste effect.

And that's really what we have with 5937. It's highly potent at P2X3. So in our hands, about 3x more potent than the Merck compound, which should drive that antitussive effect, but even more importantly is the selectivity. And so when we say selectivity, it's the ratio of potency at one receptor, at the cough receptor, over the taste receptor. So P2X3 over P2X2/3. The Merck compound, as reported by Merck, is three to sevenfold in terms of the selectivity. We have best-in-class selectivity at 1,500-fold. So that can really drive down or significantly reduce that taste effect. And I'm going to take you through some of the most important data to support that.

So first, on Slide 16 is the data from our Phase I trial. This was a trial that was completed in November of 2018. I'm showing you 2 columns here. So the column on the right is the Merck data at the 50-milligram BID dose. And as -- so this is -- these are numbers that are in line with what I was saying before. So 81% in total that have taste adverse events, 20 -- about 20% was complete taste loss, about 25% with partial taste loss and 48% with taste alteration, so all important numbers. And then when you compare 2 doses that are comparable in terms of their exposure levels or ability to inhibit the P2X3 receptor, so the cough receptor, in our case, the 50- and 100-milligram doses, we have less than 5% of subjects that have shown taste alteration. Obviously, this is at lower levels of duration. So some of these subjects are at 1 day. Some of them are at 7 days. But in all, you can see that it's a drastic difference in terms of the taste effect seen on the Merck compound versus the BELLUS-compounded comparable doses.

So if we then try to answer the second half of the question. So I think that we have strong data to support the differentiation in terms of the taste side effects, but how about efficacy? Can we generate the same or similar level of efficacy to the Merck compound?

Here, I'm showing you animal data on 17. So the preclinical data that supports that. On the left-hand side is expression analysis. Looking at the expression of P2X2 and P2X3 in the upper airway, as you can see, it's almost exclusive expression of P2X3. So hence, the formation of the P2X3 receptor being the form that's driving the cough -- or the cough reflex in the airway. And that translates really nicely in the guinea pig cough model. In this case, we've gone head-to-head versus the Merck product at increasing doses. And as you can see, whether you gave 5937 or 7264, even though the BELLUS product is much more selective, in this model, there's very similar levels of efficacy between the 2 compounds.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Nice to have animal data, but I think it's just as important to look at clinical data to support that. The -- on Slide 18. So we don't have our own clinical data yet. We will have that in a couple of months from now. But there's definitely data from our competitors that support that more selective agents can drive efficacy in this patient population. So Shionogi's compound, as they reported, is 250-fold in terms of selectivity. So not quite at our 1,500-fold level but still quite selective. And in the case of Bayer, the selectivity, based on our estimate -- they have not disclosed this, but based on their IP, we believe that their selectivity is somewhere in the 25- to 125-fold range.

As you can see here, both of those compounds generate statistically significant differences versus placebo. These are clinically meaningful differences as well. So from our understanding, patients that have taken these products appreciate the difference. So definitely, there is clinical validation that the more selective agents can drive an antitussive effect.

And on Slide 19, we're kind of like putting that all together from a competitive landscape perspective that we've talked a lot about the Merck product. I've shown you data at 50 milligrams BID. They ended up taking 45 milligrams BID into the Phase III. As I mentioned here, we're using the numbers from the Phase IIb. We haven't heard specifically what the Phase III data is, though, it is anticipated to be somewhat in line with what's been seen previously. They also had a lower dose in the Phase III. That lower dose did not achieve the primary efficacy end point. So we do not believe that it will be -- we do not believe that it is approvable.

In terms of the second-generation agents, I think it's important to note that we believe we have differentiation at the level of selectivity. So we have the highest selectivity out of this group of 3. We believe that, that's going to give us the widest therapeutic index to be able to show the best profile possible for the next-gen agents.

And I've detailed a little bit of the cough and taste side effects here in this table. And our own Phase II data will be available coming up in June, July, so just in a couple of months. I think order of entry is also important or state of development is important. And it's important to note that all 3 of the -- of Bayer, Shionogi and BELLUS are at relatively similar stages of development, all in Phase II currently.

And I think that, that's a good segue into the next slide, on Slide 20. So obviously, we believe that we -- that our best-in-class selectivity can drive a very good profile. But this is also a very big class, and we believe that there can be multiple winners here. We don't expect that there will be a winner-take-all kind of drug in this market, and then the market will get shared across multiple agents and that multiple agents can be blockbuster products. And I think the numbers do support that. So as I mentioned earlier, 2.6 million patients in the U.S. that are treatment-refractory over 1 year. If you push that out to the major pharma markets, it's over 6 million patients. So there are a lot of patients that suffer from this condition.

