**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARL D. CACHIA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BELLUS HEALTH INC., ROBERTO BELLINI, FRANÇOIS DESJARDINS, DR. CATHERINE BONUCCELLI, DR. JACKY SMITH, JEFFERIES LLC, COWEN AND COMPANY, LLC, GUGGENHEIM SECURITIES, LLC, ROBERT W. BAIRD & CO. INCORPORATED, and BLOOM BURTON SECURITIES INC., <br><br> Defendants. | No. 1:21-CV-02278-GBD |

<u>**PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW**</u>
<u>**IN OPPOSITION TO THE MOTIONS TO DISMISS**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

ARGUMENT .................................................................................................................. 11

I.    DEFENDANTS MADE FALSE AND MATERIALLY MISLEADING
STATEMENTS AND OMISSIONS .......................................................... 11

    A.  Defendants' Challenges to Materiality Fail. ........................................... 15

    B.  Defendants' Truth-on-the-Market Defense Fails ................................... 17

    C.  Defendants Are Liable Even If Some Statements Are Construed as Opinions.... 18

    D.  The Safe Harbor Does Not Shield Defendants From Liability ............................ 20

    E.  Defendants' Risk Disclosures Do Not Immunize Them From Liability. ............. 21

    F.  The Remaining Precedent Cited by Defendants Is Inapposite ............................ 22

II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER .............. 23

    A.  The Complaint Adequately Alleges Scienter as to the Individual Defendants
and Defendant Smith. ........................................................................ 25

        1.  The Company, Individual Defendants and Defendant Smith Knew of or
Were Reckless to the Differences Between the RELIEF Study of
BLU-5937 and Competitors' Studies. .......................................... 25

            i.  In Their Efforts to Encourage Investments, Defendants Differentiated
the Company by Touting Its Team's Knowledge and Experience. ....... 25

            ii.  The Individual Defendants and Defendant Smith Had Access to the
Design of and Enrollment in BELLUS's Study and Thus Were Aware
of and Understood the Ramifications of the Material Differences
Between the Two Studies. ................................................... 26

            iii.  The Individual Defendants and Defendant Smith Were Well Aware of
the Market's Understanding of BELLUS's Study Versus Competitors'
Studies and the Resulting Positive Impact on the Company's Stock
Price. ......................................................................... 28

            iv.  The Company, the Individual Defendants and Defendant Smith Knew
the Facts Underlying the BLU-5937 Study Based on Their Detailed
Statements About the Study and Likening It to Merck's Study. ........... 30

        2.  The Individual Defendants and Smith Had Motive and Opportunity to
Commit Fraud. ....................................................................... 31

    B.  The Complaint Adequately Alleges BELLUS's Corporate Scienter. .................. 32

III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ................. 33

IV.   PLAINTIFF'S SECURITIES ACT CLAIMS ARE TIMELY ................................... 36

V.    THERE IS PERSONAL JURISDICTION OVER DEFENDANTS BECAUSE THEIR CONDUCT IS CONNECTED TO THE UNITED STATES AND BECAUSE PLAINTIFF PURCHASED BELLUS ON US-BASED EXCHANGES ...................................................................................................... 38

CONCLUSION ............................................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*,
690 F.3d 98 (2d Cir. 2012) ...................................................................................................... 24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................................ 11

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353, (E.D.N.Y. June 28, 2021) ........................ 20

*Benfield v. Mocatta Metals Corp.*,
26 F.3d 19 (2d Cir. 1994) ........................................................................................................ 37

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.*,
180 F. Supp. 3d 316 (S.D.N.Y. 2016) ..................................................................................... 22

*Blank v. TriPoint Glob. Equities, LLC*,
338 F. Supp. 3d 194 (S.D.N.Y. 2018) ..................................................................................... 27

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
No. 3:16-cv-2127(AWT), 2021 WL 3675180 (D. Conn. Aug. 19, 2021) ............................... 30

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..................................................................................... 27

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y 2006) ...................................................................................... 28

*Credit Suisse First Boston Corp. v. ARM Fin. Grp. Inc.*,
No. 99 CIV 12046 WHP, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) .................................. 22

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................................................ 34

*Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................................................... 25

*Fadem v. Ford Motor Co.*,
No. 02 Civ 0680(SCH), 2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003) ............................... 27

*Fialkov v. Alcobra Ltd.*,
No. 14 Civ. 09906 (GBD), 2016 WL 1276455 (S.D.N.Y. Mar. 30, 2016) .............................. 23

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
141 S. Ct. 1017 (2021) ............................................................................................................ 38

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014) ...................................................................................... 28

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................................... 17

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................................... 34

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)......................................................................... 32

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015)..................................................................................... 34

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.),
  *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ...................................................................... 23

*Hart v. Tri-State Consumer, Inc.*,
  No. 21-CV-1738 (VEC), 2021 WL 5180923 (S.D.N.Y. Nov. 6, 2021) ................................. 15

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................................ 30

*Horowitz v. Sunlands Tech. Grp.*,
  No. 19-CV-3744 (FB) (SMG), 2021 WL 1224517 (E.D.N.Y. Mar. 31, 2021) ........................ 21

Hutchison v. Deutsche Bank Sec. Inc.,
  647 F.3d 479 (2d Cir. 2011)...................................................................................... 15

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021)................................................................. 26, 28

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021)....................................................................................... 31

*In re Aphria, Inc. Sec. Litig.*,
  No. 18 Civ. 11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ........................... 28

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................................ 23, 27, 32

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................ 38

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................ 34

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................................ 34

*In re CitiGroup Inc. Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010)........................................................................ 18

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)...................................................................... 34

*In re Dynagas LNG Partners LP Sec. Litig.*,
  No. 19-CV-4512 (AJN), 2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020) ............................... 23

*In re EDAP TMS S.A. Sec. Litig.*,
  No. 14 Civ. 6069 (LGS), 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ......................... 23, 32

*In re Express Scripts Holding Co. Sec. Litig.*,
  No. 16 Civ. 338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)...................................... 28

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................... 21

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015).......................... 28

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................... 30

*In re Henry Schein, Inc. Sec. Litig.*,
   No. 18-CV-01428 (MKB), 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019)............................. 33

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)................................. 28

*In re Neurotrope, Inc. Sec. Litig.*,
   315 F. Supp. 3d 721 (S.D.N.Y. 2018)............................................................... 23, 32

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
   2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ......................................................... 37

*In re OSI Pharms., Inc. Sec. Litig.*,
   No. 04-CV-5505 (JS)(WDW), 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007)......................... 13

*In re Pall Corp.*,
   No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009)........................... 28

*In re Pareteum Sec. Litig.*,
   No. 19 Civ. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ............................. 30

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 449 (S.D.N.Y. 2005).................................................................. 38

*In re Perrigo Co. PLC Sec. Litig.*,
   435 F. Supp. 3d 571 (S.D.N.Y. 2020)................................................................. 30

*In re Reserve Fund Sec. and Derivative Litig.*,
   732 F. Supp. 2d 310  (S.D.N.Y. 2010)................................................................. 28

*In re Salix Pharm., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................. 20

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015),
   *aff'd sub nom*. *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)................................. 23

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010).................................................................. 27

*In re Supercom Inc. Sec. Litig.*,
   No. 15 Civ. 9650 (PGG), 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018)............................. 28

*In re VEON Sec. Litig.*,
   No. 15-cv-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).......................... 27, 33

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009).................................................................. 35

v

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ........................................................................................ 11

*In re Wells Fargo & Co. Sec. Litig.*,
  No. 1:20-cv-04494-GHW, 2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)................... 18, 19, 21

*In re World Wrestling Ent., Inc. Sec. Litig.*,
  180 F. Supp. 3d 157 (D. Conn. 2016) ......................................................................... 12

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ........................................................................................ 22

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  468 F.2d 1326 (2d Cir. 1972) ...................................................................................... 38

*Lehmann v. Ohr Pharm. Inc.*,
  No. 18 Civ. 1284 (LAP), 2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019),
  *aff'd and remanded*, 830 F. App'x 349 (2d Cir. 2020) ......................................... 23, 32

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).......................................................................................... 34

*Leykin v. AT & T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006),
  *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007)..................................................................... 34

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).......................................................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................................................ 11

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)..................................................................................... 12, 21

*Micholle v. Ophthotech Corp.*,
  No. 17-CV-210 (VSB), 2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019) ................. 12, 15, 20

*Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*,
  No. 21-801-cv, 2021 WL 5782079 (2d Cir. Dec. 7, 2021) ........................................ 24

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018).......................................................................... 29

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................... 25

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................................ 27

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .......................................................................................... 12, 18, 19

*Ortiz v. Canopy Growth Corp.*,
  No. 2:19-cv-20543-KM-ESK, 2021 WL 1851933 (D.N.J. May 7, 2021) .................. 28

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................................ 26

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
  No. 17 CV 5753 (JGK), 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ................................ 21, 22

*Rex & Roberta Ling Living Tr. v. B Commc'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018) ................................................................ 15

*Rosi v. Aclaris Therapeutics, Inc.*,
  No. 19-cv-7118 (LJL), 2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ................................ 11, 25

*Schaffer v. Horizon Pharma PLC*,
  No. 16-CV-1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ................................ 27

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .......................................................................... 24, 25

*Skiadas v. Acer Therapeutics Inc*,
  No. 1:19-cv-6137-GHW, 2020 WL 3268495 (S.D.N.Y. June 16, 2020),
  reconsideration denied, No. 1:19-CV-6137-GHW, 2020 WL 4208442
  (S.D.N.Y. July 21, 2020) ........................................................ 24, 29, 31, 35

*Slayton v. Am. Exp. Co.*,
  460 F.3d 215 (2d Cir. 2006) ........................................................................ 36

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008) ........................................................................ 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................ 24

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................................ 23

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) .......................................................... 30

*Villare v. Abiomed, Inc.*,
  No. 19 Civ. 7319 (ER), 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) .............................. 28

*Wilson v. LSB Indus., Inc.*,
  No. 15 CV 7614 (RA), 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ................................ 20

*Yannes v. SCWorx Corp.*,
  No. 20-cv-03349 (JGK), 2021 WL 2555437 (S.D.N.Y. June 21, 2021) .............................. 26

*Zagami v. Cellceutix Corp.*,
  No. 15 Civ. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016) .............................. 22

Lead Plaintiff Carl D. Cachia ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits this omnibus Memorandum of Law in opposition to Defendants' motions to dismiss, which are supported by the Memorandum of Law in Support of BELLUS Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF No. 55) ("MOL") and Defendant Dr. Jacky Smith's Memorandum of Law in Support of Her Motion to Dismiss the Amended Class Action Complaint (ECF No. 64) ("Smith MOL").

