M76CcacO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARL D. CACHIA, Individually
and On Behalf of All Others
Similarly Situated,

                    Plaintiff,

          v.                         21 Civ. 2278 (GBD)

BELLUS HEALTH INC., ROBERTO
BELLINI, FRANCOIS DESJARDINS,
DR. CATHERINE BONUCCELLI, DR.
JACKY SMITH, JEFFERIES LLC,
COWEN AND COMPANY, LLC,
GUGGENHEIM SECURITIES, LLC,
ROBERT W. BAIRD & CO.
INCORPORATED and BLOOM BURTON
SECURITIES INC.,

                    Defendants.

------------------------------x
                                     New York, N.Y.
                                     July 6, 2022
                                     10:56 a.m.

Before:

               HON. GEORGE B. DANIELS,

                                     District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M76CcacO

APPEARANCES

ROCHE FREEDMAN LLP
     Attorneys for Plaintiff
BY:  CONSTANTINE P. ECONOMIDES

GOODWIN PROCTER LLP
     Attorneys for Defendants BELLUS Health Inc., Roberto
     Bellini, Dr. Catherine Bonuccelli, Francois Desjardins
BY:  TUCKER DeVOE
     CAROLINE H. BULLERJAHN
     KATHERINE FAHEY

LANKLER SIFFERT & WOHL LLP
     Attorneys for Defendant Jacky Smith
BY:  RAMYA KASTURI
     JILLIAN BERMAN
     DANIEL REYNOLDS

M76CcacO

(Case called)

MR. ECONOMIDES:  Good morning, Constantine Economides, with Roche Freedman LLP on, behalf of plaintiff.

THE COURT:  Good morning.

MR. DeVOE:  Good morning, your Honor.  Tucker DeVoe Goodwin Procter, on behalf of defendants BELLUS Health Inc., Roberto Bellini, Francois Desjardins, and Dr. Catherine Bonuccelli.  Also present with me, your Honor, are my colleagues, Katherine Fahey and Caroline Bullerjahn.

THE COURT:  Good morning.  Who else do we have?

MS. KASTURI:  Good morning, your Honor.  My name is Ramya Kasturi.  I am with the law firm Lankler Siffert & Wohl. I'm joined by my colleagues, Jillian Berman and Daniel Reynolds, on behalf of Dr. Jacky Smith.

THE COURT:  Who else do we have at plaintiff's table?

MR. ECONOMIDES:  Your Honor, this is our summer associate, Hannah Shea.  She's not entering an appearance, but assisting me.

THE COURT:  Good morning.  So who wants to be heard on the defense's motion.

MR. DeVOE:  Your Honor, Tucker DeVoe again, Goodwin Procter.  Does your Honor have a preference, I can take off my mask or --

THE COURT:  Our protocol is now it's up to you.

MR. DeVOE:  I think it might make it a little easier

M76CcacO

to hear me, your Honor.

THE COURT:  Yes.

MR. DeVOE:  Obviously we're here on defendant's motions to dismiss.  It's also the recently filed motion for leave to amend filed by plaintiff.  I'm happy to go in any order that the Court prefers, but our thinking was, in our briefing, is that the proposed second amended complaint is something of a supplement to the amended complaint and we address plaintiff's motion for leave to amend in that light as a supplementation to our motion to dismiss.

So my intention today, your Honor, is to proceed with the argument on our motions to dismiss and, where appropriate, supplement in where any facts from the second amended complaint possibly change that analysis.

THE COURT:  That's fine.  I think I don't have yet any reply brief.  I don't know if there is going to be a reply brief with regard to the motion to amend, but, obviously, I'm more concentrated on the motion to dismiss.  I'll consider, once I get the reply, the motion to amend to the extent that it cures any of the deficiencies pointed out by the defense.

So, there are a number of grounds that you say that this case should be dismissed.  So why don't we start wherever you want to start.

MR. DeVOE:  Thank you, your Honor.  And I'm of course happy to jump around if the Court has questions on particular

M76CcacO

issues.

I think, just to start, what plaintiff is missing fundamentally in his case in this court is two baseline things.

First, the scientific endeavors are, in fact, uncertain. No one knows the outcome of the clinical trial before it happened. For that reason, many of the cases in this district and in the Second Circuit stay out of the way of scientific judgment calls of pharmaceutical companies trying out these risky drug. Second, the securities laws don't punish companies for experimenting and testing new drugs for exactly that reason.

THE COURT: Well, let me just jump in there. That's not the issue. The issue is not whether or not we should be second-guessing scientific studies. The critical issue is whether or not the company and its executives engaged in false or misleading statements.

MR. DeVOE: That is the question, your Honor. The only way that plaintiff in this case attempts to get at that question is by saying when defendants factually accurately describe the clinical trial design of the relief trial that was testing the drug in this case. When they were designing it, despite laying out accurately what the design was, they failed to understand they had designed it poorly and didn't disclose to the market that they designed it poorly. The only way that the plaintiff's theory of the case gets into a potential for a

securities claim is by saying the trial was poorly designed, which drives right back into an analysis of the underlying merits --

THE COURT:  What claim is that, from your perspective?  Poorly designing a trial is not a securities fraud claim.

MR. DeVOE:  That's exactly right, your Honor.

THE COURT:  A securities fraud claim is misleading investors by putting false information into the marketplace.

MR. DeVOE:  That's correct.

THE COURT:  So I'm not sure that either side has defined what this case is about in a way that I can relate it to a securities fraud claim.

MR. DeVOE:  This case doesn't relate to a securities fraud claim.  Plaintiff's claim that the trial was poorly designed and should have been designed differently is, at most, a claim of business mismanagement which, if that's the case, that's the claim they want to bring, it should be brought under the laws of the jurisdiction of incorporation under classic fiduciary duty principles.  That's not a Securities Act claim, it's not an Exchange Act claim.  This case truly is about disclosure because, in defendant's public disclosures, it's talking about this relief trial.  They said, these are our key criteria in our design.  Plaintiff has not said that they're factually inaccurate.  One of the design features was there was a cost severity threshold.  Plaintiffs aren't saying that

M76CcacO

that's inaccurate.  There was a cost frequency threshold.  Plaintiffs aren't saying that that's inaccurate.  These inclusion and exclusion criteria were accurately described in the prospectus, accurately described in the defendant's statements, accurately published online with the government and clinical trials.gov.

The only argument plaintiff brings is, well, I read these other materials.  In reading these other scientific materials and literature, I come to the conclusion that the trial should have been designed differently.  That's an analysis, a moot analysis that the Second Circuit has repeatedly rejected as being a disclosure claim.

I'd like to highlight a line of cases from the Second Circuit in particular that drive towards that conclusion.  I'd start here, your Honor, with the *Kleinman* case in the Second Circuit.  Now *Kleinman* was a case in which a company had a negative trial result and said, well, we've done some additional analysis on our trial results and after these post hock analyses, we conclude that the trial actually had some positive merits and disclosed that to the market.

Plaintiff came in and said, well, that's misleading.  You've read the scientific data differently than I've read, and so you've made a false and misleading statement.  The Second Circuit rejected that argument saying defendants are not required to adopt plaintiff's view regarding the studies in

*Kleinman* and others and may take issue with defendant's researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement.

Plaintiff's response to the *Kleinman* case, your Honor, is that they're not talking about the relief trial's disclosure about the end results described by relief, but what they are talking about is they're saying these competitor companies, Merck and Bayer and Shionogi, they issued their own study results. After reading those study results, the right conclusion from those study results is to say you should have designed this trial differently. That's exactly the kind of analysis and second-guessing of scientific judgment that the court in *Kleinman* rejected.

The next in this trio of cases that I think are critical here is *Tongue v. Sanofi*, a Second Circuit case from 2016. The claim there was that it was a trial of multiple sclerosis disease. The company was conducting a single blind trial because of difficulties with conducting a classic double blind trial. During the conduct of the trial, the FDA, the regulator of this company said they have, quote, grave concerns and major concern using a single blind trial. The company never disclosed those concerns to the market. The company repeatedly gave positive views of the potential that these trials could be successful and lead to FDA approval.

After the drug was denied approval, plaintiffs came out and said, you hid from us these major concerns and grave concerns from the regulator, and that made your optimism unreasonable, that made your trial design unreasonable in a disclosure violation.  Again, Second Circuit rejected that noting that there was an absence of any serious conflict between the regulator's conclusion that there was a major concern and the scientists of the companies other reading of the data.

Here, what plaintiff is arguing falls squarely within that.  And, indeed, the case is much weaker for this case than in *Tongue v. Sanofi* because  the plaintiff has not identified anyone, ever, at any point prior to his own analysis in his own complaint, ever suggesting that the relief trial was poorly designed on account of the previous disclosure of trial results from the competitor.

The last case in this trio came out during the midst of our motion to dismiss briefing, and this is a recent decision from the Second Circuit from March of this year, *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.* There, the facts are highly similar to this case. *Bristol-Myers Squibb* was conducting a lung cancer clinical research drug.  A key issue for that trial was what threshold of activity do we set for our patients in the trial.  Do we set it at a certain level, do we set it at this level.  They set it

at 5 percent.  Competitors set higher thresholds, including as high as 50 percent.

The trial failed.  Bristol-Myers Squibb later admitted it failed because they set the threshold too low.  Plaintiffs came out and said, well, your trial was poorly designed, you didn't disclose that you set it too low, and your risk factors and your prospectus -- excuse me.  But your other SEC filings didn't specifically name the low threshold or the reason why your trial might fail.

The Second Circuit rejected all of those arguments saying, instead, and I wanted to be careful and quote it here, that the company had generic risk statements about the drug, the drug might fail at trial.  The Second Circuit said, quote, this cautionary statement identifies the particular risks that the investors ran.  And although they claim that Bristol-Myers had an obligation to disclose why, bolded, why the trial might fail, i.e., the selection of a 5 percent threshold, they cite no law that supports such an argument.

That's what plaintiff is trying to do here.  Plaintiff is trying to say BELLUS and other defendants disclosed their trial design, that trial design was poor, they should have set the threshold higher, and their failure to disclose that is a Securities Act violation.

THE COURT:  Failure to disclose what?

MR. DeVOE:  Failure to disclose, in plaintiff's words,

M76CcacO

the poor design of the trial.

THE COURT:  What is it about the poor design of the trial that wasn't disclosed?

MR. DeVOE:  To be candid, your Honor, I don't know what more facts were known at the time.  There were no more facts in plaintiff having identified them that could be disclosed.

Plaintiff reads -- to back up a little and dig a little bit into the science here that plaintiff tries to read. The competitor studies had no frequency threshold for cross counts.  It wasn't a criteria of their trial, but plaintiffs allege because if you take the mean average of the cough frequency of those trials, it came after a certain number that ended up being higher than the number that the related trial ended up.

Defendants never claimed there would be one number or another.  They just set a minimum threshold for a trial and that minimum threshold is accurate, and the final cough frequency count of the relief trial accurately was higher than the minimum threshold, and that's it.  What plaintiffs are trying to argue is after we looked at these drug trial results from these competitors, we think it suggests that you should have designed this trial differently instead of higher minimum threshold.

That's it.  This isn't a fact that presently existed

at the time the defendants made their statements.  They disclosed what the trial design was, the public knew what the trial design was, and these cases from the Second Circuit show that that's what you need, you need to say what your design is accurately, describe the markets and investors can come to their conclusions.  And to the extent that plaintiffs are concerned about the risk that the trial might fail, those are the sorts of things that BELLUS and defendants included in their statements.