And from a payer perspective, I'm showing you a couple of comparables here on the screen. I think LINZESS, in particular, is one of my favorite comparables. LINZESS is a product for chronic idiopathic constipation. So another condition that's nonlife-threatening, chronic in nature. Where there are cheaper drugs available at the pharmacy or over-the-counter that don't work that well, LINZESS is a commercial success in the U.S., sells for over $1.5 billion. It's priced at $375 per month, widely reimbursed, low co-pay. So I think that, that's probably a very good comparable for where we could see pricing in this category. And obviously, you start putting together multimillion patients pricing at the kind of like $4,000, $5,000 per year range. You can really appreciate how this market can easily become a multibillion-dollar market.

So we're going to dive into a little bit more detail here on the Phase I trial. It's a pretty classic trial that included single ascending dose cohorts and multiple ascending dose cohorts. On Slide 23 is the PK profile, which is great. This is a product that's rapidly absorbed. We think that, that's going to be important and meaningful for patients here. We do think that there's an acute effect when giving P2X3 antagonist. And so patients will see this kind of almost immediate relief from coughing. There's very nice systemic increases in exposure, up to 800 milligrams, the half-life of the product that support BID dosing, no significant food effects, no accumulation of drug, so very nice PK profile.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And when we look at our Phase I data as well as PK data available from Merck and receptor occupancy, we project our optimal dose to be somewhere between 50 and 100 milligrams BID. We are studying 25 to 200 in the Phase II trial. So we're actually doing 4 doses. And so I think a very nice wide range that we're going to be studying around our projected optimal dose.

On Slide 24, is the most frequent adverse event table from the Phase I trial. We don't really see anything of note here. Maybe a couple of things that I can highlight are the potential class-related side effects. Those obviously include taste effects, and I have a slide to go into that in a little bit more detail. But there are a couple of other potential P2X3 class-related side effects, include hypoesthesia. This is a little bit of numbness that's usually felt in the jaw line, so oral hypoesthesia. We don't see any at 50 to 100, but it is something that we see at higher doses. It's also something that's seen in the small percentage of patients in the Merck trial. It's transient. It's not linked to any dropouts. And nausea is a little bit of a question mark for us. There does seem to be a little bit of dose-dependent increase in nausea in the Merck Phase IIb trial. We don't have any, again, at 50 to 100. We do have somewhat higher doses, but these are small numbers. Again, nothing of real concern. If anything, when it's seen, it's mild and transient and not linked to any dropouts.

So let's dive into a little bit more detail on the taste. And here, we've added in data from 2 Phase II -- from 2 Phase I trials. So it includes the SAD and MAD cohorts, but it also includes a cohort of 28 subjects that were done in a DDI trial at 200 milligrams that were dosed for 10 days. In that trial, there were 7% of taste effects. So it's included in this table, where the N equals 44. But overall, as you can see, and particularly at the doses that are being explored in the Phase II, it's a very low level of taste effects. These do start increasing as we move up to 400 and above. And that's likely because we're starting to slightly inhibit the P2X2/3 receptor.

On Slide 26 is the design of the Phase II trial. So this is a crossover design trial with 2 periods with a forced dose escalation. So every single patient takes all 4 doses, and they do that in 4-day incremental period. So someone comes into the study, they're randomized to placebo or drug. They do a baseline cough count and then they do 4 days at 25 milligrams, 4 days at 50, 4 days at 100, 4 days at 200. And at the end of each of those many periods, they have a cough count as well. They're washed out. And then they crossed over. So they cross over and they do matching either placebo or drug, period. So every patient takes -- has a cough count at all the doses and matching placebo, which is very strong from a stat perspective in generating power in this study.

To be clear, this isn't a study that we invented. This is a trial design that's been conducted many, many times. In the chronic cough space, it works very, very well. One thing of note here is that we did complete the study with 68 patients enrolled. Unfortunately, not all of those were able to complete the study due to the COVID environment. 52 patients did complete dosing. And even at 52 patients, this is the largest of the crossover design trials in the phase for Phase II in the refractory chronic cough space. So comparative studies that were completed by Afferent and Merck, where they did 3 studies with about 30 patients each. The Shionogi study that was completed was 31 patients, and the more recent Bayer trial was at 40 patients. So we do feel very comfortable around the powering due to the fact that we have 52 patients having completed all of the treatment periods.

We've been asked a lot. So our guidance before was kind of like was midyear, mid-2020, and people would ask us a ton of questions. What does midyear mean? Does midyear mean May, June, July? Does it mean September? So we're happy today to be kind of like narrowing in that range. We had the last patient visit in the second half of April, and we are anticipating to have top line data. We'll do that top line data in June or July. We'll do that through a press release and a conference call. And on that -- in that press release and conference call, you can expect us to provide the reduction in cough frequency at all of the doses. You can expect us to provide p-value associated at all -- with that cough frequency reduction at all the doses. And you can also expect us to have the taste effect at each of the doses. That's definitely the information that I'd like to have in terms of top line.