## INTRODUCTION

In a single day, BELLUS lost over 69% of its value, costing investors hundreds of millions of dollars. Defendants contend that the loss occurred solely because investors agreed to take a risk that unfortunately manifested: during a clinical study, BELLUS's primary product, BLU-5937, failed to show efficacy in treating chronic cough. But Defendants still refuse to acknowledge and tell the full story. Although investors in burgeoning publicly-traded bio-tech companies must incur *some* risk, the investors are entitled to accurate disclosures, free from material mischaracterizations. Defendants violated that requirement, misled investors about the risks, and left those trusting investors with enormous losses.

Specifically, Defendants portrayed BELLUS's Phase 2 clinical trial as copying the material components of competitors' trials that had demonstrated that similar drugs to BLU-5937 were effective in treating chronic cough. As characterized by Defendants, therefore, BLU-5937 did not face a substantial risk as to efficacy; rather, the main risks were tied to whether BLU-5937 could eliminate the adverse effects of taste and smell loss associated with those competing drugs. Indeed, BELLUS's commercialization plan was to **improve on** competitors' chronic cough treatments, not to develop a wholly new treatment or beat competitors to FDA approval and commercialization. To that end, Defendants steadfastly touted how they needed only to follow the

1

protocols of competitors' earlier successful studies. At worst, BLU-5937 would be another effective treatment for chronic cough, with similar side effects to alternative products. At best, BLU-5937 would be an effective treatment that also eliminated those side effects.

In reality, and as known by Defendants throughout the Class Period, the risks to investors were much more severe. Defendants were **not** copying competitors' previous clinical studies. Those studies had shown that drugs like BLU-5937 worked in reducing chronic cough for patients with collective average cough rates of 40.3 to 56.9 coughs per hour. Critically, those studies had **not** shown that this class of drugs could reduce chronic cough (to a statistically significant level) where the patients' collective average cough rates were less than 40.3 coughs per hour. Although Defendants repeatedly conveyed to investors that BELLUS was effectively copying those studies, the average cough rate in the BLU-5937 clinical trial was much lower, averaging 32.4 coughs per hour.

Consequently, the risk of failure was not solely about adverse effects. BELLUS was testing this class of drugs on a different type of patient (*i.e.*, those with lower cough frequency). Therefore, there was a substantial risk that the drug would not even work in reducing chronic cough at that lower frequency. In other words, Plaintiff is not taking issue with the results of the trial but with Defendants' statements about the clinical trial's design and similarity to competitors' successful trials. Defendants knew that they were failing to enroll patients with a higher cough frequency, that their data would be skewed towards patients with a low cough frequency, and that they were gambling on whether this class of drugs had any (statistically significant) effect on people with less severe chronic cough.

Meanwhile, investors had no idea about that gamble. On July 6, 2020, Defendants finally revealed the truth: BLU-5937 had not proven effective in treating chronic cough. Worse yet, it had

proven effective in the subset of patients who had higher cough rates. In other words, BLU-5937 could work in higher cough frequency patients – as studied by BELLUS's competitors – yet BELLUS had failed to sufficiently study that target treatment population. To seek FDA-approval and commercialize BLU-5937, Defendants would have to conduct an additional Phase 2 study. On that news, investors were stunned, as they had **not** been prepared for a risk that BELLUS had studied the wrong patients. BELLUS lost 69% of its value.

Now, Defendants seek immunity from liability for that substantial damage they caused to investors. By seeking a dismissal with prejudice, Defendants are asking this Court to forever bar investors from conducting any discovery, seeking to prove their claims, or obtaining a single dollar of recompense in connection with Defendants' conduct that eradicated 69% of the Company's value in a single day. There could come a time where, based on a full record, Defendants obtain immunity from liability, either by the Court at summary judgment or by a jury at trial. But Defendants' attempt to close the door on their aggrieved investors is premature and misplaced. As alleged in the Complaint[1] and described herein, Plaintiff has stated valid claims for securities fraud and is entitled to the chance to prove those allegations. Thus, the Motions should be denied, and this case should proceed into discovery.

## **FACTUAL BACKGROUND**

BELLUS is a clinical-stage biopharmaceutical company developing a treatment for chronic cough (generally defined as a cough lasting at least eight weeks). Because traditional pharmacologic treatments have proven ineffective for chronic cough, there is an untapped, multi-billion-dollar market for an effective treatment for chronic cough. ¶¶3, 61-64.

---

[1] Unless otherwise noted, all emphasis has been added, and internal citations have been omitted. Citations to "¶" refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 33) ("Complaint"). Capitalized terms that are not defined have the meanings ascribed in the Complaint.

The potential financial payoff, therefore, has drawn big pharmaceutical companies like Merck & Co. ("Merck"), Shionogi and Bayer AG ("Bayer") into the race to develop an effective treatment. ¶¶3, 76, 88, 91. As part of that race, pharmaceutical developers have focused on specific receptors in patients' peripheral sensory neurons. ¶¶58, 61-62. Through these clinical studies, and as represented by Defendants on many occasions, developers have shown that P2X3 receptors are a promising therapeutic target in neuropathic conditions such as chronic cough.[2] Accordingly, companies like Merck, Bayer, Shionogi and BELLUS have focused on developing a treatment that targets and inhibits the P2X3 receptors and, in turn, ameliorates chronic cough. ¶¶3, 76-77.

From the start, Merck was well ahead of the pack, setting the pace and creating a roadmap for competitors.[3] ¶¶4, 77. By March 2018, Merck had completed successful Phase 2 clinical trials demonstrating that its P2X3 antagonist, gefapixant or MK-7264, was effective in patients with chronic cough at a high cough frequency (*e.g.*, with a mean awake cough frequency of 56.9 coughs per hour (c/h) in its first Phase 2b trial and 40.3 c/h in its second Phase 2b trial). ¶87. But gefapixant had problems; its users experienced significant adverse effects (AEs) including taste alteration or taste loss. ¶¶86, 98, 139, 216.

---

[2] ¶¶105-08, 139 ("The *only clinically validated treatments* in development for refractory chronic cough *are molecules that inhibit the P2X3 receptor*" based on Merck's studies), ¶153 ("*Clinically validated target*"), ¶154 ("P2X3 is a *clinically validated target, with multiple positive Phase 2 trials*" while depicting results from Merck and Shionogi's Phase 2 trials); ¶¶161-62 ("*we know that it works at this point* [while] showing [] data from a Merck Phase II B study" and "both *Shionogi and Bayer are clinically meaningful in terms of their efficacy*. They've hit stat[istical] sig[nificance] in their Phase II trials."), ¶164 ("*very consistently across numerous Phase II trials*. *Merck has shown very substantial reductions in cough* frequency… so there's *no real issue on the efficacy side*" and "qualitative top line *data has been released by Merck*, and they have said that *the trial is successful* at the top dose…[and] in line with previous trials" and "there's *definitely data from our competitors that support that* more selective agents can drive efficacy in this patient population" in explaining Shionogi and Bayer's results), ¶166 ("P2X3 receptor antagonists are a *clinically validated target based on the work* that has been *done by Merck* with their drug gefapixant"), ¶170 ("*all* of the P2X3 antagonists *studied to date*… *have resulted in clinically meaningful reductions* in cough counts versus placebo.").

[3] Shionogi and Bayer were not far behind Merck, with patients suffering from same AEs as Merck. In March 2019 Shionogi published top line data from its Phase II study. ¶¶88-89.

Although Merck was further in the process, BELLUS touted to investors that the Company had a lucrative opportunity from the day it announced its initial public offering ("IPO") on September 3, 2019: follow the same roadmap for creating a P2X3 antagonist but eliminate the AEs of taste alteration and taste loss. As explained by BELLUS, gefapixant's problem was that, in addition to inhibiting the P2X3 receptors, it also affected the separate P2X2/3 receptors, which are associated with taste. More specifically, gefapixant—as well as similar treatments in development by Bayer and Shionogi—were not "highly selective" vis-à-vis the receptors they targeted and inhibited.[4] Those treatments inhibited multiple receptors, including the P2X3 receptors **and** separate P2X2/3 receptors. ¶¶77, 88, 91, 170. Accordingly, BELLUS stated to investors that it was developing a treatment that was "highly selective," meaning the treatment would select and inhibit only the P2X3 receptors (associated with chronic cough), without inhibiting the P2X2/3 receptors (associated with taste).[5] To that end, Defendants touted to investors that BELLUS's drug, BLU-

---

[4] ¶162 ("5937 is much more selective than the Merck compound" and "our 2 other competitors that are developing more selective antagonists are Shionogi and Bayer…. these 2 are more selective than the Merck compound"); ¶170 ("*all of the P2X3 antagonists studied* to date, *irrespective of selectivity*, *have resulted in clinically meaningful reductions* in cough counts" "*the reduction in cough…is very similar for the most selective…and the least selective*" and "[T]he *Bayer compound with intermediate selectivity* for P2X3 showed …*improvements [which] were*, nonetheless, both *highly statistically significant and clinically meaningful*.")

[5] ¶138 ("*In contrast [to BLU-5937], gefapixant… cause[d] taste alteration and/or taste loss* in up to 80% of patients"), ¶143 (the RELIEF trial "[wa]s expected to *build on the Phase 1 evidence showing little to no impact on taste*"); ¶151 ("*The Company believes that its highly selective P2X3 antagonist can also reduce coughing* in patients with chronic cough, *while maintaining taste function*, by not inhibiting P2X2/3 receptors. *This hypothesis has been validated in a recent clinical trial* with a more selective antagonist of P2X3; however, *BLU-5937 is the most selective of the P2X3 antagonists*"); ¶154 ("Preclinical data supports BLU-5937 *having comparable efficacy to MK-7264*" and "based on clinical trial results to date: *BLU-5937 has significantly improved taste effect profile* versus MK-7264"); ¶156 ("we believe *our compound may be better tolerated than competitor* candidates… potentially *reducing cough frequency with little to no taste alteration*."); ¶161 (MK-7264 *"works really, really well"* in this patient population. *Shows significant decrease in cough, but at the same time has a liability, a tolerability issue with about 80% of patients having some form of taste effects*, so either taste alteration or taste loss. *We think we've solved that problem by having a highly selective P2X3 antagonist*."); ¶162 ("we generate the same level of efficacy to the Merck product….5937 is much more selective than the Merck compound" and "our 2 other competitors that are developing more selective antagonists are Shionogi and Bayer…. these 2 are more selective than the Merck compound… *all of those other trials readout with positive* top line data."); ¶164 ("whether you gave (sic) 5937 or 7264, even though *the BELLUS product is much more* selective"); 170 ("*the clinical data to date* aligns well with this hypothesis, with the *compounds that are more selective for the P2X3 homotrimers*" "*all of the P2X3 antagonists studied* to date, *irrespective of selectivity*," "*the reduction in cough…is very similar for the most selective…and the least selective, …studied to date*." ("The *Bayer* compound with *intermediate selectivity for P2X3*").