To highlight a few of the key risk disclosures that the defendants already put into the public record that's included in their prospectus are disclosures such as, quote, the clinical effectiveness of BLU-5937 is not yet supported by clinical data.  They also disclose, quote, based on results at any stage of clinical trials, we may decide to repeat or redesign that trial or discontinue the development of a product candidate.

So the market knew the drug was risky, they knew the drug was untested clinically, and they knew the means and methods of the design of the relief trial.  Nothing more is required and nothing more could be known prior to the release of the data from this double-blind trial.

I want to move on to, your Honor, unless your Honor has more questions specifically on the misstatement issue, and I think that element of plaintiff's claim cuts through all of

the counts in plaintiff's case, I wanted to move on to the scienter arguments.

I don't want to belabor it too much, but the securities law require a strong, cogent, compelling showing of scienter for Exchange Act claims.  Truly, plaintiff's amended complaint and the proposed second amended complaint contain nothing showing defendant's contemporaneous knowledge of contrary -- there are no specific allegations throughout the complaint.

On motive issues, this court analyzes plaintiff has not pled anything other than the normal motives that every business has, and for those reasons, it had been long rejected by multiple holdings of this court --

THE COURT:  I'm not sure I understand how you articulate what they say the motive is.  The motive to do what?

MR. DeVOE:  The motive to mislead the market by concealing some information about its clinical trials.

THE COURT:  For what purpose?

MR. DeVOE:  The purpose, your Honor, I don't know what the purpose would be, but to take plaintiff's case, it would be to mislead the market so as to -- and I'm not sure what.

THE COURT:  Who benefits by that?

MR. DeVOE:  As we point out, your Honor, no one benefits, I guess.  So let me back up.

THE COURT:  Obviously I'm putting you in an awkward

M76CcacO

position to articulate what you think their claim is, but I'm trying to understand from your perspective, when you talk about scienter and motive, I'm looking at certain classic indicators. I'm looking first to see whether they're material misstatements or misrepresentation, then I'm looking to see whether or not they're made by those individuals who had a motive to mislead the public to their own benefit.  So I'm trying to understand, when you define scienter and motive, what are you saying that's where I should be looking?

MR. DeVOE:  I think I could address the Court's question there.  A classic example of motive analyzed by this Court in many of its decisions are personal financial rewards gained by defendants who might mislead.  There are no trading allegations in this case, your Honor.  So the plaintiff doesn't allege that any of the speakers in this case sold stock to their financial benefit after making the alleged misleading statements and prior to the alleged corrective statement. That's a classic motive allegation that's just not contained in the complaint.

In plaintiff's opposition, they raise a case, *Skiadas v. Acer Therapeutics* in the Southern District of New York where the court found there was a possible motive allegation where a company was on the edge of bankruptcy, they needed to live just a few more days to roll the dice on FDA approval.  That's not this case for many, many reasons, including the fact that, as

defendants disclosed in their public statements, they're in the early stages of the drug trial process. They engaged in the relief trial, which was an early phase 2 clinical trial. They were going to need to raise more money later for later phase 2 trials, more money later for later phase 3 trials, and then move forward into the FDA approval process.

So, the incentive actually cuts the other way because defendants had every reason to have the drug trial succeed and describe it in a way to the market that's accurate so their stock price could maintain for the long-term future, the high price, so they can take access of the public market.

If plaintiff's argument is all pharmaceutical companies engaged in clinical drug trials necessarily have motive for purposes of scienter and securities laws, then that's a per se argument that can be applied to every pharmaceutical drug company in the world --

THE COURT: Well, I don't think that's their argument. The argument would have to be that they had information that they did not disclose to the public and they did that because, for that time period that it was not disclosed to the public, it would increase the value artificially of the stock. So it doesn't matter that they get caught six months later if their motive is to increase the value of their stock by either putting out misleading statements or with regard to the trial or by not disclosing what they knew was material information.

M76CcacO

So they painted a rosy picture that they got this great trial going on and the stock moves up 10 points when, in fact, they know this trial is going to fail and six months from now, the stock is going to drop 15 points.  That kind of theory, I can understand.  I've taken some time to look at, I wouldn't say I've studied the 150-page complaint or had an opportunity to go through in detail the proposed amended complaint, but I'm trying to understand the theory and the facts on which that theory is supposedly based as alleged in this complaint or the amended complaint.

MR. DeVOE:  The part of the way the courts in this district have conducted the analysis -- I want to make two points.  First is just briefly on knowledge, and we can get back to specifically what defendants knew, this is a blinded trial.  So defendants couldn't have known and plaintiff hasn't tried to state otherwise what the results of the relief trial were going to be before that card is flipped over and, at the end of the trial, it's finally revealed what the results were.

THE COURT:  I'm not sure that's necessarily so if you've designed a trial in a way that you know is going to fail.

MR. DeVOE:  That would require -- so that argument, I agree, as a general matter, it can be the case, you can know things that are contradictory to what you're saying, but what the securities law say is, okay, plaintiff needs to plead

M76CcacO

specific facts that show that that's the case, and there is none of that here.  There is no confidential witness allegations, there is no internal reports, there is no internal documents contradicting any statement of what defendant said. In fact, there is just no statement in the complaint prior to the release of the trial results in July of 2020 that suggested that the relief trial was doomed to fail or likely to fail because of its design.  So those are facts that could exist in a hypothetical case that would contradict some hypothetical defendants, but that's what's missing from the complaint in this case.

Just briefly back on the motive point.  Again, I agree, your Honor, it can be the case if you can show specific facts why you need the stock price high on this day only, then you might be able to show a motive, and that's why courts in this district and in the Second Circuit have required some pretty particularized allegations of what makes this different from a normal run-of-the-mill business operation.  Companies raising money on the public market is a normal course of business operation.  That doesn't inherently create a scienter motive allegation because it's as consistent with just trying to accurately and correctly describe to the market what your business plans are.  What you need to show is something special and different from the normal case, and that's what plaintiffs had failed to accomplish here.  There is nothing special or

different about this case that takes it out of the Brian

Reynolds case where companies engage in corporate transactions,

access the capital markets, et cetera, to obtain funds from

this market.

On knowledge, again, this seems to be highly specific.

Plaintiff doesn't have anything specific.  Instead, plaintiff

relies on a set of, in their papers, a set of

should-have-known-type doctrines to try to argue that

defendants should have had some knowledge.  I'm still not quite

sure what that knowledge is.

THE COURT:  That's what I was going to ask, knowledge

of what?

MR. DeVOE:  Because as I was previously discussing,

all that plaintiff can really say defendants could have known

is that their trial was somehow poorly designed.  That could be

supported if there existed confidential witness statements or

internal documents telling the defendant specifically this

trial will fail because of something that you're doing, so

don't go out into the public market and say we have reasons to

believe in this trial.  But that's totally opposite here.

Going back to the misleading statement aspect of it.

It's not just some fact cutting the other way, some fact that

could be read in a way that's inconsistent.  It's a fact that's

directly inconsistent.  The Court laid out in *Tongue v. Sanofi*

a fact cut the other way doesn't make your statement about why

M76CcacO

your trial might be successful and misleading, you need direct specific evidence to you, to the speaker that that is your belief, it's misleading and inconsistent with the factual reality.  Just none of that is here and that's why plaintiff cites the things like the cooperations doctrine, which some courts have suggested might not even exist after the Reform Acts passage, even assuming the core operations doctrine exists, courts in this district say it can't stand alone as a basis for a scienter.  And also the core operations doctrine as we describe, it exists to avoid arguments like the CFO didn't know that the company was about to fail, that that was truly core operations.  Plaintiff cited no case.  I'm aware of no authority that the core operations doctrine has been applied to, say, a population statistic during the middle of a clinical drug trial and imputing that knowledge to a specific speaker.

So absent any specific allegations, plaintiff can't make the case for scienter.  And then what also plaintiff doesn't include in their papers and is required to balance the inferences of scienter created by plaintiff's specifically pled allegations against the nonfraudulent inferences.

The nonfraudulent inferences are quite strong in this case.  Just a quote, as other courts have analyzed these sorts of -- it is not an uncommon situation for a pharmaceutical company to end up in front of this court or other federal courts defending the fact that, yes, the clinical trial failed.

M76CcacO

That is the court in Exotics Securities litigation, it's an S.D.N.Y. case from 2009, described about the nonfraudulent inferences the allegations of securities fraud here premised on plaintiff's belief that defendants did not design the phase 3 trial properly.  The idea that this company highly depended on the success of the new drug would knowingly or recklessly carry on a defective trial so that any defects were not remedied virtually defies reason.  That's here.  Nonfraudulent inference is that defendants were attempting to conduct a clinical drug trial as best they could in order to achieve success for their drug candidate so that they could treat the people who are suffering from debilitating chronic cough.  The complete lack of specifically identified facts showing the defendants' thought otherwise during the time of their statements is dramatically inconsistent with the normal nonfraudulent inference.

And in the proposed second amended complaint that plaintiffs recently filed, one of the few factual allegations they added in is that after the relief trial showed mixed results failed in its primary and point of success of whether patients -- the company conducted a second trial, focused on those patients who were successful in the relief trial.  That next trial was successful, and recently, we read out positive cough line results.  That dramatically undermines the fraudulent inferences and dramatically supports the

nonfraudulent inferences because plaintiffs are essentially saying that the very same defendants would intentionally or recklessly cause their trial to fail and then go on the same people to fund and support and create another successful trial. The much more likely inference is, both times, they were trying to have a successful trial.

Also, under the Exchange Act --

THE COURT:  I'm not sure that, depending on what the timing is and depending on what the motive is, I'm not sure that necessarily -- you may want the first one to fail and the second one to succeed or you may want the second one to fail and the first one to succeed.  Doesn't necessarily mean you wanted both to fail or you wanted both to succeed.

MR. DeVOE:  I'm not saying it's dispositive, your Honor.  I take the point, it may.  Then I think the key in your Honor's question is the word "may," and what the securities law, what the Exchange Act, unlike many other motion to dismiss standards in many other cases requires the Court to analyze is balance the inferences taken from those facts and see which makes more sense, which is more cogent and compelling than the other.

To fill in that gap of the "may," plaintiff must come forward with specific facts showing the fraud, showing the intentionally avoided knowledge that defendants were describing for the market.  That's completely absent.  So that's why a

M76CcacO

nonfraudulent inference is that way.

My point on the second trial is simply, it doesn't add to the fraudulent inferences to the prior study design because that second trial didn't happen yet, so it doesn't reveal any new information about what defendants were thinking at the time of their statement in challenged in this case.

Another element just to briefly address on the Exchange Act is loss causation.

THE COURT:  Yes.

MR. DeVOE:  I see it as a useful framework or useful lens for the Court to view the disclosures and to think about how the alleged corrective disclosure marries up with the alleged misleading disclosures.  As the Second Circuit in *Lentell v. Merrill Lynch & Co.* described the question of, quote, the subject was the cause of the statement or omission was the cause of the loss suffered.

Plaintiff has raised two statements they alleged were corrective disclosures.  The first in April of 2020, plaintiffs say this is the first time that defendant said that a phase 2B trial was possible following the relief trial.  That's plainly not true.  We describe in our moving papers and we described in our recent opposition for leave to amend, the company described from the beginning in the prospectus that it may initially, in a phase 2B trial, after the phase 2 trial, that information is already in the public.  It also announced in the prospectus

that it may design or redesign new trials after the results of prior trials.  And so there was no new information contained in that April 2020 statement that's new and unknown to the market based on defendants' statements prior to that day.