And so that's what we're going to be providing to investors at that point. We will most likely save some of the secondary end points and some of the more detailed tables to present at a medical conference later on in the year.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So if we move on to the platform, I think that there is strong potential beyond refractory chronic cough. There are Phase II trials ongoing or planned in 5 other indications in 2020. And we think that positive data from our competitors in those indications can definitely have positive implications for value for 5937 as well as that data expands the potential use cases for this product in a number of potential areas. So I'll obviously -- we're excited about chronic pruritus associated to atopic derm. And I'll take you through a couple of slides on that. But I think that all these other indications are also extremely interesting and exciting. Merck should have data in endometriosis pain and sleep apnea over the course of the second half of the year. And then for Shionogi, Shionogi will -- has announced that they are planning on starting Phase II trials in neuropathic pain and sleep apnea as well. And then more recently, we've had the announcement from Bayer that they're going to be starting a Phase II trial in overactive bladder. So pretty excited overall as this class continues to branch out into a number of different therapeutic areas that all have significant market opportunities.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Roberto Francesco Bellini**
*President, CEO & Director*

Maybe there's one question that came in. I'm going to answer it right now. So it kind of has to do a little bit with the platform here. There's a question that came in on whether there's the potential to do -- to use 5937 in COVID-related cough?

So I think that, that is a possibility. I think that this mechanism probably plays a role also in acute cough and whether that's acute cough due to something like COVID or an upper respiratory tract infection, so definitely, mechanistically, that makes sense. I think that right now, there's obviously a big need to be looking for therapies that are focused on the underlying cause of COVID and to really be addressing the condition. So we don't see this. And we see a lot of the patients and studies moving in that direction, so we wouldn't put this as a high priority for the company currently, but definitely something that we're thinking about in the back of our minds.

On Slide 29, this is an indication we are excited about. I think mostly because there are very strong similarities mechanistically between chronic cough and chronic pruritus. We see the role of P2X3 in chronic pruritus becoming more elucidated in terms of playing this role of hypersensitization of the itch response, just like it does in cough. This translates very nicely into the animal models where we can show significant reductions in scratching in the animal.

And I think beyond that, this is also a market that is very large and where there's still a significant unmet medical need, particularly when it comes to pruritus associated with atopic derm. There's a huge amount of patients that suffer from this condition. And while there are an increasing number of therapies that are focused on more severe patients, I think that there is a lack of therapy in the mild to moderate patients that have a low body surface area of eczema plaques, but that has a high burden of itch. And this is the #1 complaint for these mild to moderate patients. It's the itch. They really have trouble sleeping at night, in particular. So this will be the focus for our first proof-of-concept trial in atopic derm. And this trial is -- it will be around 100 mild to moderate atopic derm patients, but that have a significant itch burden. Overall, this is a more competitive area. So there are a number of therapies that are being developed. But our feedback from discussions with KOLs has consistently been that there is the real need for agents that specifically treat the itch to help these patients.

So we're going to move on to IP now. We're building out a pretty robust IP portfolio. At the core of that is the composition of matter patents for BLU-5937. These are already granted patents in all the major markets. They're long dated. They go out to 2034, and that does not include potential patent term extensions. And we also have patents, method of use patents, specifically to cough and the selectivity of 5937. This has been granted already in the U.S. with expiry in 2038.

As I mentioned earlier, I think it's important to reiterate that we own 100% of the revenue streams associated with 5937. So there are no third-party obligations with the program.

On the cash side. So we finished the year with $90 million of cash. Post-market today, we'll actually have the Q1 results. That will have the cash position for Q1. And so I think that, that does put us in a pretty good position from a cash position. And I do think it's important to note as we move forward and think about our cash runway.

I see that there's a question that came in here on kind of like on cash runway and cost going forward. So depending on the strategy that we take going forward from a clinical development perspective, there could be different kinds of uses of cash over that period. But certainly, it's important to note that Phase III trials in this indication are likely to be large trials. To put you in perspective, the Phase IIIs from Merck were 2,000 patients in total. We expect the cost of a program similar to that to be north of $100 million. So definitely, I think that there is the need at some point to further finance the company as we head towards that. But right now, the company is in a very flexible position where there's no -- there's absolutely no

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

need to finance in the short-term before the Phase II or -- and we do have flexibility in terms of like timing thereafter as well.