5937, presented the efficacy of competitor drugs—like Merck's gefapixant, Shionogi's sivopixant

(i.e. S-600918), and Bayer's eliapixant —but without causing the AEs of taste alteration.[6] In other

words, Defendants conveyed that those competitors' successful trials—showing that inhibiting the

P2X3 receptor would alleviate chronic cough—were proof that BLU-5937 was effective as well.

When describing BLU-5937, therefore, Defendants repeatedly flaunted competitors' data as

support for BLU-5937:

- "Preclinical data supports BLU-5937 having comparable efficacy to MK-7264."

- "P2X3 is a clinically validated target, with multiple positive Phase 2 trials, with low and high selectivity P2X3 antagonists."

- "BLU-5937 has the potential to address a significant unmet medical need in chronic cough, and we believe our compound may be better tolerated than competitor candidates due to its high selectivity, potentially reducing cough frequency with little to no taste alteration."

- "I think it's obviously easy for me to tell you that, that mechanism is a rational one because we know that it works at this point. So on this slide, I'm showing you data from a Merck Phase II B study where they treated patients over a 12-week period.... This is the kind of level of efficacy that you see from MK-7264 across all their trials. It's like 50% to 60% reduction from baseline in cough, so consistently shows benefit in these patients."

- "[W]e don't have our own human efficacy data yet. That's really what we're going to read out midyear this year, but we do have some data from some of our competitors. So our 2 other competitors that are developing more selective antagonists are Shionogi and Bayer. . . both Shionogi and Bayer are clinically

---

[6] ¶138 ("*In contrast [to BLU-5937], gefapixant… cause[d] taste alteration and/or taste loss* in up to 80% of patients"), ¶143 (the RELIEF trial "[wa]s expected to *build on the Phase 1 evidence showing little to no impact on taste*"); ¶151 ("*The Company believes that its highly selective P2X3 antagonist can also reduce coughing* in patients with chronic cough, *while maintaining taste function*, by not inhibiting P2X2/3 receptors. *This hypothesis has been validated in a recent clinical trial* with a more selective antagonist of P2X3; however, *BLU-5937 is the most selective of the P2X3 antagonists*"); ¶154 ("Preclinical data supports BLU-5937 *having comparable efficacy to MK-7264*" and "based on clinical trial results to date: *BLU-5937 has significantly improved taste effect profile* versus MK-7264"); ¶156 ("we believe *our compound may be better tolerated than competitor* candidates… potentially *reducing cough frequency with little to no taste alteration*."); ¶161 (MK-7264 *"works really, really well* in this patient population*. Shows significant decrease in cough, but at the same time has a liability, a tolerability issue*…. *We think we've solved that problem by having a highly selective P2X3 antagonist*."); ¶170 ("*the clinical data to date aligns well* with this hypothesis, with the *compounds that are more selective for the P2X3 homotrimers, maintaining efficacy* for cough, *but with substantially fewer taste side effects*").

meaningful in terms of their efficacy.... All 3 of the programs, Bayer, Shionogi and BELLUS are at relatively comparable stages of development in Phase II."

- "P2X3 receptor antagonists are a clinically validated target based on the work that has been done by Merck with their drug gefapixant, known as MK-7264 on this trial."

- "[A]ll of the P2X3 antagonists studied to date, irrespective of selectivity, have resulted in clinically meaningful reductions in cough counts versus placebo, with placebo adjusted reductions between roughly 25% and 35%."

¶¶154, 156, 162, 166, 170.[7] Furthermore, Defendants explained that their study **design** followed the successful designs from Merck, Shionogi, and Bayer:

- "To be clear, this isn't a study that we invented. This is a trial design that's been conducted many, many times. In the chronic cough space, it works very, very well."

- "So this trial is a Phase II, quite well tested study design now."

- "So how does this study compare to other similar Phase II studies of P2X3 antagonists performed by Merck and Shionogi? Well as you can see here, it's very similar to many of the other Phase II trials that have been done, except the larger numbers."

¶¶164, 167. According to Defendants, therefore, the only open question regarding BELLUS's BLU-5937 was AEs, not the drug's efficacy in relieving chronic cough:

---

[7] ¶4-5, 7, 95-96 ("[t]he RELIEF study in chronic cough *will build on the body of earlier clinical evidence*"), ¶139 ("*Advances in the understanding* of possible mechanisms underlying chronic cough *have paved the way for product candidates targeting the P2X3 receptors*, such as BLU-5937."), ¶146 ( "*Clinically validated target* reduces clinical risk"), ¶147 (same); ¶151("it has been *validated in multiple clinical trials*"); ¶153 ("*Clinically validated* target"); 162 ("*we know that it works at this point*. So on this slide, *I'm showing you data from a Merck Phase II B study*" "our 2 other competitors …are *Shionogi and Bayer*. They've both *reported on their Phase II trials*… both… *are clinically meaningful* in terms of their efficacy"); ¶164 ("*very consistently across numerous* Phase II *trials. Merck has shown very substantial reductions in cough frequency*….a *clinically meaningful effect*" "there's *no real issue on the efficacy side*" "*data* has been *released by Merck*, and they have said that *the trial is successful* " "*both* [the Bayer and Shionogi] compounds *generate statistically significant differences*…. These are *clinically meaningful differences*…. [T]here is *clinical validation*"); ¶170 ("*the clinical data to date aligns well* with this hypothesis, with the *compounds that are more selective for the P2X3 homotrimers, maintaining efficacy*" "*all of the P2X3 antagonists studied* to date, irrespective of selectivity, *have resulted in clinically meaningful reductions* in cough counts" "*the reduction in cough…is very similar for the most selective…and the least selective, …studied to date*, suggesting that the contribution of the P2X2/3 receptor in chronic cough is minimal. Although the Bayer compound with intermediate selectivity for P2X3 showed numerically lower reductions in cough than the Merck and Shionogi compounds, these *improvements were*, nonetheless, both *highly statistically significant and clinically meaningful*."); ¶180 ("b*aseline cough frequency* and patient exclusion (severe lung disease, smokers, etc.) s*hould be similar across trials*.)

- "**MK-7264 … from Merck** … works really, really well in this patient population. **Shows significant decrease in cough, but at the same time has a liability, a tolerability issue with about 80% of patients having some form of taste effects**, so either taste alteration or taste loss. **We think we've solved that problem** by having a highly selective P2X3 antagonist."

- "Dr. Smith has also shown you already that the clinical data to date aligns well with this hypothesis, with **the compounds that are more selective for the P2X3 homotrimers, maintaining efficacy for cough, but with substantially fewer taste side effects relative to** the much less selective class leader, **gefapixant**."

- "With 52 patients having completed dosing, the RELIEF trial is powered at more than 80% to see a 30% difference between BLU-5937 and placebo in awake cough frequency."

¶¶158, 161, 170.[8]

In sum, Defendants repeatedly conveyed to investors that BELLUS's study design mirrored competitors' studies, which had proven that P2X3 antagonists limited chronic cough. Defendants reiterated that, because they were following those study designs, BLU-5937 was poised to be proven effective. As represented to investors, therefore, the primary risk was whether BLU-5937 would eliminate AEs, not whether BLU-5937 would be effective in reducing chronic cough.

But Defendants' portrayal of BELLUS's studies—and of the associated risks—was misleading. The successful clinical trials by competitors had included patients with a higher mean frequency chronic cough (¶¶4, 8, 80, 110), while BELLUS's Phase 2 RELIEF trial for BLU-5937

---

[8] ¶151 ("***The Company believes that its highly selective P2X3 antagonist can also reduce coughing*** in patients with chronic cough, ***while maintaining taste function***, by not inhibiting P2X2/3 receptors. ***This hypothesis has been validated in a recent clinical trial*** with a more selective antagonist"); ¶154 ("BLU-5937 ***having comparable efficacy to MK-7264***" and "based on clinical trial results to date: ***BLU-5937 has significantly improved taste effect profile*** versus MK-7264"); ¶156 ("we believe ***our compound may be better tolerated than competitor*** candidates… potentially ***reducing cough frequency with little to no taste alteration***."); ¶161 (MK-7264 ***"works really, really well*** in this patient population***. Shows significant decrease in cough, but at the same time has a liability, a tolerability issue***… ***We think we've solved that problem by having a highly selective P2X3 antagonist***."); ¶162 ("***we know that it works at this point***"); ¶164 ("there's ***no real issue on the efficacy side***"); ¶170 ("***the clinical data to date aligns well*** with this hypothesis, with the ***compounds that are more selective for the P2X3 homotrimers, maintaining efficacy*** for cough, ***but with substantially fewer taste side effects***").

8

had only a subset of patients at those levels of chronic cough frequency, with more patients with cough frequencies closer to 10 coughs per hour. ¶¶12, 199. While BELLUS was enrolling patients in its Phase 2 RELIEF trial, Defendants knew the average coughs per hour for patients in competitors' successful trials (*see* ¶77 (56.9 c/h disclosed on 5/18/16), ¶81 (40.3 c/h disclosed on 5/22/17), ¶110 (56 c/h disclosed on 9/22/19)) and, in turn, knew that BELLUS's patients had materially lower average coughs per hour. ¶¶12, 199 (32.4 c/h only for subgroup disclosed on 7/6/20). But Defendants did not disclose that critical fact during the Class Period. *Id.* Worse yet, Defendants portrayed BELLUS's study design as yielding patients with higher cough frequencies. Specifically, while BELLUS's competitors did not have a minimum cough frequency baseline for enrolling patients, BELLUS stated that its study was designed to have a baseline of 10 coughs per hour. ¶¶167, MOL at 6, 8, 20 n. 30. Hence, the market assumed, as represented by Defendants, that the mean cough frequency for BELLUS's study—if deviating from the competitors' studies that Defendants repeatedly plugged as supporting BLU-5937's efficacy and commercial prospects—would be higher than the cough frequency in the competitors' studies. ¶¶90, 93, 110-12, 115-16, 117, 120-23, 165 ("[I]ncluding the RELIEF study, more recently, studies have been also using a cough frequency cutoff. And so I think **it's fair to assume the patients included in these studies are at the more severe end**."). Instead, because BELLUS's Phase 2 RELIEF design permitted and yielded patients with lower cough frequency, the trial did not generate enough data to show that BLU-5937 was effective in treating chronic cough. BELLUS had needed to follow the material components of competitors' study designs, but despite Defendants' repeated statements about following those designs, BELLUS studied the wrong set of patients. ¶¶12, 199, 204-05.