So, too, with the July 2020 disclosure.  That press release said essentially three things.  One, the relief trial is done and we've now -- two, the relief trial showed some merit, but not statistically significant with the key population we were looking at; and three, it did show statistically significant benefit with a subset of that population.

Each of those points, that the trial was now emblended, the results on the whole population of results of the subjects, none of those facts existed prior to that day and none of defendants' statement that are in the complaint or we looked at in our moving papers claims to make a representation about those facts.  So because of that, it's not a correct due disclosure that changes anything about defendant's prior statements.  That's why there's no loss causation.

There are two final arguments I want to address.  One relates to the statute of limitations, which affects only Section 11 and Section 15 Securities Act claims, and the other is our waiver argument about statutory standing that we raised in our papers.  On the statute of limitations, plaintiff doesn't disagree with us on the basic facts.  It's a one-year

statute.  The first complaint in this case was filed within the one-year statutory period, the amended complaint was not, the second amended complaint is not.  And so the Section 11 claim was raised for the first time in the amended complaint, it wasn't raised in the original complaint.  And so, the question is, do the allegations in that Section 11 claim and Section 15 claim, do they relate back to the original complaint, the only one that was filed in the time period.

And on this, they don't, because the original complaint was concerned with a different issue that plaintiffs' subsequent theory in the amended complaint and the proposed second amended complaint.  Specifically, I'll quote from the original complaint to highlight it for the Court.  The original theory that plaintiffs were pursuing this case under was, quote, specifically, defendants knew but failed to disclose that while BLU-5937's high selectivity contributed to the drugs causing little to no taste alterations in front of cough patients, that high selectivity also contributed to the drugs potentially being less efficacious and thus likely not being able to meet the primary endpoint of the company's phase 2 trial.

That allegation, that defendants were hiding the fact that an inherent feature of the drug, its selectivity affected its efficacy is absent from both the amended complaint and from the proposed second amended complaint.

So we've been talking about here today instead defendants now claim in their new complaint, it's filed after the expiration of the statute of limitations, that what defendants were hiding from the market were flaws in the design of the relief trial. That is not an aspect of the original complaint that they filed in this case.

And so, to take the standard from the Second Circuit in *Slayton*, the question is whether the new allegations rendered a prior allegation more definite and precise. Here, they don't. The new allegations are about alleged lack of disclosure in trial design characteristics, and the original complaint was entirely about an alleged lack of disclosure about how the drug's chemical structure affected its efficacy. They are two separate issues. Defendants were not put on notice with the filing of the original complaint that they were going to be facing allegations that they misleadingly disclosed the relief trial design because that was not a feature of the original complaint. For that reason, the new allegations don't relate back, which means that when that complaint was filed in September of 2021, a year out of time, they were time barred. So it should be dismissed for that reason, in addition to the reasons I've already discussed why there is no misleading statement made by defendants.

To address briefly the statutory standing issue we raised in our briefing, post Morrison, it's clear that domestic

M76CcacO

shared buying is an element of the claim. You can't purchase shares on foreign markets or just in a foreign transaction. If you read plaintiff's original complaint, he doesn't say that he purchased his shares in the United States or on a U.S. exchange, it's just not mentioned. He says he purchased shares. But based on the public statements incorporated by plaintiff into his complaint, balance is traded in both Canada and in the United States. You can buy shares in both places. The amended complaint didn't cure that issue. It also contains no statement about where the plaintiff made his purchases of his shares that could be freely bought in either Canada or United States. We've raised this issue in our motion to dismiss. In plaintiff's opposition, he did not address it at all. In our reply, we'd again raise the issue and said now having failed to raise an argument against an affirmative aspect of his case, he waived argument otherwise.

We filed our reply, a month passed, plaintiff didn't do anything. The Court set hearing for this argument today, another month passed, plaintiff hadn't done anything. Plaintiff then reached out to us at the very end of May, beginning of June and asked to file a proposed second amended complaint. That proposed second amended complaint now probably just gets over the Rule 8 threshold for alleging that he made his purchases domestically. It says he purchased them on a, quote, domestic exchange. But it's too late in the day. We

went through addressing this issue where plaintiff, at any time, could have said, yes, I purchased my shares on NASDAQ, but here's the issue, but chose instead to oppose that motion, not mentioning the issue, and wait till weeks before this hearing to try to raise it up here.

THE COURT:  Why does that preclude them from addressing the specific requirement that he purchase on the domestic exchange and what time period you said he could raise that issue.

MR. DeVOE:  He could have raised it in the opposition.

THE COURT:  He could have, but wasn't required to.

MR. DeVOE:  We point to some case law, your Honor, saying if you don't address a substantive issue as a basis for dismissal in your opposition or suggest that you could plead past security issue, you have waived the issue.

THE COURT:  But this isn't the substantive issue.  The substantive issue is not about whether or not he has specifically alleged in the original complaint that his purchases were on a domestic exchange.  What is required is that the purchases be on a domestic exchange.  That's not an element of the claim that has to be specifically alleged, it is a requirement that has to specifically exist.

MR. DeVOE:  I think, your Honor, post Morrison, it does need to be alleged, that you need to allege in your complaint, yes, we purchased these securities domestically,

M76CcacO

because the Supreme Court made very clear in that case that foreign purchases don't count.

THE COURT:  I know, but if you knew that he had made purchases, if you have records yourself that indicate that they made purchases on a domestic exchange, it would not be an argument to make that, simply because they didn't say it in the complaint, you get to dismiss all the claim.

MR. DeVOE:  I will say, we don't have those records because it's a publicly traded stock, plaintiff does.

Maybe to take it in an analogy, your Honor, from the criminal law, in my practice, at least in Massachusetts, the elements of drunk driving are, did you drink too much alcohol, were you driving, was it a public way.  And the public way, element, even though it seems easy to allege or a sideshow isn't a necessary component of the allegation.  I think when the Supreme Court in Morrison said our securities laws do not reach foreign transactions, that set a bar.  You have to say I purchased these shares here.

THE COURT:  I'm not sure.  I have to look back at the case law because I'm not sure that the case law stands for the proposition that you must specifically alleged that you're on a domestic exchange rather than there is a specific requirement that you have traded on a domestic exchange.  I'm not sure that the case law specifically addresses the issue of pleading as opposed to the issue of whether or not, in fact, you actually

M76CcacO

have statutory standing.

MR. DeVOE:  Some of our cases were motion-to-dismiss decisions where there were multiple layers of defendants, some who had purchased foreignly, some who purchased domestically, and vise-versa.

THE COURT:  Those were cases, I assume, where that was genuinely in dispute.  I'm not sure in this case it was generally in dispute.  You didn't say, oh, wait a minute, get out of here because we know you bought this in Canada and you didn't buy this in the United States, and so we move to dismiss.  You are saying, oh, well, we don't really know whether you brought it in the United States or bought it in Canada, and since you don't specifically say you bought it in New Jersey, then we get to dismiss your claim.  I'm not sure that you get the benefit of that kind of an argument.

MR. DeVOE:  Your Honor, two things, briefly.  One is, it is an aspect that plaintiff has in his knowledge and could easily plead in any complaint, and plaintiffs have to file certifications about purchases, and plaintiffs here just didn't include the fact that it relates to a U.S. security purchase.

THE COURT:  But they have done that since.  You're arguing about the timing of it.

MR. DeVOE:  That's right.

THE COURT:  You're not arguing that it doesn't exist or they're not in the position to allege it.  They have now

attempted to allege it and you don't come back and say you're wrong, you didn't buy it on the domestic exchange.  So I'm not sure whether or not where you say the ground is to dismiss their original complaint and preclude them from amending the complaint at this time to that extent.

MR. DeVOE:  I think the Court has the facts right. Our argument is a waiver-based argument as we set out in our most recent papers filed on Friday.

I would just note that to the extent that the Court wants to focus its attention more on the other totally independent reasons we have for dismissing this complaint, those standing in full force and effect regardless of the Court's view of the waiver argument.

THE COURT:  Do you still have an allegation that there is no personal jurisdiction?

MR. DeVOE:  Our personal jurisdiction allegation was dependent on the domestic share-buying issue.

THE COURT:  But you're not making an argument that, somehow, you still get to make that argument because of the lateness?

MR. DeVOE:  No.  And the cases we cited are clear, if you're a foreign entity or foreign defendant from making statements about known U.S. securities, then that's enough for personal jurisdiction purposes.  So we're not making that argument.

M76CcacO

If the Court has any other questions, I reached the end of what I wanted to discuss with the Court today, but I'm happy to discuss any specific questions --

THE COURT:  Let me hear from them and then you rebut that, because I want to hear how they articulate their particular claim.

MR. DeVOE:  Just as a matter of procedure, your Honor. Defendant Smith, who is not an employee of the company, she's separately represented by counsel here today on the defense side.  Your Court's preference if you wanted to hear limited issues, specifically first --

THE COURT:  Depends on how much new argument you're going to make.

MS. KASTURI:  Your Honor, if you wouldn't mind, we would like to be heard on a couple of discrete issues as they apply to Dr. Smith.  We join in everything my colleague has already said, but we have a couple of unique arguments.

Your Honor, would you mind if I use the podium?

THE COURT:  Please.

MS. KASTURI:  So we represent Dr. Jacky Smith, who's a professor of respiratory medicine at the University of Manchester in the United Kingdom, and an honorary consultant at the University Hospital of South Manchester NHS Foundation.

As alleged in the complaint, Dr. Smith was an adviser to BELLUS.  For all of the reasons that my colleague,

Mr. DeVoe, has already stated, Dr. Smith has no place in this litigation.  The single broad-based claim brought against Dr. Smith under the Exchange Act fails for all the reasons that BELLUS has argued.  But what I'd like to focus on today is plaintiff's failure to allege scienter as to Dr. Smith.

Plaintiff fails to allege an inference of scienter against Dr. Smith, let alone the strong inference required under the PSLRA.

First, plaintiff has not alleged particularized allegations as to Dr. Smith's scienter.  Rather, plaintiff lumps all of the defendants together and makes sweeping broad allegations of the group scienter.  On this basis alone, the complaint should be dismissed.

Second, none of plaintiff's sweeping allegations regarding scienter applied to an individual like Dr. Smith.  As alleged in both versions of the complaint, both the first amended complaint and the proposed second amended complaint, Dr. Smith was the principal investigator of BELLUS's phase 2 relief trial and/or the chairman of the clinical advisory board.  Dr. Smith was not an employee of BELLUS, she was an adviser to the company.

Plaintiff's allegation regarding motive, as we see it, essentially is that the company needed to fundraise in order to survive and this was their motive.  Plaintiff makes no allegation as to how this motive allegation would apply to a

third-party adviser of a company.  Moreover, the only alleged statements that are attributed to Dr. Smith took place more than six months after the company completed its IPO and raised $70 million, and it took place barely a month before the results of the relief trial were actually unveiled to the public.

THE COURT:  I'm sorry.  Say that again, first part of that.

MS. KASTURI:  So the only statements that are attributed to Dr. Smith took place more than six months after the company's IPO was completed and the company raised $70 million.  So it just doesn't make any sense that Dr. Smith was motivated -- to the extent that a third-party adviser to a company has any motive in the company's fundraising, it doesn't make sense she would have this motive six months after the company already raised $70 million just a month before the results of the trial are about to be unveiled.