And then on Slide 34, we have the milestones going forward. So as I mentioned, kind of like when I started the presentation, I think the team has done an incredible job in terms of like executing on this project and creating value for shareholders. Obviously, this year is a huge year for us with the Phase II trial data coming out in a couple of months from now. I think that, that's obviously going to be a big catalyst for the company. We do expect to continue kind of executing on other parts of the program as well, including the Phase II for chronic pruritus.

And I think in this space, I think competitor data is also important. These are important kind of catalysts and milestones that drive interest in the P2X3 and chronic cough landscape and help further elucidate the -- like, overall, the competitive landscape.

I think on the right-hand side of the slide, one of the pictures didn't come out. This is a picture that was -- it was just kind of like the "save the date" for our KOL event that's going to be at the end of May. I think this is going to be a great event. So we want you to put that on your calendar. It's going to be at 9:00 a.m. on May 27. Dr. Jacky Smith, who's the PI in the Phase II trial, will be there to talk about cough, talk about the current treatment options in cough, the development pipeline. I think it's a great forum for her to express her opinion on the different P2X3 antagonists in development. And on the company side, we will provide you further information on some of our thoughts for the clinical development path going forward. We'll provide some more detailed information on the market and on our commercial perspective on -- in this specific therapeutic area. So it will be a great opportunity to do a much deeper dive in terms of the whole program, kind of like leading in to the Phase II trial data that will be in June or July.

And with that, that kind of wraps up the presentation. I know that there's a couple of questions that have kind of like started piling up here. So I'm going to answer those.

But before getting to the Q&A, I do want to take the opportunity to thank a number of people that are involved in this program. I feel like since I'm not limited to this kind of like 25 minutes that they give you at the banking conferences, I can take a little bit of time, first of all, to thank my team. And that's across the team at the senior management level, but even all the employees in the company that worked incredibly hard day in, day out. And I can tell you, it's been an incredible kind of like the change in work environment and workflow over the last 6 to 8 weeks due to COVID. And I'm really proud of how the team has adapted to these new work environments and has managed to stay incredibly productive through this whole period. So I definitely want to take the time to thank them. I also want to thank -- I want to thank the Board. A lot of investors don't necessarily get a chance to kind of see the work that the Board does, but there is -- the Board provides an incredibly important role in terms of helping us think through the strategy of the company. And I want to thank them for that support. And lastly, I also want to thank -- I want to thank all the shareholders. We don't do this without you. And we're doing this for you, but you've been incredibly supportive across the board. Little shareholders, shareholders on -- like shareholders on Twitter, institutional shareholders, the big shareholders, I think it's been really great for me in terms of interacting with the shareholder -- at the shareholder base. I've gotten great ideas from shareholders through my discussions with them, and I just want to thank you all for that support.

So with that, I'll -- let me -- there have been some Q&A questions here piling up, and let me try to answer a couple of those.

So we have one question on the patients that dropped out due to COVID. So maybe just a clarification. I didn't -- I probably didn't do that justice. So the reason that they dropped out -- so our study was being conducted in the U.K. and in the U.S. Obviously, 2 geographies that have a high COVID impact. And particularly in the U.K. where we had 60% of our patients, they really went in a critical period kind of like of our trial. At the tail end there, they went from thinking about doing herd immunity and everything, like we're just going to keep business going, to being full lockdown. And I think that, that switch in terms of policy actually created a number of patients that decided to -- a number of patients that decide to drop out of the trial due to them being in the at-risk category.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And secondly, there are also some investigators that were drawn into doing -- going into the kind of like COVID front lines and weren't able to continue the trial. And I think that we felt overall, based on those numbers and the fact that there weren't very many patients remaining, that it was not appropriate to continue the trial and put patients at risk in the circumstances when we already had a very strong number of patients that had completed the trial already at 52.

So there are -- I think that there's a couple of questions also on partnering and on strategy. I think it's important to note that the company and the management team have a strong belief in optionality. So I think that as a company, we are building up our organization to be ready to continue moving this project forward independently. I think we have great plans around that. We're building out our team. And I think that we're excited about doing that. And at the same time, in parallel, we also understand and appreciate that chronic cough and a number of the other indications that are being targeted with P2X3 antagonists are big market indications. And that these big market indications may be better served by having a larger partner support the program. And so from our perspective, we think it's important that in parallel to us, continuing to move this project forward, we're open to having discussions with potential partners that can -- that could drive additional value for shareholders.

Let me take another quick look here to see if there are any other questions. I think I've answered most of the questions. Yes. I think I've answered all the questions.
I do appreciate all the interaction and the questions that have come in. And listen, don't hesitate to reach out if you do have follow-up questions as well. Thank you very much.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**BELLUS HEALTH INC. SHAREHOLDER/ANALYST CALL | MAY 14, 2020**

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.