On April 6, 2020, Defendants made a partial disclosure of the truth, stunning investors with the unexpected news that BELLUS was now considering the prospect that BLU-5937 would not show efficacy and was planning for a potential additional Phase 2b trial. ¶¶11, 196. They disclosed that BELLUS was "currently working on the scenario planning for the next step (Ph2b vs. Ph3)" and that "[i]f no minimum efficacy dose is observed, a small Ph[ase] 2b may be necessary." ¶196. Consequently, BELLUS's stock price plummeted 9% after two days of heavy trading. ¶197.

On July 6, 2020, Defendants revealed the results from the trial – that regardless of AEs, BLU-5937 did not actually work to reduce chronic cough in the tested population. They explained that BLU-5937 "did not achieve statistical significance for the primary endpoint of reduction in placebo-adjusted cough frequency at any dose tested." ¶199. However, "[a] clinically meaningful and highly statistically significant placebo-adjusted reduction in cough frequency was achieved in a prespecified sub-group of high cough count patients (all patients at or above the baseline median average of 32.4 coughs per hour)." *Id*. Accordingly, the Company intended to move "forward into an adaptive Phase 2b trial enriched for higher cough count patients" and "expect[ed] to begin this trial in the fourth quarter of 2020." *Id*. In other words, despite repeatedly touting that BELLUS was following competitors' study designs—which had proven the efficacy of P2X3 antagonists—Defendants:

- had knowingly or recklessly ignored the higher cough frequencies of patients in those previous studies;
- had tested BLU-5937 on a lower cough frequency population;
- had obtained results showing that BLU-5937 did not work (except on the few high frequency cough patients in the study);
- had to spend more time and money on an additional study that targeted the correct patient population.

¶¶199-205. Because of those stark revelations, BELLUS lost **over 69%** of its value in a single day, amounting to a 75% drop from its class-period high less than two weeks earlier. ¶¶199-201.

10

In sum, Defendants' false and misleading statements and omissions artificially inflated BELLUS's share price during the Class Period, including at the time of the IPO. *See, e.g.,* ¶¶10, 54. As the truth was revealed, the Company's share price dropped, causing tens of millions of dollars in losses for its investors, who had relied to their detriment on Defendants' statements. *See, e.g.,* ¶¶11-14, 193-205. Because of this conduct, Plaintiff raises claims against the 1934 Act Defendants for violations of §§ 10(b) and 20(a) of the Securities Exchange Act and the 1933 Act Defendants for violations of §§ 11, 12(a)(2), and 15 of the Securities Act. ¶¶351-400.

## ARGUMENT

Defendants raise assorted arguments for dismissal of Plaintiffs' separate claims under the Exchange Act and Securities Act. First, Plaintiff addresses arguments aimed at the Exchange Act claims, including arguments regarding Plaintiff's well-pleaded allegations of scienter. *See* § I, *infra*. Second, Plaintiff addresses arguments regarding the strict liability Securities Act claims— which disclaim scienter and survive irrespective of the scienter allegations. *See* § II, *infra*.

**I.    DEFENDANTS MADE FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS**

"[W]hether a statement or omission is materially misleading . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-cv-7118 (LJL), 2021 WL 1177505, at *9 (S.D.N.Y. Mar. 29, 2021) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)). The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). "Moreover, under the federal

securities laws, 'literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another.'" *Id*. (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)). Even with "no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). "Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Id*. at 250-51.

Under those standards, a duty to disclose arises, for example, where defendants "benchmark" their company's performance against competitors' performance (*e.g.*, "television contracts against contracts obtained by live sports") but fail to disclose a material difference between their company and the competitor (*e.g.*, the company's television contracts "brought in a fraction of the advertising revenue that live sports did"). *In re World Wrestling Ent., Inc. Sec. Litig.*, 180 F. Supp. 3d 157, 183–84 (D. Conn. 2016) ("Given the context in which the statements were made—discussions about the defendants' contract negotiations with NBCU[ ] it was misleading to benchmark WWE against sports like NASCAR and [ ] in order to render such a comparison not misleading … the discrepancy in advertising revenue needed to be disclosed.").

Similarly, a duty to disclose arises where defendants compare the enrollment criteria of their clinical trial to the criteria of another trial but "fail[ ] to disclose that they made a 'critical change' to the enrollment criteria" which "significantly affected the trial's enrollment criteria in that patients . . . who had been excluded from Phase 2b may have been eligible to participate in Phase 3." *Micholle v. Ophthotech Corp*., No. 17-CV-210 (VSB), 2019 WL 4464802 at *11-*13 (S.D.N.Y. Sept. 18, 2019) (finding actionable "Defendants' repeated assertions that they made no significant changes to the inclusion and exclusion criteria between Phase 2b and Phase 3 of the …

clinical trials"); *see also In re OSI Pharms., Inc. Sec. Litig.,* No. 04-CV-5505 (JS)(WDW), 2007 WL 9672541, at *8 (E.D.N.Y. Mar. 31, 2007) (finding that Defendants "did not adequately convey to the public the limitations of Tarceva that were discovered during the Clinical Study").

As alleged, Defendants misled investors regarding the RELIEF trial's design, enrollment, and prospects for success. Defendants misleadingly represented that they were following the design of competitors' successful trials and, therefore, that there was a high likelihood of BELLUS also showing that BLU-5937 was effective in treating chronic cough. *See, e.g.,* ¶164: (Bellini: "To be clear, this isn't a study that we invented. This is a trial design that's been conducted many, many times. In the chronic cough space, it works very, very well."); ¶167 (Smith: "[I]t's very similar to many of the other Phase II trials that have been done, except the larger numbers.… [B]aseline cough severity scores…if anything, **are at the higher end** and more comparable to those seen in the Shionogi study."). Defendants further misleadingly implied that BELLUS had a high number of quality – i.e. severe cough – patients enrolled in its study, like its competitors did. *See, e.g.,* ¶162 (Bellini: "We do feel very comfortable around the power of the trial, considering it's the largest that's been completed with this design. It's important to note all of those other trials readout with positive top line data."); ¶168 (Smith: "[I]ncluding the RELIEF study, more recently, studies have been also using a cough frequency cutoff. And so I think it's fair to assume the patients included in these studies are at the more severe end.").

In reality, BELLUS was not following a critical aspect of its competitors' study designs. ¶¶9, 135, 195. Unlike BELLUS, the competitors had tested their drugs on more patients with higher cough frequencies. ¶¶4, 8, 80, 110. Yet Defendants still touted those successful results as a barometer for the Company's RELIEF study. ¶146 (Bellini: "P2X3 is a clinically validated target, with multiple positive Phase 2 trials, with low [gefapixant] and high selectivity [sivopixant]

antagonists"); ¶170 (Bonucelli: "all of the P2X3 antagonists studied to date, irrespective of selectivity, have resulted in clinically meaningful reductions in cough counts versus placebo"). Although all clinical studies involve risk – and investors in clinical-stage biotech companies choose to incur that risk – the risk of failure for BELLUS's study was enormously higher than the risk Defendants disclosed to investors. *See* ¶¶8, 10, 55-57, 124, 128, 135. Indeed, Defendants could have proven that BLU-5937 was effective, if they had followed BELLUS's competitors' study parameters (as Defendants repeatedly claimed to be doing). Instead, the RELIEF study failed because Defendants incurred the high risk of studying a majority of patients enrolled had lower cough frequency. ¶¶12, 199, 204-05.

Because Defendants had provided misleading information about the study design and risks, investors were stunned when the truth was fully revealed, prompting BELLUS to lose over 69% of its value. ¶¶13, 199-201. Those allegations—which must be taken as true—establish that Defendants made misleading statements and/or omitted material information when speaking about the design, enrollment, and risks of the RELIEF study.

Seeking to bypass those well-pleaded allegations of falsity, Defendants raise a series of arguments aimed at eliminating the prospect of liability. First, Defendants contend that their misstatements and omissions were not material. Second, Defendants suggest that they disclosed the truth to the market. Third, Defendants argue that their misleading statements were inactionable opinions. Fourth, Defendants claim they are protected by the safe harbor. Fifth, Defendants contend that their risk disclosures immunize them from liability. Finally, Defendants rely on distinguishable or otherwise inapposite precedent. As explained below, each argument fails.

14

### A.  Defendants' Challenges to Materiality Fail.

Defendants argue that none of the misleading statements or omissions are material. MOL at 19-23. Under the law and facts, Defendants are wrong.

"Materiality is a fact-specific inquiry as to whether 'there is a substantial likelihood that a reasonable shareholder would consider [the stated or omitted fact] important in deciding how to act." *Micholle*, 2019 WL 4464802, at *13 (quoting *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011)) (declining to "make a materiality determination as a matter of law" where "a prospective investor may well have considered the degree of similarity between the parameters of a new clinical trial and those of a recently completed—and purportedly very successful— clinical trial important in deciding whether to invest in a developmental drug"). "To be material, a statement must, in the view of a reasonable investor, have significantly altered the total mix of information made available." *Hart v. Tri-State Consumer, Inc*., No. 21-CV-1738 (VEC), 2021 WL 5180923, at *9 (S.D.N.Y. Nov. 6, 2021). Accordingly, "[a]t the motion-to-dismiss stage, . . . a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Rex & Roberta Ling Living Tr. v. B Commc'ns Ltd*., 346 F. Supp. 3d 389, 402 (S.D.N.Y. 2018).