What makes far more sense as to Dr. Smith and what's far more cogent and compelling is the nonfraudulent inference, and that is that Dr. Smith is an academic clinician from the U.K. whose life work was then to try to improve outcomes for patients suffering from chronic cough, and that's what she did in the relief study, she was trying to design a study that would help her patients and hoped for success.

THE COURT:  I assume Dr. Smith was not doing this for

M76CcacO

free?

MS. KASTURI:  No, I'm not saying she was doing this for free.

THE COURT:  She had just as much as a financial motive as anybody else.

MS. KASTURI:  I guess I'm not so sure about that given she's not actually employed by BELLUS and she's an adviser.

THE COURT:  I'm not sure what you say her altruistic role was as opposed to her economically motivated --

MS. KASTURI:  Plaintiff hasn't alleged that Dr. Smith was going to reap some kind of greater reward if the study was successful.  I'm not sure that plaintiff has alleged any specific financial motive as to Dr. Smith.

Moreover, I think on this point, the *Gillis v. QRX Pharma Ltd*. that Judge Engelmayer decided is helpful.  There, Judge Engelmayer said that where a defendant derived no concrete personal benefit, it's implausible to think that they would invest time and resources into a clinical trial that they knew was doomed to fail and that they would lie to investors about the --

THE COURT:  That's what I'm trying to understand. Where am I supposed to determine or on what basis are you urging that she gained no financial benefit?

MS. KASTURI:  The plaintiff hasn't alleged that she gained a financial benefit by lying to the public or allegedly

M76CcacO

lying to the public.

THE COURT:  Well, I can examine that.  What are you saying is the benefit to her, other than the financial benefit?

MS. KASTURI:  I mean, I guess I'm saying that the benefit to her is to help improve patient outcomes --

THE COURT:  -- too if she didn't get a financial benefit.  The benefit to her is both her desire to help people and her desire to --

MS. KASTURI:  That's true to the extent --

THE COURT:  McDonald's has a motive to want to feed the world, but that's not their only motive in selling hamburgers.

MS. KASTURI:  That's true to the extent, your Honor, that we assume she is being paid for the work that she's conducting for BELLUS, and we're not disputing that, although plaintiff hasn't specifically alleged it.  But what plaintiff has not alleged is that Dr. Smith was going to somehow reap some greater reward by telling investors something that wasn't true.  So I don't really understand what the motive would be. It's not like she owned stock in the company and that she was going to benefit somehow from an inflation in stock price. That has not been alleged from Dr. Smith.

And I think my colleague, Mr. DeVoe, already touched on this, but the nonfraudulent inference here is actually bolstered by what plaintiff has added to his second amended

M76CcacO

complaint, and that is that after learning through the phase 2 relief trial that BLU-5937 — and that's BELLUS's drug that was at issue — had not produced a statistically significant positive effect on patients with lower cough frequencies. BELLUS conducted another study — and that study was called the soothe trial — on patients with higher cough frequencies.

So, in other words, once Dr. Smith and BELLUS were given good reason to think that BLU-5937 might not have a statistically positive effect on patients with lower cough frequencies, they raised the minimum cough frequency threshold in their clinical design. As plaintiff points out, Dr. Smith and BELLUS in the soothe trial actually looked again at patients in the lower cough frequency covert. So that is between patients averaging coughs between 10 and 25 coughs per hour, and they did this to confirm that the drug was not effective on those patients. And, frankly, if this had been an obvious point that it wouldn't be effective as plaintiff seems to suggest, it doesn't really make sense that they would reexamine this same thing that apparently was obvious during the relief trial.

THE COURT: Those are all reasonable inferences, but I'm not sure they're all reasonable inferences that I'm supposed to apply at this stage of the proceeding on the allegations of the complaint.

MS. KASTURI: Sure. But I guess the point is, at this

stage, one thing we should do is weigh the competing inferences. So that's the fraudulent inference against the nonfraudulent inference. So here, the nonfraudulent inference that we've presented is much more compelling than any possible fraudulent inference that plaintiff has alleged.

So That goes to motive. I also would like to address the issue of recklessness since scienter can be shown either through motive or recklessness.

Where allegations of movie are absent, plaintiff has a correspondingly greater burden to allege strong circumstantial evidence behavior or recklessness, and that is extreme departure from the standards of ordinary care to the extent that the danger was known to the defendant or so obvious that the defendant must have been aware of it. Plaintiff fails in this regard, as well.

As we read it, plaintiff's claim seems to be based on the assumption that Dr. Smith should have known ahead of time — that is prior to obtaining the results of the relief study — that the average cough frequency of the relief trial was going to be 25 coughs per hour and that, therefore, this meant that there was a high risk that the trial would not produce a statistically positive result.

So just pulling out some examples from the complaints. In the amended complaint, plaintiff alleges that Dr. Smith knew that BELLUS had enrolled a low number of severe cough patients,

and that's paragraph 169.  The proposed second amended complaint characterizes the same allegations slightly differently, stating that Dr. Smith knew that BELLUS was failing to enroll patients in the so called, quote, target population, and that's at paragraph 183.  Both complaints allege that these facts meant that there was a high risk that the relief study would not meet its designated endpoint for efficacy.

These conclusory allegations fail for two reasons.  First, plaintiff has not made any particularized allegation that Dr. Smith knew that the average cough frequency of the relief trial was 25 coughs per hour at the time of the alleged misstatements.  And as Mr. DeVoe stated earlier, I think, given the doublewide structure of the study and the fact that certain patients dropped out of the study due to COVID midway through, there is no reason to infer that Dr. Smith knew the average cough frequency of the patient population at any given time.

Second and more fortunately, even if you assume that Dr. Smith knew that the average cough frequency of the patient population in the relief trial was 25 coughs per hour as plaintiff has alleged, plaintiff has not identified any source of information that existed at the time of the alleged misstatements indicating that this patient population was not the, quote, target population.  Plaintiff hasn't pointed to any contemporaneous source of information to indicate the

difference between the average cough frequencies of the relief patient population and the competitor study population was known to actually matter, meaning that it was known that this would mean that the trial would not produce a statistically significant positive result.

On that point, plaintiff points to competitor trials that had ended up with average cough frequencies in the 30s, 40s, and 50s if you look at the second amended complaint, paragraph 11, but plaintiff has not alleged that any competitor ever released data showing that drug efficacy would have changed based on lower or higher cough frequency.  There is no allegation that any competitor reported results specifically for a subgroup with a higher or lower cough count.  And unlike BELLUS, which actually used a cough frequency threshold of 10 coughs per hour, competitor studies that plaintiff points to in his complaint did not even use a cough frequency threshold.

So, for example, in Merck's first phase 2 trial on a drug that was supposed to address a similar issue, the average cough frequency of the patient population there was 56.9 coughs per hour.  Merck then did another phase 2 trial, again, not using a cough frequency threshold, and their average cough frequency was 40.3 coughs per hour.  And then even having the results of these two studies, Merck did a phase 3 trial, and again, Merck did not use a minimum cough frequency threshold. If the danger of failure due to a low cough frequency was so

M76CcacO

obvious at the time of these studies as plaintiff alleges, it makes no sense that the very competitors that plaintiff points to did not use a minimum cough frequency threshold.

In short, plaintiff has pointed to nothing to suggest that Dr. Smith knew or recklessly disregarded specific information that anything she said was misleading.

Just so that I'm brief, your Honor, I won't go through all the arguments that Mr. DeVoe already made as to why none of the statements are actual, but I would just like to point out that, in our motion to dismiss, we made the argument that Dr. Smith cannot be held liable for any statements that she did not make and we had two arguments for this.

First is that many courts in the Second Circuit have held that the group pleading doctrine doesn't survive the Supreme Court's decision in Janice Capital in which the Court held that only, quote, makers of statements, that is those with ultimate authority over them may be held liable.

And second, we also argue that even if this Court were to find the group pleading doctrine is viable after Janice, it's extremely narrow in scope and it doesn't apply to secondary actors like Dr. Smith. Plaintiff didn't respond to this argument that we made in our motion to dismiss, so I think he conceded the point that Dr. Smith is only liable for statements that she actually made, but I just wanted to raise that.

M76CcacO

That's all, your Honor.

THE COURT:  Did anyone else want to be heard on defense side?

MR. DeVOE:  No, your Honor.

THE COURT:  Let's take a short break.  We're going to give the court reporter a break and see if we can finish up within the hour.

(Recess)

THE COURT:  Yes, sir.

MR. ECONOMIDES:  Thank you, your Honor.  Is it okay if I stand at the podium?

THE COURT:  Yes, please.

MR. ECONOMIDES:  Once again, your Honor, my name is Constantine Economides with Roche Freedman LLP on behalf of plaintiff.

This case is not about disagreeing with science, it's not about disagreeing with the study design, it's not about disagreeing with the interpretation of the study results, it's about false and misleading statements about what was going on with the study while those things were happening.  And I want to focus on those statements, something that I didn't hear with the opposing counsel's arguments looking at the actual statements that were saying were false and then talking about why defendants were reckless or knowledgeable with making those false statements.

M76CcacO

Now, the one moment though, there is the critical fact that we've alleged that must be taken as true, a critical and plausible fact. That's that defendant's relief trial included a materially different patient population than the patient populations in competing trials. That fact, for the purposes of a motion to dismiss, must be taken as true.

Specifically, the patients in the relief trial had a materially lower cough count than the average cough counts in those other trials. So in other words, no other company had ever attempted to show efficacy with this specific patient population nor had anyone actually shown efficacy with this specific patient population that was being studied by BELLUS in the relief trial. When that is established, we look at the statements and we ask, do the statements fairly represent that fact or are they misleading or false in relation to that fact?

So I'll turn to some sample statements here. This is in paragraph 161 of the operative complaint. This is Mr. Bellini, president and CEO. Here, they're always comparing their trial to other trials, they make that choice, they don't have to. They don't have to talk about Merck and Shionogi, but they do. They say, hey, when we're doing our trials, look at these trials and take away the facts of those trials so you can understand the risks of our trial and the lowered risk we might have if we were spearheading this without the foundation. But we have this foundation, this foundation with competitors,

M76CcacO

that's always the context they're talking in.  Here's what he says.  So the lead product here, probably that's the most advanced is MK7264, and P2X3 antagonist that's currently in phase 3 trials for Merck.  That drug works really, really well in this patient population.  False, it does not.  It does not work really, really well in this patient population.

THE COURT:  What do you say this patient population is supposed to be referring to?

MR. ECONOMIDES:  The population that they're studying right now.

THE COURT:  What makes you give that definition?  Where do you get that from?  When you say this patient population, there must have been some reference earlier in that statement defining the patient population that they are discussing.  Are they discussing the patient population of patients who have coughs or are they discussing a more specific patient population?  It doesn't say study population, it says patient population.

MR. ECONOMIDES:  Fair point.  So they're either talking -- well, they're talking about the target population.

THE COURT:  Why do you say that?  The study population, my initial reaction is the study population is different than the patient population, it can be different than the patient population.  The patient population, unless you define it as it's defined specifically, can refer to that

M76CcacO

population of patients who have these issues.

MR. ECONOMIDES:  Well then, even that's false, because there are patients with chronic cough problems.

THE COURT:  Right.  That's all patients.  There is the patients in the Merck study and those are the patients in their study.

MR. ECONOMIDES:  Yes.

THE COURT:  So what's false about referencing that population?

MR. ECONOMIDES:  Because it does not work really, really well in that entire population.

THE COURT:  Well, it's not supposed to work really, really well.

MR. ECONOMIDES:  That's what I said.  The quote is that drug works really, really well in this patient --

THE COURT:  The Merck drug?