Defendants have not met, and cannot meet, this standard. There is more than a substantial likelihood that investors would have viewed the truth about the RELIEF trial to be important information that significantly altered the total mix of information about the trial, BLU-5937, and BELLUS. As alleged, Defendants presented the efficacy of competitor drugs – Merck's gefapixant, Shionogi's sivopixant, and Bayer's eliapixant – to tout BLU-5937. Defendants explained that BELLUS's study design followed the design of competitors' successful studies,

which had enrolled patients with a high mean frequency chronic cough. And Defendants conveyed that those competitors' successful trials were proof that BLU-5937 was effective. In sum, Defendants' messaging to investors was straightforward: investors should consider the open question and primary risk regarding BLU-5937 to be reduction of AEs, not the drug's efficacy. And that information was vital to investors' decisions to invest in BELLUS.

In that context, therefore, investors would have found it important that only a subset of patients enrolled in the RELIEF trial were at the levels of chronic cough frequency in competitors' trials. *See* ¶¶12, 199. Worse yet, BELLUS conveyed that the patients in its trial had even higher cough frequencies. Specifically, BELLUS publicized that its trial included a minimum cough frequency baseline for enrolling patients, whereas competitors' trials had not included the baseline. Therefore, the message to the market was that the mean cough frequency for BELLUS's study would be **higher** than its competitors. In reality – and unbeknownst to investors – the patients in BELLUS's Phase 2 RELIEF trial had substantially lower cough frequencies than the patients in competitors' trials, and because of that design, the RELIEF trial failed to show that BLU-5937 was effective. *See* ¶202 ("[T]he unusually low baseline cough counts compared to competitive trials underscore the need to improve design and rigor in ongoing [refractory chronic cough] trials."); ¶203 ("[T]he biggest contributing factor to the RELIEF trial missing its primary endpoint was the dilution of chronic cough patients who[se] chronic cough is driven by hypersensitization", meaning "patients who experience lower cough counts could have less P2X3 hypersensitization involvement").

Contrary to Defendants' assertions, moreover, the Complaint does **not** take issue with any scientific analysis. It alleges that Defendants compared BLU-5937 to the drugs in BELLUS's competitors' successful clinical studies to tout that it had been "clinically validated". ¶¶105-08,

16

139, 146, 153-54, 166. What differentiated BLU-5937 from its competitor was its potential to have fewer AEs because it was more selective. ¶¶138, 151, 154, 156, 161, 170. As such, Defendants' argument that they "explicitly disclosed … the very design flaw on which the [Complaint] is premised … [that] a cough frequency threshold of 10 coughs per hour" misses the point. MOL at 20-21. This minimum threshold – as compared to competitors' successful studies that lacked a minimum threshold – led investors to believe that the mean cough frequency for BELLUS's study would be about the same, if not **higher,** than competitors' mean cough frequency. ¶¶167-68, 183. But that was not true. ¶¶12, 199. This is the omission necessary to make Defendants' statements not misleading.

Finally, the significant drops in BELLUS's stock price in the wake of its corrective disclosures support materiality. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("comScore's significant stock drop further supports an inference of materiality"). First, the Company's stock plummeted 9% after Defendants partially disclosed the truth on April 6, 2020 – specifically, that they were considering the prospect that their study would not show BLU-5937's efficacy and that they would need to conduct a Phase 2b trial. ¶197. Then, the Company lost over 69% of its value in a single day after the truth was fully disclosed on July 6, 2020 – specifically, that, regardless of AEs, BLU-5937 did not actually work to reduce chronic cough in the tested population. ¶¶199-205. The stark price drops strongly indicate that investors had not previously received material information and, therefore, were stunned by Defendants' revelations. *See Fresno Cnty. Emps.'*, 268 F. Supp. 3d at 550 ("comScore's significant stock drop further supports an inference of materiality").

### B. Defendants' Truth-on-the-Market Defense Fails

Defendants suggest that they disclosed the truth when they published that the RELIEF trial

17

had an enrollment threshold for 10 c/h. MOL pat 20-21. To the extent that Defendants are invoking a truth-on-the-market defense, their argument is premature and unpersuasive.

"The 'truth on the market' doctrine … provides that an otherwise actionable misstatement or omission may be deemed 'immaterial' if the truth is already fully known to the investing public." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 590 (S.D.N.Y. 2010). A truth-on-the-market defense "is intensely fact-specific" and "rarely an appropriate basis for dismissing a complaint." *Id*. The defense applies only if defendants establish that "the corrective information [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*

Defendants cannot meet that burden. First, they never disclosed that the enrolled patients had materially lower cough frequencies than the patients in competitors' successful studies. Second, as stated above, Defendants' disclosure of the 10 c/h enrollment threshold suggested to investors that BELLUS was enrolling patients with higher cough frequencies, not lower cough frequencies, as compared to competitors that did not use a minimum threshold. Thus, Defendants did not provide corrective information, and even if they had, they did not do so with sufficient credibility and intensity to counterbalance the repeated statements comparing BELLUS's RELIEF study to competitors' successful studies.

### C. Defendants Are Liable Even If Some Statements Are Construed as Opinions.

Defendants incorrectly argue that the alleged misstatements by Bellini are "non-actionable opinions." *See* MOL at 22-23, 25. "[A]s the Supreme Court made clear in Omnicare [opinion] phrases [such as 'I expect' and 'my sense is'] do not operate as a magic shield against liability." *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-GHW, 2021 WL 4482102, at *9-*10 (S.D.N.Y. Sept. 30, 2021) (quoting *Omnicare*, 575 U.S. at 188-89). Opinions "can give rise to

18

liability in two distinct ways, even if they are sincerely believed: if they contain false embedded statements of fact or if they omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a[n] opinion." *Id.* "[A] reasonable investor may understand an opinion … to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 575 U.S. at 188. Accordingly, "[a]t the pleading stage, a plaintiff must identify particular (and material) facts going to the basis for the issuer's opinion— facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have— whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *In re Wells Fargo*, 2021 WL 4482102, at \*10. The "core inquiry is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Id.*; *see also Omnicare*, 575 U.S. at 183 (holding that, even if a statement of opinion was "literally accurate"—i.e., it was "honestly held"—it may still be actionable if the opinion "omits facts about the [speaker]'s inquiry into or knowledge concerning a statement of opinion" which "conflict with what a reasonable investor would take from the statement itself, necessary to make the statement not misleading to a reasonable investor").

Under those standards, the challenged statements—even if construed as opinions—are actionable. When comparing BLU-5937 to competitor drugs and comparing the Company's RELIEF trial to competitors' Phase 2 trials, Defendants should have disclosed that those trials included materially different patient populations vis-à-vis cough frequency. *See* ¶¶151, 161-65. Defendants also should have disclosed the associated risks of failure as to efficacy – *i.e.*, the precise risks that manifested when the trial failed to show that BLU-5937 was effective in treating chronic cough (except for a subset of patients with higher cough frequency). Thus, the challenged

19

statements, even if opinions, omitted material information and are actionable. *See, e.g.*, *Micholle*, 2019 WL 4464802 at *11 (finding statements to be actionable where "there is evidence suggesting that Defendants' characterization of the altered methodology as having no meaningful impact on the trial's inclusion and exclusion criteria may well have been inconsistent with the data known to them." *Id.* at *11-*13.

### D. The Safe Harbor Does Not Shield Defendants From Liability

Defendants argue that various alleged misstatements were forward-looking and protected by the safe harbor. MOL at 23-25. This argument fails.

First, the "safe harbor ... does not protect material omissions." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016); *see also Wilson v. LSB Indus., Inc.*, No. 15 CV 7614 (RA), 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) ("Court[s] in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions.").

As described above, Defendants omitted the material problems and risks with their patient enrollment. The safe harbor cannot shield Defendants from liability for those material omissions.

Second, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking[.]" *Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19-cv-00024 (DLI)(LB), 2021 WL 2646353, at *7 (E.D.N.Y. June 28, 2021). Rather, forward-looking statements' "accuracy can only be verified after they are made." *Id.* "Where a statement contains elements that are forward-looking and elements that are not ... the forward-looking elements and the non-forward-looking are severable." *Id.* Thus, "[d]efendants cannot escape liability merely by including forward-looking statements alongside statements of historical and present facts." *Id.*

Moving Defendants cite various statements that are not forward-looking. Every statement of present or historical fact, whose accuracy could be determined when it was made, falls outside the safe harbor, including statements about the enrollment in and status of the RELIEF trial. Finally, as noted below, the risk disclosures were not "meaningful cautionary language."

**E.  Defendants' Risk Disclosures Do Not Immunize Them From Liability.**

"[D]efendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *In re Wells Fargo*, 2021 WL 4482102, at \*11. "Because [c]autionary language in securities offerings is just about universal[,] the key question … is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing … that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Id*.

Furthermore, a "company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). Indeed, "a warning framed in hypothetical terms does not apprise a reasonable investor of actual misconduct." *Horowitz v. Sunlands Tech. Grp.*, No. 19-CV-3744 (FB) (SMG), 2021 WL 1224517, at \*3 (E.D.N.Y. Mar. 31, 2021); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17 CV 5753 (JGK), 2019 WL 2360942, at \*4 (S.D.N.Y. Mar. 4, 2019) ("These were current problems, not potential ones, and representing otherwise was untruthful."); *Jinkosolar Holdings*, 761 F.3d at 251 (finding "misleading omission[s]" where company warned of risk from "environmental violations" but did not "disclose then-ongoing and serious pollution violations" which caused investors to be "overly optimistic" about the risk).

21

Here, Defendants do not identify risks disclosures warning that BELLUS was studying a materially different population of chronic cough patients who, because of lower cough frequency, might not respond to a P2X3 antagonist. Rather, while knowing that the RELIEF study included a very low average c/h for patients, Defendants provided generic risk disclosures couched in hypotheticals. *See, e.g.*, ECF No. 56-2. Those generic statements were more prone to mislead, rather than warn, investors about the true known risks for the RELIEF study. *See, e.g.*, *Tableau Software, Inc.*, 2019 WL 2360942, at *4 (finding falsity where "[b]y using the qualifiers 'if' and 'may,' the Form 10-K presents these issues as potential problems . . . [b]ut the plaintiffs allege that the company was already experiencing significant setbacks with licensing sales at the time the 10-K was issued").[9]

### F.  The Remaining Precedent Cited by Defendants Is Inapposite

Arguing that the Complaint lacks allegations of misstatements, Defendants cite two general types of inapposite cases. First, Defendants cite cases involving "a dispute about the proper interpretation of data."[10] Those cases have no bearing, as Plaintiff is not taking issue with Defendants' interpretation of the clinical results for the RELIEF trial. Rather, Defendants' portrayal of the design of the trial and similarity to previous trials was misleading. Because of those misleading statements, the trial involved a set of risks unknown to investors (*e.g.*, the risk that a drug that targets the P2X3 receptors reduces high frequency chronic cough but not low

---

[9] *See also BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 324 (S.D.N.Y. 2016) ("[A]ny disclaimers issued by [the Company] are irrelevant to the issue of whether other statements by [the Company] were false or misleading when made."); *Credit Suisse First Boston Corp. v. ARM Fin. Grp. Inc.*, No. 99 CIV 12046 WHP, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001) ("[W]arnings of specific risks … do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described[.]").