MR. ECONOMIDES:  Yes.

THE COURT:  All right.  The Merck drug.  He's saying that the Merck drug works well in the patient population that has this issue?

MR. ECONOMIDES:  Yes.  That's false.

THE COURT:  What's false about that?  The Merck drug does not work well?

MR. ECONOMIDES:  If we're saying the patient population is the people with chronic cough, right, that's the

M76CcacO

general public with chronic cough.

THE COURT:  Okay.

MR. ECONOMIDES:  And that's the patient population.
What's been shown by Merck and others is that the Merck drug
and similar drugs work really well in one part of that
population, not in the whole population.  So it doesn't work.
No one has shown --

THE COURT:  Well, it does work well in a portion of
that population.

MR. ECONOMIDES:  Yes, that's true.

THE COURT:  So you're saying the difference is they
should have said it works well in some of the population rather
than imply it works well for everybody in the population?  That
can't be the argument.

MR. ECONOMIDES:  In a way, yes.  There is more
statements that we'll get to, but that's the point, because
they were studying only the part that didn't work well on.

THE COURT:  Let's put it in a relevant context that
we're in now.  For someone to say that the COVID drug works
well in the population of people who have COVID is not a
representation that it is a successful drug for 100 percent of
the patients who took the drug.

MR. ECONOMIDES:  Yes.  But let's say, add to the
context, you're here as an investor and I'm telling you about
my COVID drug, and then you say, well, what do you have to say.

M76CcacO

Well, I'm doing my first phase 2 trial, I did guinea pig trials, now we're in humans.

THE COURT:  And you can say that in the Merck, in the Pfizer trials, this has worked well in that population.  What is false about that statement?

MR. ECONOMIDES:  Because I'm studying a materially different population.

THE COURT:  Well, again, we've come full circle.  What is the materially different population that you say that that comment is referring to when it's just in general saying this population?

MR. ECONOMIDES:  Higher cough count versus lower cough count.

THE COURT:  Where is that defined that way?

MR. ECONOMIDES:  What a reasonable investor's understanding right now in this context, what they're saying, to use the COVID example, let's say the Merck drug or the Pfizer drug worked on one string but not another — the science is clear, they didn't study one string and you're happening to be studying the other string and the investor comes and say what are you doing and I say, well, Pfizer works in this population.  So that's bolstering --

THE COURT:  That's not what happened here, the example, and I don't want to get bogged down on each first example, but the example you just gave doesn't say what you

just said it's supposed to mean.  It simply said -- read it to me one more time.  Read it again slowly.

MR. ECONOMIDES:  So the lead product here, probably that's the most advanced, is MK7264 --

THE COURT:  Okay.  Whose lead product is that?

MR. ECONOMIDES:  That's Merck.

THE COURT:  Merck's lead product.  So take away all the nonsense, the surplusage, they're saying that the lead product is the Merck product, that's what that first part says.  And then it says what about that product?

MR. ECONOMIDES:  That's currently in phase 3 trials for Merck, that drug works really, really well in this patient population.

THE COURT:  So that drug works well for whom?

MR. ECONOMIDES:  All we know is this patient population --

THE COURT:  If that's all we know, how do you say that that's a material misleading statement, unless you can tell me that they mean to mislead the public into thinking it's a different population than it actually is?

MR. ECONOMIDES:  So what I'll add, your Honor, is from the statement itself on its face just on paper, it doesn't add clarity there.

THE COURT:  So how is that materially misleading or a material misstatement or omission?

MR. ECONOMIDES:  Because BELLUS is telling you this fact at a conference to tout BELLUS's own trial.

THE COURT:  But you're not arguing that that fact, the way it's stated, is false.

MR. ECONOMIDES:  Well, I'll move on to another statement because I think your Honor is not --

THE COURT:  I don't want to get bogged down just on this one, but that's the example that you gave me.  My first focus is I want to figure out what the fraudulent statements were and in what way they were misleading because they were false, affirmatively false, or they were material omissions that they should have said.

Now, with regard to the example you just gave me, if it didn't work well in the population that they're discussing and they said it worked well, that's a material misstatement with regard to that statement.  If they were trying to fudge it and say it works well in this population, but what they really should have told the public is that, well, no, it only works well in a subset of that population, I understand the distinction, but I'm still trying to figure out why that would be a material misrepresentation such that it would have been reasonable for an investor to rely on this statement, as vague as it is, to make an investment decision.

MR. ECONOMIDES:  Fair enough, your Honor.  So this is a series of statements.  I'll go to the next specific one where

they constantly compare to the other drugs that showed efficacy. And they say, hey, those drugs show efficacy, it's clinically validated that this type of drug, whether a P2X3 antagonist, like a receptor, the drug, that receptor, it shows a decrease in cough. They keep saying that.

THE COURT: That's the Merck drug?

MR. ECONOMIDES: It's all of them. All of them are P2X3 receptors.

THE COURT: But are they talking about something other than the Merck drug in the Merck trials?

MR. ECONOMIDES: Right. So repeatedly, they say, why should you invest in us and believe in our trial in a lower risk of our trial showing efficacy. The reason is, investors, because Merck showed efficacy by doing the same thing that we're doing. We're doing the same thing. Shionogi showed a decrease in cough count by doing the same thing. So we think it works.

And I'll tell you the next one. They literally say, I think that there is, so there is no real issue on the efficacy side.

THE COURT: Again, that's out of context. I'm not sure what they're referring to.

MR. ECONOMIDES: I'll read more, your Honor. Again they're talking about the Merck study, but it gets specific. In this study, it was 57 percent from baseline, placebo

M76CcacO

adjusted were 37 percent.  In previous phase 2 trials, definitely see a consistent kind of 50- to 60-percent reduction in these patients.

THE COURT:  I didn't mean to cut you off, but I'm trying to focus on those statements about the Merck drug. That's public information, isn't it?  Whatever comments they're making about the Merck drug, any investor, they didn't have any additional information that they're relying upon nor are they representing they had additional information.  They're talking about the public results of the Merck study.

In what way is repeating that information that's already publicly available to the public, even if you say they've not accurately characterized that, how is that in some way their being aware of the information that the public doesn't have and is trying to keep certain information from the public?

MR. ECONOMIDES:  Because the public knows the Merck results.  You have 56 coughs per hour, those patients go down. The public doesn't know BELLUS's, the defendant's -- what's actually happening in their story.

THE COURT:  But what you just quoted to me says absolutely nothing about how the BELLUS study is being conducted.

MR. ECONOMIDES:  They suggest there is no real issue in the efficacy side.  We're not worried about --

THE COURT:  That doesn't tell me anything about the test results.  It doesn't represent what the test results are and it doesn't represent what the -- it's clearly, at that point, not a representation about the results of their study, and it's clearly not a representation about the current state of their study.

MR. ECONOMIDES:  So, your Honor, perhaps I picked examples that have those infirmities, so I'll give you this example, this statement.

So how does this study compare — this study meaning BELLUS's study — to other similar phase 2 studies of P2X3 antagonists performed by Merck and Shionogi.  Well, as you can see here --

THE COURT:  Slow down for the court reporter.

MR. ECONOMIDES:  Well, as you can see here, it's very similar to many of the other phase 2 trials that have been done, except the larger numbers.  That refers to more patients in the study.

THE COURT:  Okay.

MR. ECONOMIDES:  Other phase 2A trials have been very much in 20 to 30 patients whereas this is a total of 68.  The geographic region in terms of -- it's a little unclear with the way that they're speaking orally.  The geographic region in terms of being doing in the U.K. done in the U.K. and U.S. is very similar as is the baseline cough frequencies that we've

M76CcacO

seen in this study.  That's it.

THE COURT:  So what part of that is a false statement?

MR. ECONOMIDES:  This statement is, our baseline cough frequencies in our study is very similar to the baseline cough frequencies in Merck's and Shionogi's study.

THE COURT:  Similar or dissimilar how?

MR. ECONOMIDES:  When they're saying similar, that can only mean high — Higher is better, right? — baseline cough frequencies.

THE COURT:  Well, I'm not sure why that follows.

MR. ECONOMIDES:  Let me walk that back.  It's similar in terms of the similar range in coughs per hour, how many coughs per hour do our patients have.  I know that might seem innocuous now, but that's what actually happens, that investors believe that you don't have an efficacy problem.  Later, they suddenly reveal, you know what, we couldn't even show efficacy and then they say why, because our baseline cough rebuttal frequencies were so low, and that's realtime data they have as they're enrolling.  That means you enroll patients --

THE COURT:  That's not a specific factual representation with regard to the current state of the study.

MR. ECONOMIDES:  I respectfully disagree, your Honor.  They say the baseline cough frequencies are very similar.

THE COURT:  What is the nature of the fraud?  That's what I'm trying to understand.  What do you contend, in what

M76CcacO

way and what did they say that was misleading to the public and for what purpose?

MR. ECONOMIDES:  So they keep saying that we're so similar to these other studies --

THE COURT:  They are similar to those other studies. They're not exactly the same as those other studies, but you can't argue with the fact that they're both testing the same drug for the same issue.

MR. ECONOMIDES:  Yes, but they do more than that. They say we're so similar in material respects --

THE COURT:  That's your characterization, that's not what it says.  That's not what they said.  They didn't say it's so similar in material respects.  That's your language, that's not their language.  They said the studies are similar.

MR. ECONOMIDES:  They said the studies are similar with baseline cough frequency.

THE COURT:  Where does it say they had the same baseline cough frequency?

MR. ECONOMIDES:  That's what they said, is very similar -- their geographic region is very similar as is the baseline cough frequencies that we've seen in this study.

THE COURT:  Okay.  And you say they're not similar.

MR. ECONOMIDES:  Correct.

THE COURT:  And you say they're not similar because of what?

M76CcacO

MR. ECONOMIDES:  Because the baseline cough frequencies in Merck's study were materially higher, 56 coughs per hour, and then in this study they were 25 coughs per hour.

THE COURT:  Does that make it not similar, in your view?

MR. ECONOMIDES:  Yes.

THE COURT:  Materially, is there someplace where they make a specific representation about the level of baseline with regard to either Merck or their product?

MR. ECONOMIDES:  At the end, they say our study failed --

THE COURT:  Well, that's the end.  The end is not --

MR. ECONOMIDES:  Well, because of the baseline cough frequency.

THE COURT:  You don't claim that that's the false misrepresentation.

MR. ECONOMIDES:  That's the revelation.

THE COURT:  Right.  You're saying that that's the corrective disclosure.  But what you say they're falsely representing is that the baseline?  I want to make sure I have the phrase right.

MR. ECONOMIDES:  Baseline cough frequency.

THE COURT:  The baseline cough frequency is similar. You're saying that that's what they're trying to say?

MR. ECONOMIDES:  Yes.

THE COURT:  And you say similar must mean what?

MR. ECONOMIDES:  Not materially different.  Not so different that one study fails because of the baseline cough frequency and one succeeds.

THE COURT:  What allegation or evidence is there that it failed for that reason?

MR. ECONOMIDES:  Their own admission.  That's why, the revelation.  They say -- one moment, your Honor.  They say we didn't meet our endpoints statistically except for a smaller group of higher cough frequency patients.  So that's the reason they gave for failure.

THE COURT:  So what's the inference of fraud here?  In what way do those kinds of general representations accomplish some kind of fraud on the purchaser or the shareholder?

MR. ECONOMIDES:  The shareholders believe there is lower risks.  And the analysts say this, there is lower risk here with this drug after showing efficacy than we would normally have.