[10] *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013)(no misstatement where Plaintiff was "tak[ing] issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable."); *Zagami v. Cellceutix Corp.,* No. 15 Civ. 7194 (KPF), 2016 WL 3199531, at *12 (S.D.N.Y. June 8, 2016) (same).

frequency chronic cough). Thus, this case has nothing to do with Defendants' analysis of the RELIEF results.

Second, Defendants cite a series of cases finding that a company's statements never contradicted other facts disclosed by the company and/or that those statements were non-actionable opinion statements, forward-looking statements, or puffery.[11] As explained, *supra*, Defendants' Class Period statements about the RELIEF trial contradicted the realities that Defendants partially revealed on April 6, 2020, and fully revealed on July 6, 2020.

## II.   THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER[12]

An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or

---

[11] *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (statements at issue not actionable because statements such as "remarkable progress," "[we] hope[]," and "confident" were puffery, opinion statements and forward-looking statements, had been disclosed, and some had been pled only with "generalized, conclusory allegations"); *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (no misstatements or omissions where Plaintiff's claims were based on concerns the FDA had raised with the company but were not insurmountable); *Lehmann v. Ohr Pharm. Inc.*, No. 18 Civ. 1284 (LAP), 2019 WL 4572765, at *3 (S.D.N.Y. Sept. 20, 2019), *aff'd and remanded*, 830 F. App'x 349 (2d Cir. 2020) (no actionable misstatements where "Plaintiffs' argument boils down to the assertion that the IMPACT Trial's failure to perform consistently with prior comparable studies necessitated the Company's providing more context" because there were no allegations that Defendants had represented this would be the case); *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 731-34 (S.D.N.Y. 2018) (no falsity where Defendants stated that the drug showed positive results *without stating the methodology* and either never addressed that topic in other alleged misstatements or utilized terms such as "potential" or "exciting" which constituted puffery); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 400-15 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) (finding statements regarding the efficacy of the drug not actionable because such statements referenced safety studies, where there was no duty to disclose, or utilized "could" or "plan to," which made the statements puffery and forward-looking); *Fialkov v. Alcobra Ltd.*, No. 14 Civ. 09906 (GBD), 2016 WL 1276455, at *4-*6 (S.D.N.Y. Mar. 30, 2016) (no falsity where statements involved enrollment criteria being "rigorously" and "meticulous[ly]" done because they constituted puffery or were immaterial because they did not affect the trial's outcome and were refuted by the documents on which they relied); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) (no misstatements or omissions where Plaintiff's claims were based on concerns the FDA had raised with the company but were not insurmountable); *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9-*13 (S.D.N.Y. Sept. 14, 2015) (finding that statements regarding meeting FDA milestones being "on track," "progress" or "great news" constituted puffery and were forward-looking, statements such as "safe and effective" and "excellent efficacy" amounted to a "disagreement with how defendants chose to interpret the results of the clinical trial" and "fraud by hindsight" and thus there had been no duty to update or disclose, and there was also no duty to disclose the substance of an FDA inquiry during the pendency of the application).

[12] Scienter is irrelevant to the Securities Act claims. *See In re Dynagas LNG Partners LP Sec. Litig.*, No. 19-CV-4512 (AJN), 2020 WL 6947521, at *20 (S.D.N.Y. Nov. 25, 2020) ("Neither [§] 11 nor [] 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action."). As such, should the Court find BELLUS and the Individual Defendants made false and/or misleading statements in the IPO Documents, their motion to dismiss should be denied as to the §§ 11 and 12 claims. And for purposes of Plaintiff's § 10(b) claim, the Court need only analyze the scienter of BELLUS, the Individual Defendants, and Defendant Smith.

even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007) (quotation omitted). "As the Supreme Court has instructed, [the court] evaluate[s] the sufficiency of a complaint's allegations of scienter 'holistically,' considering 'all of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'" *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quoting *Tellabs*, 551 U.S. at 323); *cf. Anschutz Corp. v. Merrill Lynch & Co., Inc*., 690 F.3d 98, 110 (2d Cir. 2012) ("generalized and conclusory allegations" insufficient).

Moreover, a court must conduct its "comparative assessment of plausible inferences" while "**constantly assuming the plaintiff's allegations to be true**." *Tellabs*, 551 U.S. at 326-27. *See also Skiadas v. Acer Therapeutics Inc*, No. 1:19-cv-6137-GHW, 2020 WL 3268495, at \*11-\*12 (S.D.N.Y. June 16, 2020), reconsideration denied, No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) ("Viewing the totality of [Plaintiffs]' allegations, the inference that Defendants had an intent to defraud is at least as compelling as any alternative inference."). The inquiry is: "[w]hen the allegations **are accepted as true** and taken **collectively**, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id*. at \*10. *See also Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co*., No. 21-801-cv, 2021 WL 5782079, at \*2 (2d Cir. Dec. 7, 2021) (The Court "must consider whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). Accordingly, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Skiadas*, 2020 WL 3268495, at \*10.

Plaintiff has met this standard, and Defendants' arguments to the contrary fail. First, the Complaint adequately alleges scienter as to the Individual Defendants and Defendant Smith.

24

Second, the Complaint adequately alleges corporate scienter for BELLUS.

### G. The Complaint Adequately Alleges Scienter as to the Individual Defendants and Defendant Smith.

"To establish scienter [for an individual defendant], a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap.*, 996 F.3d at 78. Recklessness is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Aclaris Therapeutics*, 2021 WL 1177505, at \*22 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). In evaluating whether either of these showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged indeliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford,* 794 F.3d 297, 306 (2d Cir. 2015).

#### 1. *The Company, Individual Defendants and Defendant Smith Knew of or Were Reckless to the Differences Between the RELIEF Study of BLU-5937 and Competitors' Studies.*

##### i. In Their Efforts to Encourage Investments, Defendants Differentiated the Company by Touting Its Team's Knowledge and Experience.

BELLUS and Defendant Bellini touted the Individual Defendants and Defendant Smith as an "Experienced Team," with a depth of knowledge and abilities that distinguished them from the Company's competitors. ¶¶125-26. Defendant Bonuccelli was described as having the "ideal scientific and product development background to help advance the study of BLU-5937 for the treatment of chronic cough" and the Company would be "leveraging her deep proficiency in

25

respiratory diseases, and her substantial development expertise in bringing compounds through the clinical development lifecycle, in order to fulfill our mission of helping patients overcome the burden of chronic cough." ¶99. Bonuccelli was further described as having "the right kind of expertise that we want in our current project." ¶126. Similarly, Defendant Smith was described as a "world-renowned expert in chronic cough." *Id*.

Those allegations bolster the inference that Defendants knew of or recklessly ignored that the RELIEF study had material different patients and, in turn, material different risks as compared to competitors' successful studies. Accordingly, those Defendants had scienter when touting competitors' studies, while omitting that RELIEF had a material distinction from those earlier studies.

ii.    The Individual Defendants and Defendant Smith Had Access to the Design of and Enrollment in BELLUS's Study and Thus Were Aware of and Understood the Ramifications of the Material Differences Between Competitors' Studies.

Scienter is adequately alleged where a complaint references information "that the defendants could have and should have learned in the course of reasonable due diligence[.]" *Yannes v. SCWorx Corp.*, No. 20-cv-03349 (JGK), 2021 WL 2555437, at *4 (S.D.N.Y. June 21, 2021); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 169 (S.D.N.Y. 2021) (same). When "this information [is accessible to the defendants] prior to the defendants' [misstatement] it weighs in favor of an inference that [they] either knew about" the issue "or showed a reckless disregard for it." *Id.*; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (scienter supported by the allegation that information about the company's finances were "reasonably available" to the CFO, despite the plaintiff not alleging that the CFO read reports containing this information). "An egregious refusal to see the obvious, or to investigate the doubtful, may [ ] give rise to an inference of recklessness." *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214 (S.D.N.Y.

2018); *see also In re VEON Sec. Litig.*, No. 15-cv-08672 (ALC), 2017 WL 4162342, at \*10 (S.D.N.Y. Sept. 19, 2017) (finding scienter where "Plaintiffs have adequately alleged that [the Company] had access to information suggesting that [its] public statements were not accurate").[13]

Critically, BELLUS is not a large company, such that upper management could unknowingly or negligently make misleading statements while lacking awareness of the true operational details handled by lower-level employees. BELLUS had only 12 employees as of August 2019 and 32 employees as of February 2021. MOL at 2. Accordingly, Defendant Smith – who served as the Principal Investigator of BELLUS's Phase 2 RELIEF trial of BLU-5937 and/or Chairman of the Clinical Advisory Board and hosted at least two Key Opinion Leader ("KOL") meetings held by the Company – was directly involved in the Company's management and day-to-day operations. ¶¶32-34. In that tight-knit environment, Defendant Smith, as well as the Individual Defendants, knew or had access to the cough frequency of the patients being enrolled in the RELIEF study. When speaking to investors, therefore, they acted knowingly or recklessly when omitting that data and making misleading comparisons to other studies in which the class of drugs worked on patients with higher cough frequencies. ¶¶98, 130-31.[14]

---

[13] Defendants' cases are not to the contrary. *See In re SLM Corp. Sec. Litig.,* 740 F. Supp. 2d 542, 559 (S.D.N.Y. 2010) (Plaintiff had not identified any document from which Defendants would have had knowledge and to describe the contents or whether they differed from statements during the class period).