THE COURT:  There is lower --

MR. ECONOMIDES:  Lower risk in showing efficacy and showing that the drug is actually working to lower cough counts.  Why is there low risk, because defendants keep telling us, they highlight similarities of other studies.

THE COURT:  But why would it be reasonable for an investor to rely on a study that is ongoing to invest in the

stock rather than rely on the study's result?

MR. ECONOMIDES:  I don't know why people make their investment decisions, but in the end, if they are --

THE COURT:  Well, they make their investment decisions that way.  If it looks like you found a cure for cancer, I'm going to buy the cancer drug.  If it looks like you got a new drug called Viagra and it works, I'm going to buy the Viagra drug.  Just because you say you're in a trial of Viagra or cancer, I'm not sure that it's a reasonable reliance for me to say, oh, they're trying out this new drug, so I'm going to buy it and I'm going to buy stock in this company, and when I find out that their study didn't work, then I am going to claim that they misled me how?

MR. ECONOMIDES:  Understood, your Honor.  So people have different risk tolerances.  It's much less risky.

THE COURT:  No, we're talking about a reasonable risk tolerance.  We're not talking about an eggshell skull over here, we're talking about reasonable investors and whether or not there is reasonable reliance with regard to material misrepresentations or omissions.

MR. ECONOMIDES:  Yes, your Honor.  So reasonable investors, there is, I think, a range, within reasonableness, a range of risk tolerance.  Fidelity has high-risk, low-risk 401K rates.

THE COURT:  But that's not the way you analyze whether

M76CcacO

or not there is a securities fraud claim.

MR. ECONOMIDES:  Understood, your Honor.  So the point is, if I want to invest in a drug company during its trials, yes, I'm incurring risk, and that's the industry.  They need those investors.  It happens all the time.  Drugs won't get developed absent this money coming in and people saying high risk, high reward, sophisticated investors.  The point is that defendants cannot misrepresent or mislead about what they're saying about what's going on with the trial.  That changes the risk.

THE COURT:  So tell me specifically, I want to take it in two phases because I'm not sure one is your argument.  I want you to tell me specifically what they said that wasn't true and then tell me if that's your claim, and then tell me if that's not your claim, what they failed to say that you claim they should have said.  Do you understand what I'm saying?

MR. ECONOMIDES:  Yes.

THE COURT:  So what material misrepresentation do you say that they made as opposed to material omission?

MR. ECONOMIDES:  So first, material misrepresentation is, one, saying that the baseline cough frequencies they've seen in the other phase 2 trials are -- their quotes are very similar to the baseline cough frequencies --

THE COURT:  How do you independently prove that to be false?  How is the baseline not similar?  It may not be as

similar as you want it to be, but how is it not similar when they're doing the same test on the same drugs of the same kinds of patients?

MR. ECONOMIDES:  Well, it is plausible that a reasonable investor would view 25 coughs per hour to be not very similar to 56 coughs per hour.

THE COURT:  That's not the issue.  The issue is, when I said it was similar, whether or not I'm making a false statement because, in your view, it's not as similar as it should be.  You're not claiming that these studies aren't similar, right?  You're not claiming there is no definition of similar that could be applied to these two different trials.  Of course they're similar in a lot of ways.

MR. ECONOMIDES:  Yes.

THE COURT:  So that's not your argument.  Your argument is not that, well, we're saying the false statement itself, the false factual statement is that they claim that that other trial is similar to the trial that they're conducting.  Well, it is similar, it's not the same.  That's the difference between the same and similar, right?

MR. ECONOMIDES:  They said the baseline cough frequencies were similar.  So it's like saying the engine is similar on a Honda Accord and a Lamborghini, sure.  But, in some contexts, if I'm telling you to buy the Honda Accord, at some point, something is so dissimilar that a reasonable

M76CcacO

investor might find it false, and that's the standard.

THE COURT:  At the time that statement was made, why would a reasonable investor have made a different investment decision based on whether or not you said your trial was similar to the Merck trial?

MR. ECONOMIDES:  So if I'm just investing in BELLUS and I don't know anything about competitors, I go into the meeting, I'm listening to what they're saying, go to the conference, I go to my hedge fund, I'm like, look, high risk, maybe they meet it, maybe they don't.

THE COURT:  High risk is the critical part.

MR. ECONOMIDES:  Billions of dollars, they either meet it or they don't.  Now, what really happens is I call and they say what do we know.  They say, actually, we know that there has been three other studies and it works.  But this study, how similar is it, is it the exact same study.

THE COURT:  That's a good point.  How similar is it? They did not represent how similar it was.  You want to represent what similar is supposed to be.

MR. ECONOMIDES:  With baseline.

THE COURT:  They don't say how similar the baseline was.

MR. ECONOMIDES:  Correct, they did not.  It rises to it's so different.  I mean, 56 to 25, it's not just minus 36, it's a 60-percent reduction, 60-percent reduction in the key

M76CcacO

symptom, that affects the trial.

THE COURT:  But with regard to that specific information, no one made any representation about those numbers that you're claiming was false.

MR. ECONOMIDES:  No.  But to your point, your Honor, the 56 was public.  They know, defendants know.  The investors don't know the comparison, what's BELLUS's number.  All they know is, hey, what's your number, oh, it's similar to 56.

THE COURT:  No, that's not what it says because they don't say the number is similar.  Again, that's not what was represented.  The quotes that you cited to me say nothing about the numbers.

MR. ECONOMIDES:  Correct, but as you said, it was public.  I'll rephrase it.  It's similar to the publicly known numbers of Merck.

THE COURT:  No, it doesn't say that.  They don't say it's similar to the publicly known numbers.  It doesn't say anything about the numbers.  If there is some other portion of that statement, they make some representation about their numbers and Merck's numbers, then quote it to me.  The way you characterize it, it may be a reasonable characterization about what one might take from what was said, but what you quoted to me makes absolutely no representation comparing those numbers.

MR. ECONOMIDES:  It deems them similar.

THE COURT:  Deems what similar?  It deems the studies

SOUTHERN DISTRICT REPORTERS, P.C.··············
(212) 805-0300

M76CcacO

similar, it doesn't deem the 54 number similar to the 25 number.

MR. ECONOMIDES:  They say baseline cough frequency. They say the baseline cough frequencies are similar.

THE COURT:  So what's the baseline cough frequency?

MR. ECONOMIDES:  56 in Merck, that's public, and then what we don't know at this time as an investor is BELLUS's, but it ends up being 25.

THE COURT:  In your estimation, what would be similar? If it was 40 and 50?  If it was 28 and 50?  I'm not sure.

MR. ECONOMIDES:  I think that's a jury question.

THE COURT:  Well, it's not a jury question, it's a question of what's the material misrepresentation.  If I say, oh, you're a handsome lawyer, you can't come back to me and say, well, how handsome.  If somebody wants to invest in your firm because I said that, I'm trying to figure out, well, wait a minute, I didn't say anything more specific than that.  Why is that reasonable for you to plop all your money down, particularly in this case, when both Merck and the company are involved in trials?  What seems to be dependent on your argument is that they knew or should have known that their trial was going to fail at that point.

MR. ECONOMIDES:  No, just that they knew or should have known that the average patient was at 25.

THE COURT:  Wait a minute.  But that's not the

material fact that the public is interested in.  The public is interested in the likelihood that the trial will be successful or the likelihood that the trial will fail.

MR. ECONOMIDES:  The likelihood goes up and down with more information.  When they say it's very similar, okay, maybe it's not a 10-percent chance of success, it's more like a 50-percent.  You're changing the metrics.  If I go as an investor, if you go to the roulette table -- are you familiar with roulette so I can give you the example?

THE COURT:  Right.

MR. ECONOMIDES:  I know the rules.  I know if I bet on black, it's about 49 percent because is there the, you know, half are black except for the green zero.  But now, it's not that I'm defraud -- now let's say they change the green and it was bigger so it's a more chance that it hits the zero or there is another zero and they lied to me about it.  It doesn't matter that I ultimately lose, it's that I bet with a 49-percent chance when I really only had a 30-percent chance.  That's a fraud on me to induce me to invest my money in that gain by misleading about the risks.

THE COURT:  But in this case, what is the evidence that indicates that they were somehow trying to hide this number?

MR. ECONOMIDES:  Well, how do they make the comparison.  I'm sitting at a conference, I'm announcing, I'm

M76CcacO

talking about the trials to the investors, and they say, well, what are the comparisons between -- oh, we have baseline cough severities that are similar, we have geographic regions that are similar.

THE COURT:  I know, but nobody asked what are your numbers and they gave them a false representation as to the number.

MR. ECONOMIDES:  Correct.  And the veracity of the statement is measured not by its literal truth, but its ability to accurately inform rather than --

THE COURT:  I know, but that's why you have to be careful about facts as opposed to adjectives.  Here you're saying that they falsely misled the public by saying their trial was similar to the Merck trial.  You're saying then what follows is that it would have been a truthful statement instead of a false statement if they said that their trial was dissimilar to Merck.

MR. ECONOMIDES:  With baseline cough frequencies, yes, that's the true statement.  The true statement is we have a lot of similarities, geographic region, we have more patients than they did.  They showed efficacy, we have the same active ingredient, like a P2X3 antagonist, but when baseline cough frequencies were lower or dissimilar and no one showed it yet, but we think it will work.

THE COURT:  So what's the motive --

MR. ECONOMIDES:  That would have been okay.

THE COURT:  What's the motive for trying to, I'll characterize it as that awkward way to try to mislead the public?

MR. ECONOMIDES:  Sure, your Honor.  There are numerous indicia of scienter.  First, scienter is about the holistic context here.  We're not talking about Apple and Tim Cook says something about one licensing agreement with one song out of billions of dollars and revenue and then you need these doctrines to know if he would have really known or one of his 100,000 employees did.  It's not what we have here.  We have 12 employees, we have a company that's doing one thing, one thing only.  This is all in the prospectus, by the way, in the record, exhibit 3 in their motion to dismiss.  12 employees, one drug company, they're doing BLU-5937 biometrics.  That's all they're doing.

They literally state that the company might not -- we may not be able to maintain our operations in research and development without additional funding and we may not have access to sufficient capital.  This is an existential threat, the success of this.  So you have 12 people, their entire job is to do this study or to commercialize this drug and right now what they're doing is a phase 2.  If they don't get more money, there is nothing they can do, and this is all they're talking about, all they're thinking about.  All their statements are

about the drug and about comparisons to other drugs.

So from there, what's the reasonable inference that they had no idea about material components of the patients enrolled.

THE COURT:  Well, the reasonable inference would be if you demonstrated that somehow they personally gained by misleading by giving the public different information, false information than what they have -- your only theory is that during the trial period, they compared themselves to the Merck study in order to infuse more money temporarily into the Merck study that you claim that they know ultimately is going to be disastrous for the firm.

MR. ECONOMIDES:  No, your Honor, I do not think they knew it was going to fail.

THE COURT:  Isn't that what the public is really interested in?

MR. ECONOMIDES:  I think no one knows whether a study is going to succeed or fail.  I agree that people aren't going to purposefully, at all times, administer a study that they know will fail.  Maybe in the middle they need money and they're going to lie about it to keep going, but here, what I'm saying is they misrepresented the risks in real time --

THE COURT:  What are the risks are you saying they misrepresented other than the baseline cough frequency?

MR. ECONOMIDES:  That's it.  But it's not a random --

THE COURT:  That's it, right.