[14] Defendants argue that, without allegations from a confidential witness or document to support an inference of scienter, Plaintiff's complaint fails. However, as indicated in one of Defendants' own cases, a plaintiff need only identify the "way in which this contrary information was communicated to Defendants." *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at \*11 (S.D.N.Y. Jan. 18, 2018); s*ee also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc*., 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("this Court is aware of no authority requiring confidential witness allegations."). The other cases cited by Defendants do not compel a different result. *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc*., 531 F.3d 190, 196 (2d Cir. 2008) ("[B]road reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated" the alleged failure); *Aratana*, 315 F. Supp. 3d at 765 (Complaint "lack[ed] any concrete allegations whatsoever regarding defendants' knowledge, apart from the information defendants themselves disclosed"); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.,* 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) (where Plaintiff's only allegations were based on confidential witnesses who did not offer any information from which it could be inferred defendants knew or should have known); *Fadem v. Ford Motor Co*., No. 02 Civ. 0680(SCH), 2003 WL 22227961, at \*4 (S.D.N.Y. Sept. 25, 2003) (Differentiating case from another one in which the Company "had become more dependent for its profits" on

### iii. The Individual Defendants and Defendant Smith Were Well Aware of the Market's Understanding of BELLUS's Study Versus Competitors' Studies and the Resulting Positive Impact on the Company's Stock Price.

"A court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of [income]." *Aegean*, 529 F. Supp. 3d at 174.[15] Additionally, "[h]igh level corporate officers who signed SEC filings containing the company's financial statement have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations." *In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 WL 3111777, at *7-*8 (E.D.N.Y. Sept. 21, 2009).

Similarly, particular company positions trigger an inference that "[defendants] . . . had access to [the] information given their positions." *In re Aphria, Inc. Sec. Litig.*, No. 18 Civ. 11376 (GBD), 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020). Given that high-level individuals in those positions have access to and knowledge of critical corporate information, courts "presume[]

---

the division at issue). In making detailed statements about the studies in this case (*see* pp. 5-8, *supra*), Defendants themselves acknowledged their awareness of the details of the studies.

[15] *See also Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021) ("[C]ourts in this District have required that the operation at issue make up nearly all of a company's business or be essential to its survival"); *Ortiz v. Canopy Growth Corp.*, No. 2:19-cv-20543-KM-ESK, 2021 WL 1851933, at *41 (D.N.J. May 7, 2021) (finding scienter sufficiently pled where the misstatements related to defendants' core operations, and "[i]t is therefore quite plausible that the company was aware of the [issues] and understood their significance, and thus was at least reckless in declining to disclose their existence"); *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (same); *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017) (same); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015) (finding scienter where "high level corporate executives with responsibility for the financial statements" made "misstatements" about core operations); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (holding that a plaintiff adequately alleged scienter where the plaintiff alleged that a defendant was "sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional clinical trial as the FDA had recommended, heightening its need for a lucrative stock sale"); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (A company's "[c]ore operations include matters critical to the long term viability of the company."); *In re Reserve Fund Sec. and Derivative Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) ("Once a plaintiff has adequately alleged that a defendant made false or misleading statements about [] core operations … an inference arises that [he] knew or should have known the statements were false when made."); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y 2006) (factoring into scienter that a troubled division was responsible for nearly a third of the company's total profit and concluding that key officers should have been intimately informed of its operations).

that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018).

Furthermore, when defendants speak about their biotech products and FDA approval, they should know the truth about the products and about the status of approval. *See e.g.*, *Skiadas*, 2020 WL 3268495, at *10 (Because "FDA approval was the sin[e] qua non" for Acer's "success," statements "pertaining to the chances of such approval and the speed with which it would be secured were absolutely essential to the company's prospects," meaning "[d]efendants' statements concerning 'approval' by or an 'agreement themselves are probative evidence of "a strong inference of scienter." *Id*.

Those principles further bolster the inference of scienter. BLU-5937 was BELLUS's lead product (¶¶2, 63, 100), and the Company needed money to commercialize it. ¶¶7, 100. While in the middle of the RELIEF study, therefore, BELLUS announced its intent to raise $60 million in a U.S. IPO and stated that it would use the net proceeds primarily to fund research and development activities, general and administrative expenses, working capital needs, and other general corporate purposes. ¶¶7, 102. As a result of Defendants' misstatements by Defendants, the IPO was well-received by investors, raising $70 million ($10 million more than initially planned). ¶103.

As alleged in the Complaint, the Individual Defendants signed and/or authorized each of the misleading filings before and after the IPO. ¶¶136-37. By virtue of their positions with the Company, the Individual Defendants and Defendant Smith were involved in the Company's management and day-to-day operations. ¶¶28, 34-37. Therefore, they knew BELLUS needed money, knew the patient enrollment for the study posed risks, and chose to misrepresent the study and its risks, while the Company earned $70,000,000 and bolstered its post-IPO stock price. Those

29

facts further support the inference of scienter.

iv. The Company, the Individual Defendants and Defendant Smith Knew the Facts Underlying the BLU-5937 Study Based on Their Detailed Statements About the Study and Likening It to Merck's Study.

Speaking knowledgeably on a topic creates an inference that the speaker knows facts about that topic. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-cv-2127(AWT), 2021 WL 3675180, at *20 (D. Conn. Aug. 19, 2021) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it, and is strong circumstantial evidence that [they] were receiving some form of specific information about the subject[.]"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) (noting that, "to speak so knowledgeably regarding" a topic, a defendant "must have educated himself regarding" that topic); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) ("In order to speak so knowledgeably regarding the state of [Defendants]'s finances, [Defendant CFO] must have educated himself regarding [the Company]'s financial health …. It is highly improbable that … the CFO of a company 50% of whose revenues were derived from financial services … would not inquire into whether his company was exposed.").

"One who utters a statement knowing it is false, or indifferent to whether it is true or false, speaks with scienter." *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021); *see also In re Perrigo Co. PLC Sec. Litig.,* 435 F. Supp. 3d 571, 588 (S.D.N.Y. 2020) (Defendants "acted with at least a reckless disregard of a known or obvious duty to disclose" where they received, but did not publicly disclose, audit findings letter with "detailed calculations, resulting in a [t]ax payable" that "was material to" the company); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (That "CSP had weak internal controls and … that the CSP Defendants were aware of the problems … support" scienter.).

During the Class Period, the Company, the Individual Defendants and Smith spoke knowledgeably to investors about BELLUS's RELIEF study. *See* ¶¶97, 133, 143-44, 158 (Bellus), ¶¶156, 159, 164 (Individual Defendants), ¶¶33, 166, 168 (Smith). They repeatedly made detailed statements likening the RELIEF study to competitors' successful studies, while omitting the known material differences as to cough frequency. *See* ¶¶73, 102, 105, 107-08, 138-39, 150-51 (BELLUS), ¶¶75, 96, 146-47, 154, 161-62, 164, 166, 170 (Individual Defendants), ¶166 (Smith). When speaking about the studies in detail to investors, therefore, Defendants either had direct knowledge of the patient enrollment issue or refused to see the obvious about facts they had a duty to know and monitor. Those facts further bolster the inference of scienter.

### 2. *The Individual Defendants and Smith Had Motive and Opportunity to Commit Fraud.*

Defendants argue that Plaintiff has not alleged motive, because there are no allegations of insider trading or of other personal benefits. MOL at 14. Defendants are wrong.

Insider trading is not required to establish scienter. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) (rejecting argument that insider trading was required because while "such allegations may support an inference of scienter, they are not a sine qua non for raising such an inference."). Rather, "courts have found allegations of motive adequate where the company's needed to fundraise to survive." *Skiadas*, 2020 WL 3268495, at \*11. Indeed, "[t]he inference of scienter is also bolstered" where "Defendants admitted in their SEC filings that they needed to raise funds for [the Company] to remain viable." *Id.* (holding that the concern about raising funds "meant that Defendants had an incentive to gamble that the FDA would approve [the drug] by misrepresenting what the FDA agreed to" and that former executive "ha[d] a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure.").

31

BELLUS fits squarely within that precedent. Without FDA approval of BLU-5937, BELLUS will likely not survive. And without an IPO and bolstered stock price, BELLUS could not continue seeking FDA approval. When speaking to investors, therefore, it was critical for Defendants to highlight the positive and conceal the negative about the RELIEF study. The ploy worked temporarily, as BELLUS raised funds. And if P2X3 antagonists somehow worked on patients with a lower cough frequency, the RELIEF study could have been successful, and BELLUS's gamble could have paid off. But BELLUS's gamble did not pay off, and the risk – about which investors knew nothing – manifested. Simply put, BELLUS needed money, concealed from investors that the RELIEF study would succeed only if BLU-5937 worked on low-cough-frequency patients), and then lost 69% of the Company's value when the study failed because of the precise problem that Defendants had concealed. Those facts also demonstrate scienter.[16]

## H. The Complaint Adequately Alleges BELLUS's Corporate Scienter.

The well-pled allegations—as set forth in the Complaint and described above (*see* Factual Background, *supra*)—show that the Individual Defendants and Defendant Smith acted (at least)

---

[16] Defendants cite to a string of cases where courts in this Circuit have dismissed securities fraud claims under the PSLRA. MOL at 14. However, those cases involve statements relating to anticipated FDA approval. Here, the statements were not directly about FDA approval; instead, Defendants spoke about the status of a particular study and its similarities to other studies. Unlike knowledge of what the FDA will do (knowledge which, in many instances, a defendant could not have), the issue here is knowledge (or recklessness) as to objective facts about the RELIEF study and other studies. As alleged, Defendants had that precise knowledge yet made contradictory statements. And Defendants had a strong motive to fund BELLUS's development of the drug, so they misrepresented aspects and risks of the study. Because of those allegations, each case cited by Defendants is distinguishable. *Biovail*, 615 F. Supp. 2d at 226 (no scienter where the **only** motive for fraud alleged is the desire to get the Defendants' drug approved and on the market before competitors' generic versions of a similar drug were); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) (no scienter where Plaintiff alleged that Defendants knew that the drug was "doomed to fail"); *Lehmann*, 2019 WL 4572765, at *6 (no scienter where Plaintiff did not "allege any chicanery in the study itself" but that Defendants were required to make more disclosures about the trial "turning out worse."); *Aratana Therapeutics*, 315 F. Supp. 3d at 757-61 (no scienter in the absence of any motive, lack of any actionable statement, and the complaint contained allegations suggesting "the absence of fraud" where Defendant had invested millions in sales teams and developing inventory); *Neurotrope*, 315 F. Supp. 3d at 735 (finding Plaintiff had sufficiently pled that the Individual Defendants "were in a position to know, and likely were familiar with, the results of the clinical trial and its significance," but failed to allege motive); *EDAP TMS*, 2015 WL 5326166, at *13-*15 (scienter not found where the company could have known about the problems in the testing procedures, planned to remedy those deficiencies, and still thought it could achieve FDA approval).

recklessly. Irrespective of that finding as to those individuals, however, BELLUS still possesses the requisite scienter.