MR. ECONOMIDES:  But it's not a random thing --

THE COURT:  Is there any place that they make any representation that is false regarding the baseline cough frequency, other than this similar conduct?

MR. ECONOMIDES:  Yes, your Honor.  One more. Including the relief study, which is their study, more recently -- I'll start again.

Including the relief study, more recently, studies have also -- have been also using a cough frequency cutoff.  So I think it's fair to assume the patients included in these studies are at the more severe end.

THE COURT:  Again, what does that mean?

MR. ECONOMIDES:  They're saying that our cough frequency patients are at the more severe end in our study.

THE COURT:  Read that again.  I'm not sure where I get that interpretation.

MR. ECONOMIDES:  Including our study, more recently, studies have been also using a cough frequency cutoff.

And so I think it's fair to assume --

THE COURT:  What's the cough frequency cutoff?  What are they representing about the cough frequency cutoff?

MR. ECONOMIDES:  The next part is the false part. I'll read that part again.  I think it's fair to assume that the patients included in these studies are at the more severe

M76CcacO

end.  I can explain this.  You have inclusion criteria for your trial, right, people sign up and you can't just have someone that doesn't cough or someone that doesn't have cancer for the cancer trial.  You need criteria, how long have you been coughing, how severe is it, how many coughs per hour.  The other studies didn't have a minimum cough per hour as a requirement to be in it.

THE COURT:  But this doesn't say they had a minimum cough per hour.

MR. ECONOMIDES:  They said they did.

THE COURT:  Where does it say they had a minimum cough per hour?

MR. ECONOMIDES:  A cough frequency cutoff.  That's what they mean.

THE COURT:  So what are they representing about the cough frequency cutoff?

MR. ECONOMIDES:  It was ten coughs per hour.

THE COURT:  How is that misleading and fraudulent?

MR. ECONOMIDES:  It's not that part.  That's just the context.

THE COURT:  Okay.

MR. ECONOMIDES:  They say I think it's fair to assume the patients included in these studies are at the more severe end for cough frequency.

THE COURT:  Included in whose studies?  When you say

SOUTHERN DISTRICT REPORTERS, P.C.•••••••••••••
(212) 805-0300

M76CcacO

these studies, their studies, everyone's studies, Merck's studies?  What does that represent?

MR. ECONOMIDES:  Fair enough, your Honor.  It's a bit ambiguous the way they say it, but they're talking about their own study.

THE COURT:  It's the ambiguity that I'm concerned about.  That's why I'm trying to focus on it.  You're not here saying, aha, gotcha.  You're not showing me the smoking gun, you're showing me the statements that you argue that if one reasonably interpreted to mean X, that they're withholding information.

MR. ECONOMIDES:  Yes, your Honor.  So to make it simple, I'll concede that if you're looking for a metric, hey, we have average of 50 coughs per hour, but it was really 25, we don't have that.  What we have are, hey, we have similar to people that have 56, but it was really 25.  We have people with higher coughs, that's what they're saying here in context, that the --

THE COURT:  Higher coughs than what?

MR. ECONOMIDES:  Than the earlier studies.

THE COURT:  Which studies?

MR. ECONOMIDES:  Merck's or Shionogi's.

THE COURT:  And you say that --

MR. ECONOMIDES:  They don't.  They say it's more severe.  It's another adjective.

THE COURT:  You're saying it's false, that they don't have people who have more severe coughs than some of the people in the other studies?

MR. ECONOMIDES:  No, it would be -- I don't know about every individual and whether one person was at 60, but we --

THE COURT:  What are you saying that you're representing by making this comment?  You're not saying that they're representing that every single person falls into that category.

MR. ECONOMIDES:  No, they're saying that, in general, our study -- I'm talking about averages then.  Our study has people more severe than other studies.

THE COURT:  Has some people more severe?

MR. ECONOMIDES:  The average.  The average would be more severe.

THE COURT:  When you say the average, did anybody use the word average?

MR. ECONOMIDES:  No, your Honor, but it's the context about how they speak about trials.  They always come out with the average cough count, then there is a breakdown of lots of other data.

THE COURT:  The thing is, the issues that I'm having is that those inferences that you're saying should be drawn with regard to the statements are reasonable inferences to be drawn if it is accompanied by scienter.  I'm not quite sure

M76CcacO

where -- the most you say about the scienter is that they just wanted to infuse more money into the trials while they were going on, and so they made it sound like their studies were conducted in a manner that was better than they were being conducted.

But I still don't know how you keep avoiding the ultimate issue, whether or not it was giving an indication that the trial is likely to be successful and that they knew that the information they had meant that the trials weren't likely to be successful so that they knew that any reasonable investor would not invest in this company if they knew the true facts.

MR. ECONOMIDES:  And so at the pleading stage, it's plausible whether a reasonable investor would say, this affected me.  I wanted to know -- I wanted to know what your real comparisons were to the other trials, and when you keep telling me that's a clinically validated target, that there is no real issue on the efficacy side and they're talking about the other trials, but there is no reason to talk about them unless you're talking about the risks of your trial, and everyone was stunned.  Are you kidding me?  There is no efficacy here?  You're kept saying that the real issue was whether we were going to successfully eliminate these side effects.  And I don't know if anyone went over the facts, but the previous trials worked in reducing cough by the same kind of active ingredient, but they also had taste loss and then

M76CcacO

BELLUS is saying we can do it without the taste loss.  But the real question to investors is are you really going to do it without the taste loss or are you going to be the same as them and -- and then everyone was stunned because they couldn't even reduce cough.

THE COURT:  Those are reasonable arguments, but they're based on facts and representations that you don't specifically have.  You don't say they made a false representation about taste or whatever you just referenced.  Those specific representations were not made.

MR. ECONOMIDES:  I think they're misleading in context.  They omit that when you say they're similar with cough frequencies, we define similar as anything, right --

THE COURT:  Well, that's the point.

MR. ECONOMIDES:  As the Lamborghini engine and the Honda engine, they're both car engines.

THE COURT:  Right.  If you ask me is a Lamborghini similar to a Volkswagen, I might say yes.  That would make it false.

MR. ECONOMIDES:  It depends on the context.

THE COURT:  Exactly.

MR. ECONOMIDES:  In the context here, if you're trying to sell me the Volkswagen for speed, then we're talking false. The person comes in, doesn't know anything about cars, I just want to go fast.

M76CcacO

THE COURT:  No, not unless I know that's what I'm interested in and you specifically ask me is a Volkswagen faster than a Lamborghini, then I say yes, then that would be a false statement, I would understand that.  If you say is a Volkswagen faster than a Lamborghini, I say no, but they're similar, I'm not sure maybe you reached that threshold of I made a materially false misrepresentation.

MR. ECONOMIDES:  Let's say you want to buy the car, you don't know anything, and you're like, I want to know, is this thing fast, how does it handle, I say it's similar to a Lamborghini.

THE COURT:  I would say yes, it's similar, but they're not the same.  Is that a false statement?

MR. ECONOMIDES:  It's a misleading statement if I'm asking how they handle and how fast they are.

THE COURT:  Why?  What did I represent about the Volkswagen that was false?  If the Volkswagen can go 100 miles an hour and the Lamborghini can go 150 miles an hour, why is my saying that they're both fast, why is that a material misrepresentation that you followed up with and how fast is that?  The next thing out of my mouth might be a material misrepresentation if I say, well, the Volkswagen can go just as fast as the Lamborghini, but for me to say, well, look, if you're on the highway, you know, Volkswagen can go similar speed as a Lamborghini, I'm not sure why that's necessarily a

M76CcacO

false statement about the speed of the Volkswagen or the speed of a Lamborghini.

MR. ECONOMIDES:  Maybe at a bench trial, a jury trial, people would ultimately conclude that.  But the question is, is it plausible that would an investor, in the hypo or in reality, would feel they didn't get full information.  So again, I think we're off literal falsity.  Yes, you can say the Lamborghini and the Honda Accord are similar, but we're talking about when I'm saying tell me car A, car B, I don't know the Lamborghini. I want a fast car, I want good breaking speed, I want flash --

THE COURT:  They both go fast.

MR. ECONOMIDES:  -- could a reasonable investor, could a jury say, no, someone investing in car A or car B could feel misled legitimately.

THE COURT:  No, I don't think a reasonable jury could say that under those facts.  I think a reasonable jury would say, wait a minute, if you believe that what was most important to you is the exact speed that the Lamborghini could go compared to the exact speed that a Volkswagen can go, then that's the inquiry you should have made.  For someone to say that they travel at similar speeds on the highway is not a statement for you to say, okay, I'm going to buy the Volkswagen because the Volkswagen can go just as fast as the Lamborghini. That's not a reasonable conclusion to reach.

MR. ECONOMIDES:  Your Honor, I respectfully disagree

M76CcacO

about how the law works here.  There is not a duty to keep asking questions, there is a duty for the speaker to not mislead.

THE COURT:  I agree.  When I say put in the context of asking questions, that's because I'm trying to figure out what is the material information that the investor can reasonably glean.  And the investor, when you say the studies are similar, your whole case seems to be dependent on defining similar to be the cough frequency.

MR. ECONOMIDES:  They say the cough frequency is similar.  They also say our studies are the more severe end in terms of baseline cough.

THE COURT:  And you say it's not the more severe end?

MR. ECONOMIDES:  Not at all.  It's at the less severe end.

THE COURT:  Less severe than what?

MR. ECONOMIDES:  Than the previous studies.  They're saying when you look at the studies on these types of drugs, our cough frequency baseline is at the more severe end.  Nope, it's the least severe end of all of them.

Going back to the Honda Accord --

THE COURT:  But the cough frequency varies, doesn't it?

MR. ECONOMIDES:  The average, the average cough varies.  So at the end, 25, it's the least severe.

THE COURT: So you're saying they made a false representation that their cough frequency was more severe than the cough frequency of the Merck patients, and that was a false statement?

MR. ECONOMIDES: Yes, your Honor.

And then drawing from there, you have more statements, about -- of course, if look in the complaint, it's clear they keep making these comparisons. Some are more of the omission now. Efficacy is shown, it works well, we know it works well, efficacy is a nonissue. That's the difference in meaning whether it's effective in reducing cough. They keep saying that about their study by comparing to the others. In the end, that's not true. Efficacy was a real big issue. The reason it was an issue was because of these baseline cough frequencies, they said more severe, less severe.

Going back to the car example, which perhaps isn't going so well for me. In the end, we have that exchange, I invest in car A instead of car B, you need it for a race, I lose the race and then I literally say -- or you tell me you lost the race because you didn't get car B.

THE COURT: Only if I should have known that the speed of the car was going to be important to you.

MR. ECONOMIDES: You were talking about it to me. Why were you talking about it to me, right, as the seller, as the company, you're talking to me about baseline.

M76CcacO

THE COURT:  But I'm not telling you that you can win a race with the Volkswagen.

MR. ECONOMIDES:  You're telling me there is less risk of losing the race.  You're saying that's the only reason --

THE COURT:  See, that sounds like a reasonable argument, except that that's not the conversation that occurred.  It's not the statements that were made.

MR. ECONOMIDES:  It's hard to convey now, but reading -- those, I picked out statements that are closest to literal thoughts, the rest are the omissions where they keep comparing, keep comparing, keep comparing, and in the end, the comparisons misled the investors.  A reasonable investor, they did feel misled.

THE COURT:  Other than the cough frequency, in what way did they compare their study to other studies that you say was false?

MR. ECONOMIDES:  It's more misleading.  I would use the term misleading by omission.  They say -- they talk about the active ingredients.  This hypothesis has been validated in a recent clinical trial with a more selective antagonist of P2X3.