Where "the scienter of a corporation is at issue, the plaintiff must allege 'facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.'" *In re VEON*, 2017 WL 4162342, at \*10 *(quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)). "[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant*." Id.* Even when scienter is imputed to the corporation, moreover, "[t]he person whose state of mind is imputed to the corporate defendant need **not** also be the person who made the material misstatements at issue." *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at \*22-\*23 n.5 (E.D.N.Y. Sept. 27, 2019) ("[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.").

Under those standards, Plaintiff's allegations establish BELLUS'S scienter. Even if no individual named defendant had direct knowledge about the low-cough-frequency enrollment, someone in the management sphere, who knew of BELLUS's statements to investors, had that knowledge. Indeed, because the Company had so few employees, it strains credulity that the people issuing statements to investors had no overlap with the people knowledgeable about the RELIEF study. Thus, BELLUS has corporate scienter.

## III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

The burden of pleading loss causation is "not a heavy one" as a complaint "must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Financing*, 797 F.3d at 187 (*quoting*

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 505 (S.D.N.Y. 2011) (Federal Rule of Civil Procedure ("Rule") 8 governs loss causation, which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief").

Loss causation can be proven by "a decline in stock price either because": (1) "a corrective disclosure reveals the falsity of the misrepresentations or omissions" (*i.e.*, "corrective disclosure" theory); **or** (2) the risk which was concealed materializes and causes the price decline" (*i.e.*, "materialization of the risk" theory). *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 239-40 (S.D.N.Y. 2006), *aff'd*, 216 Fed. Appx. 14 (2d Cir. 2007). A corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Nor does "a corrective disclosure need [to] take the form of a single announcement, but rather, can occur through a series of disclosing events." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008); *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("[A] stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more" but for the false statement); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) (upholding allegations of "Countrywide's continued misrepresentations and omissions—made concurrently with some alleged corrective disclosures").

Under a materialization of the risk theory, loss causation is adequately pleaded "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original). Since the loss-inducing event need only fall within the zone of risk concealed by the misrepresentations, loss causation "does not … require plaintiffs to establish a

34

one-to-one correspondence between concealed facts and the materialization of the risk." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 367 (S.D.N.Y. 2009).

Plaintiff amply pleads loss causation under either theory. The Complaint adequately alleges that Defendants made materially false or misleading statements and omissions about the design of and enrollment in BELLUS's RELIEF Trial and the efficacy of BLU-5837, which impacted the study's mean cough frequency, causing the Company's stock price to be artificially inflated, including as part of the IPO. ¶¶10, 14, 54, 194. Under the corrective disclosure theory, the Complaint alleges that the truth was revealed through two corrective disclosures, the first revealing the possible need for a Phase 2b trial and the second revealing the failed Phase 2 trial and confirming the need for a Phase 2b trial. ¶¶196-205. Both disclosures led to a stark drop in stock price, damaging investors. And under a materialization of the risk theory, the Complaint alleges that the risks associated with the RELIEF Study's design and enrollment materialized through the study's failure to meet its primary endpoint. ¶¶8, 12, 55, 57, 124, 128.

Despite those well-pleaded allegations, Defendants now quibble about the alleged facts and demand a mirror image corrective disclosure. MOL at 26-27. Defendants are free to raise factual challenges at a later stage, but at the pleading stage, Plaintiff's allegations must be accepted as true. *See Skiadas*, 2020 WL 3268495, at *10. Likewise, any potential truth-on-the-market defense with regard to the risk of a Phase 2b trial being disclosed to investors also fails at this stage. *See* §I.B., *supra*. And while a mirror-image corrective disclosure is not required, the Complaint alleges – and Defendants concede – that BELLUS's stock price reacted to "previously unknown information (e.g. the trial's cough counts)." MOL at 26. Thus, Defendants' premature challenge to loss causation fails.

## IV.    PLAINTIFF'S SECURITIES ACT CLAIMS ARE TIMELY

In the Complaint, Plaintiff newly asserts violations of Sections 11, 12(a)(2), and 15 of the 1933 Securities Act (Counts Three through Five) for the same underlying conduct regarding BLU-5937 that make up violations of the 1934 Exchange Act. Defendants argue that these new claims are untimely by two months because the one-year discovery period ended on July 6, 2021, and the new Securities Act claims in the Complaint, asserted in September 2021 do not relate back, to the timely initial complaint filed in March 2021. MOL at 30-31. Defendants are wrong.

Rule 15's purpose is to "maxim[ize] opportunity for each claim to be decided on its merits rather than procedural technicalities." *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006). Furthermore, relation back is permitted so long as the "general fact situation" provides "adequate notice" to defendants. *Id.*

Plaintiff's new claims relate back because they arise from the same misstatements and misconduct about Defendant's flagship drug, BLU-5937, as described in the Initial Complaint. As the Initial Complaint makes clear, the "general fact situation" has always encompassed how Defendants represented their study. Plaintiff alleged that "Defendants misled investors into believing that the Phase 2 study . . . would demonstrate the same level of efficacy as" a competing drug. ECF No. 1 ¶5. When the drug failed to show its effectiveness, Defendants planned a second study, *id.* ¶7, again emphasizing the problem with the *study* itself. Plaintiff also emphasized the announcement about the study "not achiev[ing] statistical significance." *Id.* ¶43.

To be sure, as is common in securities cases, Plaintiff's Amended Complaint expands on how Defendants "misled investors" about how the study would "demonstrate efficacy." *See* ¶¶218, 220. But relation back specifically permits plaintiffs to add allegations and claims about the "reasons behind the failure" that caused losses. *See Slayton*, 460 F.3d at 228-29 (reversing district court and finding allegation that defendant "failed to disclose lack of risk management controls"

related back to allegation that defendant failed to disclose investments in instruments that management understand).

Unlike Defendant's cases, it is not as if Amended Complaint addressed different products or business segments. For example, in *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *9 (S.D.N.Y. Mar. 31, 2010), plaintiffs brought claims alleging that defendant omitted information about the rising costs of raw materials for its products. *Id.* Later, it amended to add allegations that the defendant failed to disclose compliance with China's Environmental Regulations on certain warning labels for a specific product never previously mentioned. *Id.*[17] While the court acknowledged that claims may relate back so long as they are "similar," (and not identical, as Defendants appear to demand), it rightfully rejected relation back because the only theory tying the allegations together was that the misstatements were in the same filings. *Id.* Indeed, because the product and studies at issue are the same among complaints, the old and new claims will turn on what Defendants knew about BLU-5937's effectiveness and the studies used to determine it, they will all be proven with the "same or similar witnesses" and evidence. *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir. 1994).

In sum, Plaintiff's initial allegations about BLU-5937 have provided adequate notice to Defendants that they intended to bring claims concerning what Defendants knew about BLU-5937's efficacy and RELIEF trial. There is no basis for the Court to deny relation back under Rule 15.

---

[17] *Compare* Complaint, *In re Noah Educ. Holdings Ltd. Sec. Litig.*, No. 08 Civ. 9203(RJS), (S.D.N.Y. Oct. 27, 2008) with Consolidated Amended Complaint, *In re Noah Educ. Holdings Ltd. Sec. Litig.*, No. 08 Civ. 9203(RJS), (S.D.N.Y. April 8, 2009).

**V.    THERE IS PERSONAL JURISDICTION OVER DEFENDANTS BECAUSE THEIR CONDUCT IS CONNECTED TO THE UNITED STATES AND BECAUSE PLAINTIFF PURCHASED BELLUS ON US-BASED EXCHANGES**

Relying solely on a single quote from a 50-year-old case, Defendants argue that the Complaint fails to allege specific personal authority because Plaintiff has not alleged a "cause of action arising from the [ ] effects of [Defendants] alleged conduct in the United States." MOL at 35 (internal quotation marks omitted).[18] This effects-test-only theory is incorrect legally and factually. To satisfy purposeful availment, which focuses on *defendant's* contacts, Plaintiff need only show some non-causal "connection between the plaintiff's claims and [defendant's] activities in th[ose] [s]tates." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1032 (2021). Indeed, courts routinely find that filing falsity-riddled reports with the SEC suffices to subject one to personal authority. *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 644 (S.D.N.Y. 2017).

Plaintiff meets this test. ¶18. Even apart from registering securities on the NASDAQ Global Select Market ("NASDAQ"), Defendants made misrepresentations in **U.S.** regulatory filings about **U.S.** testing of BLU-5937 so that BELLUS could meet **U.S.** regulatory requirements to sell that drug in the **U.S.** *See id.* ¶¶33-34, 212. And if it were relevant, Plaintiff bought stock pursuant to Defendants' **U.S.** IPO. *See* ¶20. Thus, this Court has personal jurisdiction over Defendants for the conduct related to their domestically registered security.

---

[18] Defendants' citation to *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 456-57 (S.D.N.Y. 2005) does not bolster their argument. *Parmalat's* one-sentence of analysis stems from *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972), which merely found no personal jurisdiction over a foreign accounting firm's opinion on a foreign company. *Id.* at 1342. There was not an issue involving shares sold on domestic exchanges. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motions

in full. To the extent the Court grants the Motions, Plaintiff respectfully requests leave to amend.


Dated: February 11, 2022                       Respectfully submitted,

                                               **ROCHE FREEDMAN LLP**

                                               */s/ Constantine P. Economides*
                                               Constantine P. Economides
                                               Ivy T. Ngo (*pro hac vice*)
                                               Velvel (Devin) Freedman
                                               1 SE 3rd Ave., Suite 1250
                                               Miami, Florida 33131
                                               Telephone: (786) 924-2900
                                               Emails: ceconomides@rochefreedman.com
                                                       ingo@rochefreedman.com
                                                       vel@rochefreedman.com

                                               *Counsel for Lead Plaintiff and the Class*

                                               **THE SCHALL LAW FIRM**
                                               Brian Schall (*pro hac* forthcoming)
                                               1880 Century Park East, Suite 404
                                               Los Angeles, CA 90067
                                               Telephone: (424) 303-1964
                                               Email: brian@schallfirm.com

                                               *Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 11, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Constantine P. Economides*
Constantine P. Economides

40