THE COURT:  That's false?

MR. ECONOMIDES:  P2X3 is a clinically validated part of it with multiple positive beta 2 trials.  It's not literally false.  It's misleading in context.

M76CcacO

THE COURT:  What is it misleading the investor to believe?

MR. ECONOMIDES:  Believe that as long as you have a P2X3 antagonist like this active ingredient, that there is no data showing it won't work, that all the data shows that it works.

THE COURT:  And what part of that language?

MR. ECONOMIDES:  That it works with high cough frequency patients.

THE COURT:  That's true.

MR. ECONOMIDES:  It omits that it doesn't -- that's only been shown to work with high cough frequency patients.  It has not been shown to work with low cough frequency patients, and right now, I'm actually showing low cough frequency patients.

THE COURT:  Doesn't it depend on what the question was or what the context was?

MR. ECONOMIDES:  The context is, hey, investors, let me tell you about my study so you invest in my company, and then let me tell you why the risk is lower than what it might normally be because look at all these other studies that validated exactly what we're doing here.  And I'm saying, add something to that, that's it, add something.  The other companies validated it with respect to high cough frequency patients, we haven't enrolled those patients, we're lower, but

M76CcacO

we still have hope it will work, we don't know, and you're still taking a risk.

THE COURT:  We're going to have to end in a second.

What successful claim or at least a claim that's gotten by a 12(b) motion, and what case can you cite in which the court said that the representations made about the ongoing trial that's not yet complete, yet that is sufficient to state a securities fraud claim?

MR. ECONOMIDES:  Your Honor, *Micholle v. Ophthotech Corp.*, 2019 WL 4464802.

THE COURT:  Where is that case?

MR. ECONOMIDES:  Southern District of New York, the decision was September 17th, 2019.

THE COURT:  By whom?

MR. ECONOMIDES:  I believe it was Judge Broderick. And perhaps that's my memory, but maybe you can confirm.

There, this is what happened, they did a phase 2 trial and they did a phase 3 trial.  They said, quote, we have modified the methodology used to determine the patient's eligibility under certain of the inclusion and exclusion criteria for our phase 3 clinical trials as compared to our phase 2B clinical trials.  They said it, they said exclusively, we changed it, it's going to be different, who we include.

THE COURT:  And that was false?

MR. ECONOMIDES:  No, the Court said that's fine.  Then

the next statement was false.  We have made no meaningful changes to the inclusion and exclusion criteria in these phase 3 clinical trials from those we used in our phase 2B clinical trial.  We expect this will result in the enrollment of the patient population similar to the patient population enrolled in our phase 2B clinical trial.  They said that, that's it.  The meaning was lost.

Even says, stop there, we changed the criteria, we disclosed it.  The defendants argue, truth on the market, that we disclosed the exchange.  And then they said, you know what, a reasonable investor, when you say it's not meaningful and it was a meaningful change, and it was meaningful arguably, but you could have a back and forth where an investor might say, well, maybe it's meaningful, maybe it's not, they changed this, they didn't change that.  But the court said that mislead because reasonable investors found that to be that you're not changing it and you were, and then a jury can decide ultimately whether it was meaningful, it wasn't, whether even, regardless, investors feel misled.

We're squarely within that.  And they were distinguished from all the cases that they cite because those cases are saying we don't like the way you presented your data, we don't want to use post hock analysis.  We don't agree that this thing is a biomarker for cancer reduction.  These are all examples from the case.  We're not disagreeing with the

M76CcacO

science, we're disagreeing about what you said bout your study, the baseline cough frequencies.

Just one more point, your Honor, on scienter. Again, this context. 12 people doing this, is it reasonable to infer it was reckless and not know the baseline severity scores or reckless to say the severe stuff in these similarities, that it's a reasonable inference? The jury will decide ultimately if it's enough. But if you have 12 people doing one thing and the company depends on it, it's reckless to talk about these things and not know what you're talking about. I mean, these are scientists, these are people that are talking about data, data is the key. And they even say --

THE COURT: It doesn't create a securities fraud claim to talk about stuff that you don't know what you're talking about. That's not the definition of a securities fraud.

MR. ECONOMIDES: No, but that's a component of a successful claim when coupled with you misled people, the stock went up, then you disclosed the truth, the stock drastically goes down, we look at what you said before --

THE COURT: But that's not your claim. Your claim is not that they talked about stuff that they didn't know what they were talking about, your claim is that they talked about stuff they knew exactly what they were talking about and they either misled the public or withheld certain information because they didn't want the public to know.

M76CcacO

MR. ECONOMIDES:  Yes, your Honor, but there is two components.  For scienter, we succeed with recklessness, meaning they didn't have that actual knowledge or with actual knowledge.  I can't note --

THE COURT:  You can have alternative theories, but not alternative facts.  You don't allege that they didn't know, you allege that they did know.

MR. ECONOMIDES:  We allege that they knew, but we do alternatively, as in the pleading, if they didn't know, it would be reckless.  It would be reckless and it's nonsense.

THE COURT:  All right.  I'd have to analyze that on each of those bases that you discussed.

MR. ECONOMIDES:  Just one quote, your Honor, from the prospectus.  This is about scienter.  They tell the public it's our responsibility to know these things.  Again, we're inferring.  I don't have the discovery, I can't do a smoking gun email --

THE COURT:  Sometimes you can.  In this case, you can.

MR. ECONOMIDES:  The discovery stayed, PSLRA, we're not allowed --

THE COURT:  But you know what was out there and you know what the studies ultimately determined and you have a lot of information about what was going on at the time when they were making these representations.  If you have something that specifically points to scienter, you should be at this point

able to say, look, when they said X about their trial, we know now that now we have all the trial results that that was not true.

MR. ECONOMIDES:  Yes, that is the case.  It was not on the more severe end based on baseline cough frequency.

The quote I want to read from the prospectus is they take the responsibility for knowing these things.  We rely on third parties to conduct our trials, but they are not our employees, and we are responsible for ensuring that each of these clinical trials is conducted in accordance --

THE COURT:  Slow down.

MR. ECONOMIDES:  I'm sorry.  -- and our reliance on these third parties through research and development activities will reduce our control over these activities, but will not relieve us of our responsibilities.

THE COURT:  Let me give you 60 seconds to tell me what it is you say was Dr. Smith's roll.

MR. ECONOMIDES:  Dr. Smith made these statements.  Dr. Smith, I don't see a material distinction between incentives.  I don't think she was doing this altruistically.  They're all in the same boat.  If this company goes under, everyone was not getting what they were getting.

THE COURT:  She's got to be responsible for the misleading statements.  What misleading statements are you saying she's responsible?

M76CcacO

MR. ECONOMIDES:  They're delineated, paragraph 167 of our complaint, is Smith.  She's makes a statement, it's very similar to other trials and the baseline cough frequency is very similar.

THE COURT:  She repeated that same line.

MR. ECONOMIDES:  She's the one who said that line actually.  She also said the line of the more severe ends. That's Dr. Smith, as well.

The procedural issue, your Honor, I think they're nonissues.  He purchased in the U.S., that's a real fact, he purchased in Canada, as well, but he purchased in the U.S.

THE COURT:  Thank you.  If you have something quick we can do, otherwise I have to let my court reporter go.

MR. DeVOE:  Your Honor, yes, I'm mindful of the time, but a few things I think quickly that need to be addressed from that argument.

One, as I understand counsel for plaintiff's response to your Honor's colloquy of the things that was omitted, counsel said that's it as the baseline cough frequency for the relief study.  If that's the only thing that's omitted, that fact did not exist prior to the enrollment of the study completing, which occurred in March of 2020.  That means every statement plaintiff alleged in his complaint is out of the case because that fact was not in existence because the study had not finished enrollment.  So you could not calculate the mean,

M76CcacO

the median, the average, anything about the study population before that date.  That knocks the Securities Act claim out of the case, as well, because the only allegations about the Securities Act claim are the prospectus, which were filed in September of 2019.

Secondly, on scienter, every statement that plaintiff's counsel made in his colloquy with your Honor today occurred fairly late in our class time period and there is no allegation that the company raised any money during that time period, during the time of the statement that happened only with the prospectus, there is no allegation that any of the defendants sold any shares of the company during that time.  So any motive allegation plaintiff has barely attempted to raise doesn't apply to the statements that counsel for plaintiffs was discussing with your Honor today.

The statement that counsel discussed the most with your Honor was this one colloquy about the dissimilar statement, and that's in paragraph 167 of the amended complaint.  If plaintiff wants to say the next statement is a misstatement, he actually needs to file a fourth complaint in this action because both the amended complaint and the proposed second amended complaint very clearly state, we've only bolded and underlined the statements that we've alleged to be misleading, and that statement is not bolded or italicized. You can look at it, paragraph 167 in the amended complaint,

it's not bolded or italicized.  There is no briefing on that specific statement because plaintiff has never alleged that it was misleading until today during argument.

Finally, counsel was talking about "at the more severe end" quote, it's from the same paragraph in the amended complaint.  I believe he misstated what's said in that quote. That quote says, including the relief study, more studies and also using a cough frequency cutoff, so I think it's fair to assume that patients included in these studies are at the more severe end, period.

In the paragraph prior to that discussion, it was Dr. Smith who was discussing this, but was discussing not just cough frequency, but cough severity, which is a separate score in criteria that BELLUS used, that was used in this trial and not used in other trials.  And also the fact that any patient in BELLUS's trial had had this cough for at least a year.  And so there are at least three independent factors, some of them different and more severe than the ones in prior trials.

So it is not a representation, it is not a statement about the specific cough frequency.  I think that issue applies generally in this case where if you look at the very specific allegations and misrepresentations, as the Court was trying to do today, they're just not there.  Defendants didn't make a representation that the trial wouldn't succeed or that the trial was definitely going to succeed or that the cough

M76CcacO

frequency or any other statistic would come in at a certain number.  That's not in the specific allegations.  And for those and the other reasons we discussed today, this claim just does not work.

THE COURT:  I'm going to have to let my court reporter go.

MS. KASTURI:  Your Honor, very briefly.

THE COURT:  Yes.

MS. KASTURI:  I want to point you to one case which I think entirely addresses everything that plaintiff argued.  You asked him to define what the term "similar" means in his world, whether it would mean 37 coughs per hour versus 56 coughs per hour.  You asked him what would be similar and he couldn't answer the question, and that's because the term "similar" is undefined and plaintiff can point to nothing that would suggest that even if we assume that Dr. Smith knew that the average cough frequency at the trial was 25 coughs per hour at the time she made the statement, plaintiff pointed to nothing to suggest that it was inaccurate to say the average cough frequency were similar to other trials.  He cherrypicks by pointing to the fact that one Merck trial had an average of 56 coughs per hour. He failed to mentioned that the very next Merck phase 2 trial had a cough frequency of 40 coughs per hour.

And the case that I just want to direct you to, and I won't go through all the facts of it because I believe

M76CcacO

Mr. DeVoe already addressed that is *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022). In that case, the word at issue was "strong" and whether or not the defendants had used a strong expression level of a certain protein. The court said, you know what, plaintiff hasn't pointed to any fact suggesting that there was an industry consensus that "strong" meant a very specific level, and that, therefore, statements were not misleading in that regard.

THE COURT: Thank you. I'm going to look at both amended complaints. I will wait to get a reply.

MR. ECONOMIDES: We do intend to, your Honor. Believe the deadline is Friday.

THE COURT: This is helpful. Thank you very much.

* * *